**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)**

|  |  |  |
|---|---|---|
| **GLOBAL POLICY PARTNERS, LLC,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | **Civil Action No. 1:09-cv-859 TSE/TRJ** |
| **vs.** | ) | |
| | ) | |
| **BRENT YESSIN,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<u>**PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

Plaintiffs Global Policy Partners, LLC ("GPP") and Katherine Friess ("Ms. Friess") (collectively, "Plaintiffs"), by and through their undersigned counsel of record, respectfully submit this Opposition to Defendant Brent Yessin's ("Defendant" or "Mr. Yessin") Motion for Partial Summary Judgment ("Motion").

<u>**INTRODUCTION**</u>

In his Motion, Defendant once again maintains that this lawsuit is nothing more than a marital spat between him and Ms. Friess, and insists that neither Ms. Friess nor GPP were harmed by his admitted, repeated access to their email accounts. He is mistaken. Defendant has admitted that he accessed at least five of Plaintiffs' email accounts, including the primary account for almost two years. Defendant has admitted that he accessed and copied privileged emails relating to Ms. Friess' divorce and settlement strategy and shared these privileged communications with another attorney who was providing legal advice regarding his contested divorce with Ms. Friess. After Ms. Friess changed her password, Defendant misrepresented his

1

position at GPP to GPP's information technology specialist and his counsel in an attempt to convince them to permit his continued, unlawful access to Plaintiffs' email accounts.  Defendant continued these efforts even after this counsel advised him in writing that it would be against the law.  Defendant has admitted that he actively concealed his access of Plaintiffs' email accounts from Plaintiffs and specifically asked GPP's information technology specialist not to advise Ms. Friess that he was attempting to continue to access her email account.  Defendant also executed and/or authorized the filing of knowingly false Annual Reports which purported to remove the other Managers of GPP in order to attempt to give him authority to access Plaintiffs' email accounts.  Based upon his own unlawful access of  Plaintiffs' email accounts, Defendant has admitted sending an email to GPP's key partner on Plaintiffs' multi-million dollar India Project, the only purpose of which was to destroy this relationship, prevent consummation of the project, and harm Plaintiffs.  Defendant has admitted that he accessed Plaintiffs' email accounts on many other occasions, but despite claiming to have a photographic memory, he allegedly cannot remember how many times he accessed those accounts, or what emails he viewed.

Notwithstanding all these admissions, Defendant has moved for partial summary judgment in order to attempt to limit Plaintiffs' damages before a trial even begins.  Specifically, relying upon 45 allegedly undisputed material facts and some legal arguments that already have been heard and rejected by the Court, Defendant argues that: (1) Plaintiffs' claims under Section 1030(a)(2) of the Computer Fraud and Abuse Act,18 U.S.C. § 1030 (the "CFAA") (Counts I & II) fail because Plaintiffs have not met the jurisdictional $5,000 amount in loss and they have suffered no economic damages; (2) Plaintiffs' claim under Section 1030(a)(4) of the CFAA (Count II) also fails because Plaintiffs have not proved that Defendant acted with an intent to defraud and by means of such conduct furthered the intended fraud and obtained something of

value; and (3) Plaintiffs are not entitled to statutory damages pursuant to the Stored Wire and

Electronic Communications and Transactional Records Act, 18 U.S.C. § 2701 *et seq*. (the

"Stored Communications Act" or the "SCA") (Counts VI-VII) because Plaintiffs have failed to

prove actual damages.  As demonstrated below, Defendants' arguments are again not supported

by the governing law and are based on material and immaterial facts that are in dispute.

## COUNTER-STATEMENT OF DISPUTED AND UNDISPUTED MATERAL FACTS

Plaintiffs respond to Defendant's alleged undisputed material facts as follows:[1]

1.      Plaintiffs do not dispute that GPP was organized on July 16, 2007 as a Florida

limited liability company and that Defendant's paralegal filed the Articles of Organization on

behalf of GPP.  Plaintiffs dispute that Defendant provided all the funding in the July and August,

2007 timeframe as Mr. Weiss also made a capital contribution.  Friess Dep. (Ex. 1) at 242, Nov.

24, 2009.  Plaintiffs further dispute that Defendant's Exhibit 4 represents a "loan".  Ex. 1 at 211,

222-24, 236-37, 243-44, 325-26.

2.      Undisputed.

3.      Undisputed.

4.      Disputed.  Ms. Friess also corresponded with Mr. Hageman and was actively

involved in directing Mr. Hageman in establishing website hosting, email hosting and website

design and content.  Ex. 1 at 212-13; Ex. Nos. 2, 3 & 4.

5.      Undisputed.

6.      Undisputed.

---

[1]      Defendant and Plaintiffs' proposed undisputed material facts are collectively referred to as "Fact" or "Facts".  Plaintiffs note that most of Defendant's Facts are not material to, or relied upon, in his Motion.

7.      Disputed.  While Defendant initially paid to set up the website and email accounts for GPP, the domain name was purchased on behalf of GPP by Defendant as a Manager of GPP and was registered in Mr. Hageman's name for the benefit of GPP.  Ex. 1 at 115-17, 219-21, 370-71, 375-76.  In or about August 2007, Mr. Hageman's invoices were sent directly to Ms. Friess at GPP's Washington, DC address and were paid by Ms. Friess.  Ex. 5.

8.      Disputed.  The domain name was purchased on behalf of GPP by Defendant as a Manager of GPP and was registered in Mr. Hageman's name for the benefit of GPP.  Ex. 1 at 115-17, 219-21, 370-71, 375-76.  Mr. Hageman's "impression" or "understanding" that Defendant owned the domain name is not dispositive.  Hageman Dep. at 27-28, 39-40, 43-44, October 27, 2009 (Ex. 6.)

9.      Disputed.  Although there was no technical interruption of service to the gppwashington.com email site hosted by GoDaddy, there was an interruption in service in that Plaintiffs could not continue to use this domain name or the email addresses associated with it in light of Defendant's unauthorized access of their accounts and Plaintiffs were required to set up a new domain name, email accounts, website, etc.  *See also* Facts 16, 19-21, 23, 39.  In addition, while these domain names and email accounts were up and running concurrently, Ms. Friess testified that potential clients and contacts could not communicate with GPP because they would not yet have the new email addresses.  Ex. 1 at 127-31.

10.     Undisputed.

11**.**    As a result of her suspicion that Defendant was accessing her email accounts without authorization, it is undisputed that on June 25, 2009, Ms. Friess again changed her password on her GPP (and other) email account.  GPP's Supplemental Interrogatory Response

Nos. 3 & 5 (Ex. 7); Friess' Interrogatory Response No. 3 (Ex. 8); Yessin Dep. at 188, Dec. 8, 2009 (Ex. 9).

12.     Undisputed.

13.     Plaintiffs do not dispute Defendant's characterization of Mr. Hageman's testimony, but maintain that the domain name was purchased on behalf of GPP by Defendant as a Manager of GPP and was registered in Mr. Hageman's name for the benefit of GPP.   Ex. 1 at 115-17, 219-21, 370-71, 375-76.

14.     Plaintiffs do not dispute Defendant's characterization of Mr. Hageman's testimony.

15.     Plaintiffs admit that they purchased a new domain name in July 2009, as a result of Defendant's threats and unauthorized access and that Defendant served Ms. Friess on or about July 12, 2009 at her Birthday party.  Ex. 1 at 115, 327.  Defendant's contention that Ms. Friess "had already decided to divorce Mr. Yessin as of May 17, 2009" is immaterial and not supported by the record cited.

16.     Disputed.  Plaintiffs retained Mr. Hilbig to set up a new website hosting, new domain names, and email addresses as a result of Defendant's unauthorized access/intrusion and his threats. Ex. 1 at 154-55.  Ms. Friess testified that the email account and website all had to be changed because it was not known exactly how Defendant accessed Plaintiffs' email accounts and the website and email accounts were tied together – you have to change the content and contacts on the website.  Ex. 1 at 134-36, 148-51, 157-59.  *See also* Facts 19-21, 23, 39.

17.     The document speaks for itself.  It is undisputed that Plaintiffs paid the entire $4,500 invoice.  See Ex. 10.

18.     The expenditures by GPP to Mr. Hilbig were for the benefit of GPP, but were individually paid by Ms. Friess.  Ex. 1 at 118, 363-64.

19-21.  Disputed.  Mr. Hilbig's invoice speaks for itself and provides the services that were needed to respond to Defendant's unauthorized access of Plaintiffs' email accounts.  There can be no question that Plaintiffs' paid for these necessary services.  Ex. 7 at No. 10; Ex. 8 at 7; Ex. 1 at 143-45, 363-64; Ex. 11 (the invoice); Ex. 10 (the check used to pay the invoice).  While Ms. Friess testified that is was theoretically "possible" to set up a new email address and maintain the existing website, that option was not appropriate here.  Ex. 1 at 154-55. In order to respond to Defendant's unlawful access of Plaintiffs' email accounts and threats, Plaintiffs were required to change their web hosting, domain names, passwords, and information technology manager and encrypted GPP's website.  Ex. 7 at No. 8; Ex. 1 at 71-72, 77-78; 112-14, 116-18.  Ms. Friess testified that the email account and website all had to be changed because it was not known exactly how Defendant accessed Plaintiffs' email accounts and the website and email accounts were tied together – you have to change the content and contacts on the website.  Ex. 1 at 134-36, 148-51, 157-59.  In addition to this $4,500, Plaintiffs had to pay: (1) $500 to register to purchase a domain name.  Ex. 7 at No. 10; Ex. 8 at 7; Ex. 1 at 143-45, 363-64; Ex. 12; (2) $926 in establishing a new domain name of globalpolicypartnersllc.com with Network solutions.  Ex. 7 at No. 10; Ex. 8 at 7; Ex. 1 at 143-45, 158, 363-64; Ex. 13; and (3) $499 in establishing a new domain name of globalpolicypartners.com with Network Solutions.  Ex. 7 at No. 10; Ex. 8 at 7; Ex. 1 at 143-45, 158, 363-64; Ex. 14.  Ms. Friess paid for the transfer/new domain names on behalf of GPP.  Ex. 1 at 118, 363-64.[2]

---

[2]     In his Motion, Defendant questions how much was, or should have been, paid to Mr. Hilbig and further questions whether certain services were necessary.  At best, these questions raise genuine disputes of material facts.  Plaintiffs agreed, and Judge Jones ratified, that

22.      Disputed.  Ms. Friess does not know if Defendant corrupted any data or whether GPP lost any data.  Ex. 1 at 120-22.

23.      Undisputed.

24.      It is undisputed that Ms. Friess and Mr. Weiss authorized the filing of this lawsuit on behalf of GPP against Defendant on July, 22, 2009, that the Amended Complaint alleges that "Mr. Yessin unlawfully intercepted and surveilled [Ms. Friess'] business and personal documents and communications", and that Plaintiffs will not know the extent of their damages until a forensic examination of Defendant's computer hard-drive is completed.   Plaintiffs dispute that they are unable to show certain damages now.    In addition to the damages set forth in the Facts discussed above and below, Plaintiffs also are entitled to statutory, actual/compensatory damages, proximate damages, economic damages (which includes, but are not limited to, lost profits, lost goodwill, damage to reputation), punitive damages and attorneys' fees and costs which are in excess of $100,000.  Ex. 7 at No. 10; Ex. 8 at 7; *see also* Facts 17, 19-21, 26, 39, 44, 47-56.

25.      It is undisputed that Plaintiffs' contend that without authorization Defendant accessed the proposals for the India Project.  Ex. 1 at 46-49.

26.      Disputed.  Ms. Friess discussed millions of dollars of damages as a result of Defendant's use of information he accessed and used to make the India Project "disappear."  Ex. 7 at No. 10; Ex. 8 at 7; Ex. 1 at 305-06, 360-61; Ex. 15.  *See also* Facts 47-56 for a detailed discussion of the India Project and resulting damages.

---

Defendant could take the deposition of Mr. Hilbig beyond the discovery cut-off.  Thus, Defendant could have attempted to resolve any factual disputes, but he declined to do so.

27.     As to the India Project, disputed.  While Ms. Friess did share certain information with Defendant about GPP, Ms. Friess did not share the India Project proposals with Defendant and, while he was aware of them, he was not involved with their content.  Ex. 1 at 90, 307-08.

28.     Disputed.  While it is true that on occasion Ms. Friess referred to Defendant as General Counsel, it is also the case that Defendant maintained that as recently as June 29, 2009, James Cusack was GPP's General Counsel.  Ex. 16 at 2.  While Ms. Friess did state in Defendant's Exhibit 18 that "the only people authorized by law to sign binding documents on behalf of GPP are Brent Yessin and me", she corrected this at her deposition.  Ex. 1 at 270-71.

29.     As to the India Project, disputed.  While Ms. Friess did share certain information with Defendant about GPP, Ms. Friess did not share the India Project proposals with Defendant and, while he was aware of them, he was not involved with their content.  Ex. 1 at 90, 307-08.

30.     It is undisputed that Ms. Friess provided Defendant a copy of the teaming agreement between GPP and Essem High Tech and that Defendant was aware of the existence of the proposals.   Ms. Friess did not share the India Project proposals with Defendant did not participate in creating their content.  Ex. 1 at 90, 307-08.  *See also* Fact 28.

31.     It is undisputed that Ms. Friess did not share the India Project proposals with Defendant and, while he was aware of them, he was not involved with their content.  Ex. 1 at 90, 307-08.

32.     It is undisputed that Ms. Friess did not share the India Project proposals with Defendant and, while he was aware of them, he was not involved with their content.  Ex. 1 at 90, 307-08.

33.     Disputed.  While Ms. Friess testified that it is possible that GPP could get some work on the India Project, the only purpose of Defendant sending his September 8, 2009 email to

Plaintiffs' Indian partners was to destroy this opportunity for Plaintiffs and, as a result of his actions, the India Project did in fact "disappear."  Ex. 1 at 60-62, 66-69, 126-127, 293-98. Indeed, before Defendant sent his email, Ms. Friess was in very regular conduct with Lalit Mattu. Ex. 1 at 84-85.  After receiving Defendant's email, Lalit Mattu said he was sorry, advised Ms. Friess that the India Project was not going forward with at least some of the proposals and stopped corresponding with her.  Ex. 1 at 84-88.  *See also* Facts 47-56.

34.    Disputed.  Ms. Friess testified that she was not aware of any communications *before* this lawsuit was filed.  Ms. Friess has testified about such communications after this lawsuit was filed and will not know the extent of Defendant's communications until a forensic examination of Defendant's computer hard-drive is completed.  *See also* Facts 47-56.

35.    Disputed.  Ms. Friess testified that GPP was harmed and she would not know of the extent of the harm until a forensic examination of Defendant's computer hard-drive is completed.  Ex. 1 at 66-68.

36.    It is undisputed that before Defendant sent his email, Ms. Friess was in very regular conduct with Lalit Mattu. Ex. 1 at 84-85.  After receiving Defendant's email, Lalit Mattu said he was sorry, advised Ms. Friess that the India Project was not going forward with at least some of the proposals and stopped corresponding with her.  Ex. 1 at 84-88.  *See also* Facts 47-56.

37.    Undisputed.

38.    Undisputed.

39.    Undisputed, except that Ms. Friess testified that this $27,500 is damages for both her and GPP.  Ex. 1 at 135-36.  It is undisputed that Plaintiffs lost $27,500 in loss income/revenue by spending more than 50 hours of Ms. Friess' time, for which she billed $500 an hour, investigating Defendant's unauthorized access, changing her password and email

domain name, changing her email accounts, encrypting emails, securing the website and transferring the website and emails, obtaining a new information and technology specialist. Plaintiffs' investigation included reviewing all her email accounts and comparing Ms. Friess' communications with Defendant with her communications with her counsel and others, multiple conversations with counsel, Mr. Hageman, the new IT specialist and representatives with Go-Daddy (who hosts GPP's email system).   And, through counsel, responding to Defendant's unauthorized access and preparing and sending a cease and desist letter to Defendant and his counsel.  Ex. 7 at Nos. 10, 11 & 13; Ex. 8 at 7, 9, 16; Ex. 1 at 134-36, 148-51, 364-65.   Ms. Friess testified as to how she billed another client at this rate and provided the invoices to prove it.  Ex. 1 at 139-42, 161-63; Ex. 17.   Ms. Friess testified that this $27,500 is damages for both her and GPP.  Ex. 1 at 135-36.  Ms. Friess testified that the email account and website all had to be changed because it was not known exactly how Defendant accessed Plaintiffs' email accounts and the website and email accounts were tied together – you have to change the content and contacts on the website.  Ex. 1 at 134-36, 148-51, 157-59.

40.    Undisputed, but Plaintiff had this client during the period that Plaintiffs were investigating and addressing Defendant's unlawful surveillance.  *See* Facts 62-66.

41.    Undisputed, except to note that during 2009, GPP was primarily focused on the success of the India Project.  Ex. 1 at 283-84.

42.    Undisputed.

43.    Undisputed.

44.    It is undisputed that Ms. Friess cannot presently quantify her exact damages related to loss of her bargaining position in the pending divorce proceedings against Defendant, but her settlement integrity has been entirely compromised by Defendant's unauthorized access

of her privileged communications with her counsel where she divulged her divorce strategy, settlement numbers, and entire negotiating position. By knowing, *inter alia,* Ms. Friess' settlement numbers and positions, Defendant has obtained a decisive advantage in these divorce proceedings. Ex. 8 at 7, 12, 17.

45.     As of June 19, 2009, although Defendant had indicated a willingness to reach a settlement, the parties had not exchanged settlement proposals. Ex. 1 at 167-68. Since that time, Defendant has made a settlement offer which is vastly lower than the settlement offer he accessed without authorization.[3]

46.     Disputed. The cited testimony is not consistent with the alleged undisputed fact.

### Additional Undisputed Facts Which Prevent Entry Of Summary Judgment

Plaintiffs respectfully submit the following undisputed material facts regarding the India Project and Defendant's intent to defraud:

47.     GPP's India Project is a full-scale counter-terrorism, counter insurgency campaign for India to implement a broad array of security measures, including but not limited to border security, air security, maritime security, oil and gas security, sniper training, data centers, command and control operations, etc. The India Project is highly confidential and subject to non-disclosure agreements. Ex. 1 at 36-37, 47-49.

48.     On behalf of GPP, Ms. Friess was the lead on the India Project and led a team of American companies in the submission of business proposals to the government of India and various other entities. Approximately 9 proposals were submitted. Ex. 1 at 36-37, 47-49, 56-60; Ex. 15.

---

[3]     Since this settlement offer is likely protected by Fed. R. Evid. 408, Plaintiffs do not attach it to this filing.

49.     Lalit "Jolly" Mattu and Rohini Mattu of Essum High Tech were GPP's partners on the India Project.  Defendant testified that Lalit Mattu was a "critical part of the team."   Ex. 9 at 232-45.  Ms. Friess agreed that he was a key part of the decision making process.  Ex. 1 at 88-89. Ms. Friess was the only point of contact with Lalit Mattu.  Ex. 1 at 312.

50.     Defendant did not draft the India Project proposals and, in fact, had never even seen them before Ms. Friess' deposition.  Ex. 9 at 79-81.  Ms. Friess did not share these proposals with Defendant and, while he was aware of them, he was not involved with their content.  Ex. 1 at 90, 307-08.  Thus, Defendant's number of the proposals and their contents derived from his unlawful access of Plaintiffs' email accounts.

51.     If accepted, the Proposals for the India Project would result in millions of dollars of income/revenue for GPP.  Ex. 1 at 305-06, 360-61; Ex. 15; Ex. 7 at No. 10; Ex. 8 at 7.

52.     Indeed, according to Defendant, the India Project was a "big-ticket item".  Ex. 9 at 159.  Defendant had "heard from the India side of the deal that it was imminent that the deal [would] close.  The India project was going to be successful.   GPP was going to get funded." Ex. 9 at 159.  Ms Friess was also told by Lalit Mattu that the closing of the India Project was "imminent".  Ex. 1 at 87, 293-98.  During 2009, GPP primarily focused on the success of the India Project.  Ex. 1 at 283-84.

53.     On July 10, 2009, Plaintiffs' counsel sent Defendant and his counsel a letter demanding, *inter alia*, that he cease and desist from any further unauthorized access of Plaintiffs' email accounts.  Ex. 18; Complaint, Ex. A.  Later that day, Defendant responded to this letter by stating, *inter alia*, "I cannot tell you how unnerving the Indian government would find it if they thought the firm they were about to hire for security – including electronic security – thought so little of their own security capabilities as to make these rash allegations against a simple country

lawyer such as myself . . . ."  Ex. 18.  The very next day, Defendant sent an email to Plaintiffs'

counsel threatening that "[t]he India transaction will simply disappear.  If those two cannot

safeguard the confidential material sent back and forth between their partners in India, the

government and their partners here, then the Indian people have a right to know that.  I feel

obligated to tell them."  Ex. 9 at 239-45; Ex. 18.

      54.    On or about September 8, 2009, Defendant followed through with this threat.

Defendant has admitted that on or about September 8, 2009 he sent an email to Lalit and Rohini

Mattu, which attached the two frivolous Florida actions that he filed against Plaintiffs in which

he claims to be the sole Manager of GPP.  GPP's Second Set of Interrogatory Responses (Ex. 19)

at No. 23; Ex. 1 at 308-09; Ex. 20.  In this letter, Defendant admits to having never met Lalit

Mattu and recounts a Washington Post article which discusses the unlawful access of GPP's

email by him and Julianna Glover, a personal friend of Defendant, and that data has been

compromised.  Ex. 20.

      55.    Contrary to what he told the Washington Post, Defendant felt so strongly about

the illegality of Ms. Glover's unauthorized access of GPP's email system that he had his

attorney, Mr. Cusack, send Ms. Glover and Attorney General Ashcroft a cease and desist letter,

specifically mentioning that Ms. Glover had violated the CFAA.  Ex. 21.

      56.    The only purpose of sending his September 8, 2009 email to Plaintiffs' Indian

partners was to follow through on his threat and destroy this opportunity for Plaintiffs.  In fact,

Defendant was not the "managing partner" or sole Manager of GPP and he was using his own

unlawful access of Plaintiffs' email accounts as the basis to destroy the India Project – as

Defendant suggests in his email, if Plaintiffs cannot stop Defendant from unlawfully accessing

Plaintiffs' email accounts, then how can they provide security for the government of India.  As a

result of Defendant's conduct, the India Project did in fact "disappear" resulting in millions of dollars in losses for GPP.  Ex. 1 at 60-62, 66-69, 126-127, 293-98; *see also* Fact 51.  Indeed, before Defendant sent his email, Ms. Friess was in very regular conduct with Lalit Mattu. Ex. 1 at 84-85.  After receiving Defendant's email, Lalit Mattu said he was sorry, advised Ms. Friess that the India Project was not going forward with at least some of the proposals, and stopped corresponding with her.  Ex. 1 at 84-88.

### Defendant's Unauthorized Access

57.     GPP's email accounts are protected by issuing email accounts, user names and passwords to authorized users.  In addition, Ms. Friess' laptop computer has a fingerprint recognition keypad and is password protected, separate from her GPP email account. Ex. 7 at No. 8; Ex. 8 at 6; Ex. 1 at 99.

58.     Defendant did not have a GPP email account, user name, or password and was not an authorized user on the GPP email system.  Defendant's Supplemental Interrogatory Responses (Ex. 22) at No. 7; Ex. 7 at No. 8; Ex. 9 at 87; Ex. 1 at 95-96, 371-73; Ex. No. 6 at 10, 26-27.

59.     Ms. Friess did not give Defendant the passwords to her email accounts and neither Ms. Friess nor anyone else at GPP authorized Defendant to access Ms. Friess, Mr. Weiss, or GPP's email accounts.  Ex. 7 at No. 7; Ex. 8 at 5; Ex. 1 at 31-32, 42-43, 53-55, 371-75.

60.     As a matter of law, as 1 of 3 Managers, or even if he was the sole Manager, Defendant was not authorized to access Plaintiffs or Mr. Weiss' email accounts.   November 24, 2009 Memorandum Opinion (Ex. 23) at 6-8, 15.

61.     As a matter of law, as a non-Member or at best a 10% Member of GPP, Defendant was not authorized to access Plaintiffs' email accounts.   Ex. 23 at 6-8, 15.

62.     Defendant has admitted accessing Ms. Friess' Global Policy Group email account (Katherine@GlobalPolicyLtd.com) through August 2007.   Defendant's Answers to First Interrogatories (Ex. 24) at No. 1; Defendant's Answer (Ex. 25) at ¶¶ 33, 43, 75, 83, 92, & 132; Ex. 9 at 99, 108-117.

63.     Defendant has admitted accessing Ms. Friess' hotmail email account (Katherine_Friess@hotmail.com) from May or June 2007 through June 2009.  Ex. 24 at No. 1; Ex. 25 at ¶¶ 33, 43, 75, 83, 92, & 132; Ex. 9 at 99, 120-131.

64.     Defendant has admitted accessing Ms. Friess' gmail account (Katherineyessin@gmail.com) from December 2007 through June 2009.  Ex. 24 at No. 1; Ex. 25 at ¶¶ 33, 43, 75, 83, 92, & 132; Ex. 9 at 99, 132-43.

65.     Defendant has admitted accessing Ms. Friess' GPP email account (Katherine@GPPWashington.com) from July 2007 through June 2009.   Ex. 24 at No. 1; Ex. 22 at No. 2; Ex. 25 at ¶¶ 33, 43, 75, 83, 92, & 132; Ex. 9 at 87-88; 99, 146-160, 163-173, 183-84, 213-14; Ex. 1 at 22-26.

66.     Defendant also has admitted accessing Mr. Weiss' GPP email account (Jeffrey@GPPWashington.com).   Ex. 22 at No. 3.

67.     Defendant has admitted that Ms. Friess did not know that he was accessing her email accounts from at least May to the end of June, 2009, Defendant did not tell her he was accessing this account, and he did not seek her authorization to do so.  Ex. 9 at 163-65; 230-31.

68.     Defendant has admitted that he accessed and read Ms. Friess' attorney-client communications with her counsel, Stephen L. Neal, Jr., Esq., including correspondence where Ms. Friess and Mr. Neal were discussing filing a divorce action in the Commonwealth of Virginia and correspondence where Ms. Friess disclosed her settlement strategy, including her

settlement numbers.  Ex. 25 at ¶ 17; Ex. 24 at No. 8; Ex. 9 at 170-71, 215-27**;** Ex. 1 at 23-26, 167-173, Exs. 26 & 27.

69.     After reading Ms. Friess' privileged communications about her intent to file an action first in the Commonwealth of Virginia, Defendant preemptively filed an action in the State of Florida.  Exs. 26, 28.

70.     Defendant has admitted sharing Ms. Friess' attorney-client communications (which included her settlement strategy and numbers) with James Cusack, Esq., an attorney who was providing him legal advice regarding his divorce.  Ex. 24 at No. 5; Ex. 9 at 9-12; 172-74, 215-27, 180-82 Cusack Dep. at 8, 10, 12-15, Dec. 10, 2009 (Ex. 29); Ex. 1 at 23-26; Ex. 26.

71.     Despite claiming to have a photographic memory, Defendant has admitted to accessing many more emails and documents than he has produced in this litigation.  Ex. 9 at 87-88, 229-30.

### Even After Ms. Friess Changed  Her Password, Defendant Continued To Attempt To Unlawfully Access Plaintiffs' Email Accounts

72.     As a result of her suspicion that Defendant was accessing her email accounts without authorization, on June 25, 2009, Ms. Friess again changed her password on her GPP (and other) email account.  Ex. 7 at No. 3 & 5; Ex. 8 at 3; Ex. 9 at 188.  Dawn Russell, and not Defendant, initially provided Ms. Friess with her password – global1.  Ms Friess changed her password to global2 in December, 2008.  Ex. 1 at 215-216; Ex. No. 6 at 94.

73.     Immediately after Ms. Friess again changed her GPP password on June 25, 2009, Defendant contacted GPP's information technology consultant, Jon Hageman of the Logical Web Company, and demanded that he be given access to Ms. Friess' GPP email account and that her emails be "pushed" to Defendant.  Ex. 25 at ¶ 19; Ex. 24 at No. 9; Ex. 9 at 188-200; Ex. 1 at 110-111; Ex. No. 6 at 21-27, 32-34, 79-80, 91-92; Exs. 30, 31, 32 & 16.

74.     Defendant specifically asked Mr. Hageman to keep his request to have access to Ms. Friess' email account "confidential" so that she would not know that he was trying to continue to access her email account.  Ex. 9 at 193-98; Exs. 30, 31, 32 & 16.

75.     After Mr. Hageman refused to permit Defendant access to Ms. Friess' GPP email account, Defendant communicated with Mr. Hageman's counsel, Ashley McCrae, Esq., and again demanded that he be given access to Ms. Friess' GPP email account.  Ex. 24 at No. 10; Ex. 9 at 201; McRae Dep. at 5-12, Oct. 27, 2009 (Ex. 33); Exs. 34, 35 & 36.

76.     In order to convince Ms. McCrae to allow him access to Ms. Friess' GPP email account, Defendant sent her an unexecuted operating agreement and a knowingly false annual report filing so she would believe that Defendant was the only Manager and officer of GPP and, thus, he should have access to Ms. Friess' email account.  Despite being requested to do so, Defendant would not produce a signed operating agreement. Ex. 9 at 199-211; Ex. 6 at 25-26, 79, 91-92; Ex. 33. at 9-11; Exs. 34, 35 & 36.

77.     In their email exchanges, Ms. McCrae specifically advised Defendant that his access of Plaintiffs' email accounts could be a violation of the SCA.  Ex. 9 at 208-11; Ex. 33 at 11-12; Exs. 35 & 36.

78.     Because Mr. Hageman and Ms. McCrae would not allow Defendant to have access to Plaintiffs' email accounts, Defendant threatened to, and ultimately did, close all of his accounts with Mr. Hageman.  Ex. 9 at 211-13; Exs. 16, 36, 37, 38 & 39.

**Defendant Filed False Annual Reports To Obtain the Appearance of Authority
To Engage In The Unauthorized Access Of Plaintiffs' Email Accounts**

79.     Defendant is a lawyer and admits to being familiar with the law that governs limited liability companies in the State of Florida and has set up a number of them in the State of Florida. Ex. 9 at 20, 254-55.

80.     As the Articles of Organization make clear, GPP was organized on July 16, 2007, and there were three Managers – Ms. Friess, Mr. Weiss and Defendant.  According to Defendant, the Articles of Organization were prepared at his direction.  Ex. 9 at 56, 64, 255-58; Ex. 1 at 200-01; Clarke Dep. at 9-10 (Dec. 10, 2009) (Ex. 40); Ex. 41.

81.     GPP has two Members – Ms. Friess and Mr. Weiss – each with a 50% membership interest.   Ex. 1 at 201, 210-12.

82.     Consistent with a written communication authored by him and the draft Operating Agreements that were drafted at his direction, according to Defendant, he has at best a 10% Membership interest in GPP.  Ex. 42, Ex. 43 at Schedule A, Ex. 44 at Schedule A.

83.     As a matter of law, as a non-Member or at best a 10% Member of GPP, Defendant knew that he could not remove Ms. Friess and Mr. Weiss as Managers.  Fla. Stat. Ann. § 608.422(4)(c)(1) (Ex. 45); Fla. Stat. Ann. § 608.4231(4) (Ex. 46).

84.     Defendant admits to executing the April 30, 2008 and April 2, 2009 Annual Reports, or authorizing their filing, which purport to "delete" or remove Ms. Friess and Mr. Weiss as Managers of GPP.  Ex. 24 at No. 14; Ex. 9 at 258-60, 284-85; Ex. 40 at 10-14, 18-21; Exs. 47 & 48.  Although they are signed subject to penalty of perjury, Defendant claims to not have reviewed them before they were filed.  Ex. 9 at 258-60, 284-85.

## ARGUMENT

## I.   Legal Standards

In reviewing Defendant's Motion, the Court must view the facts in the light most favorable to the non-moving party. *Porter v. U.S. Alumoweld Co.,* 125 F.3d 243, 245 (4th Cir.1997). Summary judgment is appropriate where there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A "genuine" issue of material fact is present "if the evidence is such that a reasonable jury could ... return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.,* 978 F.2d 832, 835 (4th Cir.1992) (*citing Anderson,* 477 U.S. at 255).

## II.   Plaintiffs Have Suffered Losses And Damages

### A.   "Loss" Includes Consequential Damages Resulting From A Violation Of The CFAA, And Is Not Limited To Costs Incurred "Because Of Interruption Of Service"

In his Motion, Defendant claims that Plaintiffs CFAA claims fail because they have not established $5,000 jurisdictional amount in loss or damage.  Defendant's Motion at 16-24.  18 U.S.C. § 1030(g) provides:

> Any person who suffers ***damage or loss*** by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. . . . Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages.

(Emphasis added.)  Conduct under subsection (c)(4)(A)(i)(I) ("loss to 1 or more persons during any 1-year period . . . aggregating at least $ 5,000 in value") is the only type of conduct at issue here.  Even limiting recovery to "economic damages," however, the Fourth Circuit has held that "economic damages" "ought to be accorded its ordinary meaning, which would include consequential damages but exclude recovery for pain and suffering or emotional distress."  *A.V. v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009) (*citing Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935 (9th Cir. 2004) (concluding that the "economic damages limitation precludes damages for death, personal injury, mental distress, and the like," but includes "loss of business and business goodwill.")).  Moreover, according to the plain language of the statute, ***either*** damage or loss is sufficient to assert a claim for compensatory damages.

*SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 720 (N.D. Ill. 2009).  The term "loss" means:

> ***any reasonable cost to any victim***, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

18 U.S.C. 1030(e)(11) (emphasis added).  In *iParadigms*, the Fourth Circuit held that "loss" under the CFAA is a "broadly-worded provision that plainly contemplates consequential damages of the type sought by iParadigms—costs incurred as part of the response to a CFAA violation, ***including the investigation of an offense***."  *Id.,* 562 F.3d at 646 (emphasis added).  In *iParadigms*, the defendant asserted a counterclaim under the CFAA, alleging that several of its employees spent numerous man-hours over the course of a week responding to Plaintiff's unauthorized use of another entity's password.  The Court reversed the District Court, and held that such damages constitute "economic damages," and "costs of responding to an offense" and therefore constitute "loss" under the CFAA.  *Id.*  Here, response costs and investigative costs are major components of damages that Plaintiffs seek.

Defendant again erroneously overlooks the law of the Fourth Circuit (relying, instead, on case law from the Southern District of Florida and elsewhere) and argues that the last five words of the definition of loss—"because of interruption of service"—apply to the entire definition of "loss," as opposed to modifying only "other consequential damages . . ."  This is simply not the law of the Fourth Circuit.[4]  ***There was no claim whatsoever in iParadigms that its service***

---

[4]     Relying upon the same legal authority, Defendant made this same legal argument in his Motion to Dismiss.  After considering the briefs, legal authority and oral argument, the Court rejected Defendant's interpretation of the CFAA that "loss" must occur because of interruption of service.  Accordingly, the Court's decision is the law of the case.  *Walker v. Kelly*, 2009 U.S. App. LEXIS 27545, at * 22-23 (4th Cir. Va. Dec. 16, 2009) ("The law of the case doctrine promotes judicial economy and finality by providing 'that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (*citing United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (*quoting*

*suffered any interruption as a result of the violation*.  The *iParadigms* Court relied upon *Modis, Inc. v. Bardelli*, 531 F. Supp. 2d 314, 320 (D. Conn. 2008), which followed the Second Circuit in holding that, under the plain language of the CFAA, "'the costs of responding to the offense' are recoverable regardless of whether there is an interruption in service, and federal courts have sustained actions based on allegations of costs to investigate and take remedial steps in response to a defendant's misappropriation of data." (*citing  P.C. Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore, L.L.C.* 2007 U.S. Dist. LEXIS 15216, 2007 WL 708978 (D.N.J.)).

*iParadigms* also relied upon *SuccessFactors, Inc. v. Softscape*, *Inc*., 544 F. Supp. 2d 975, 980-81 (N.D. Cal. 2008), which held that the cost of investigating and identifying the CFAA offense, including "many hours of valuable time away from day-to-day responsibilities" is recoverable "loss."  There was no claim of interruption of Plaintiff's computer service in *SuccessFactors*. The Court stated that some valid claims under the CFAA indeed may not involve damage to a computer system or interruption of service:

> where the offense involves unauthorized access and the use of protected information, the reasonable "cost of responding to [the] offense" will be different from such cost in a case where the primary concern is the damage to the plaintiff's computer system itself. … In contrast, where the offender has actually accessed protected information, discovering who has that information and what information he or she has is essential to remedying the harm.  In such cases courts have considered the cost of discovering the identity of the offender or the method by which the offender accessed the protected information to be part of the loss for purposes of the CFAA.

*Id.,* 544 F. Supp. 2d at 980 (internal citation omitted); *NCMIC Fin. Corp. v. Artino*, 638 F. Supp. 2d 1042, 1064-1065 (S.D. Iowa 2009) (costs of responding to an offense are recoverable regardless of interruption of service, and costs to investigate and take remedial steps are

---

*Christianson v. Colt Indus.Operating Corp*., 486 U.S. 800, 816 (1988)).

"losses").[5]

In addition to the Fourth Circuit, the U.S. District Court for the District of Maryland has opined on this issue.  In *CoStar Realty Info., Inc. v. Field*, 612 F. Supp. 2d 660, 674-75 (D. Md. 2009), a real estate database service sued two individuals who were using its website without authorization by illicitly using a paying subscriber's username and password.  CoStar argued that it suffered damages based on loss of revenue from the failure to recover license fees.  *Id*. at 674.  As with *iParadigms*, *Modis*, and *Successfactors*, there was no claim that the plaintiff had suffered an interruption of service.  *Id*. at 675.  In denying defendant's motion to dismiss for failure to allege "loss," the Court relied upon *Frees, Inc. v. McMillian*, No. 05-1979, 2007 U.S. Dist. LEXIS 57211 at *8-9 (W.D. La. Aug. 6, 2007).  In *Frees*, the Court noted the circuit split on this issue, and disagreed that a plaintiff had to suffer "interruption of service" in order to allege "loss" and held that the CFAA "defines 'loss' in terms of "any reasonable cost."  *Frees, 2007 U.S. Dist. LEXIS 57211* at *8; *see also id. at *15* ("it makes no sense to limit the plaintiff's recovery when the lost revenue is a direct result of defendant's misconduct").[6]

---

[5]    Defendant also again overlooks a recent case from this Court, *State Analysis v. Am. Fin. Servc. Assoc*, 621 F. Supp. 2d 309, 316 (E.D. Va. 2009), in which Defendant's counsel represented Defendant AFSA.  In that case, the plaintiff was a governmental relations and analysis firm that ran a database to which the defendant subscribed.  Plaintiff sued defendants for unauthorized access and use of plaintiff's databases, and asserted violations of the CFAA. Although the CFAA claims were dismissed on statute of limitation grounds, the Court based its reasoning on the fact that plaintiff had only alleged "losses," (which sets a different statute of limitations than "damages"), and that loss "is defined as 'any reasonable cost to any victim . . .'. . . . . " (ellipses in original).  *Id*.  The Court made no reference to interruption of service, and indeed, in that case, no interruption was alleged.

[6]    Defendant's citation of another case in which CoStar sued for unauthorized access to and use of its database, *Klein & Heuchan, Inc. v. CoStar Realty Information*, 2009 U.S. Dist. LEXIS 35025 at *8 (M.D. Fla. April 8, 2009) is illustrative of the Circuit split.  There, with nearly identical claims as in the *CoStar* District of Maryland case, the Middle District of Florida held that "loss" must be because of "interruption of service."  That is not the law of the Fourth Circuit, as demonstrated by *iParadigms* and *Costar*.  Defendant's further reliance on, *inter alia,*

Moreover, if Defendant's definition of "loss" were to be accepted, it would render the definition of "damage" superfluous:  If one must suffer interruption of service (which entails lack of availability of data, programs, systems or information) in order to have "loss," then such interruption would overlap with the definition of "damages" under the CFAA, which is: "impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030 (e)(8).  Thus, there would never be a need to separately claim "damages."

Defendant's "alternative" argument suggests that even the broadest reading of the term loss limits loss to costs related to computer impairment or damage.  This reading is at odds with the case law discussed above, which holds that "loss" includes harm such as lost goodwill, lost profits, lost business, and hours lost from performing day-to-day work by investigating and responding to the offense.

Plaintiffs already have demonstrated "loss" in excess of the $5,000 jurisdictional threshold.  Plaintiffs have incurred $4,500 in IT expenses to set up web hosting, domain names, email accounts, etc. (including encryption to prevent future intrusions) with Mr. Hilbig's company; $500 to register to purchase a new domain name and; $926 and $499, respectively, to establish new domain names with Network Solutions.  *See* Facts 19-21.  These constitute costs of responding to and addressing an offense and costs of restoring the system to its condition prior to the offense.  *See* 18 U.S.C. 1030(e)(11); *iParadigms*.  In addition, Plaintiffs have further set forth evidence demonstrating the hours expended in investigating and responding to the offense, represented by more than 50 billable hours of Ms. Friess' time.  This lost time, at $500 per hour, amounts to $27,500.  *See* Fact 39.  These costs represent the costs of investigating and remedying steps to Defendant's unauthorized access and further represent many hours of

---

case law from the Southern District of Florida and the Eastern District of Missouri also is inapposite.

valuable time away from day-to-day responsibilities.   These items constitute recoverable "loss." *See iParadigms, SuccessFactors*.

Plaintiffs also have demonstrated lost profits in the form of the loss of the India Project. Defendant's interference with this project, whose consummation even he admitted was "imminent," resulted in Plaintiff's loss of the project and therein the loss of millions of dollars in revenue.  *See* Facts 25-26, 33, 36, 47-56.  These costs are "revenue lost" and therefore recoverable "loss."  *See* 18 U.S.C. 1030(e)(11); *Frees, Costar, SealSource*, *supra*.

**B.    Plaintiffs Have An Independently Sustainable Claim For "Damages" Pursuant To The CFAA**

Defendant's brief ignores the fact that the CFAA permits recovery for loss *or* damages. 18 U.S.C. § 1030(g).[7]  "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. 1030 (e)(8).  *See Ford v. Torres*, 2009 U.S. Dist. LEXIS 57245 at *25 (E.D. Va. Mar. 3, 2009) (allegation that a website's intruder took some action to limit the availability of the information to the Plaintiff "is enough to allege 'damage' *under the very broad definition the CFAA gives to that term*."  *Id*.  (Emphasis added.)); *I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys.*, 307 F. Supp. 2d 521, 525 (S.D.N.Y. 2004) (where plaintiff alleged that defendant business competitor accessed and copied proprietary information, claim that this action impaired "the integrity of its data and system" was sufficient to state a claim for damages under the CFAA; in addition, allegations of $5,000 in costs of damage assessment and remedial measures were sufficient to withstand a motion to dismiss); *see also Frees, 2007 U.S. Dist. LEXIS 57211*. at *17 ("the terms 'damage' and 'loss'

---

[7]    For example, despite Defendant's reliance on *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004) in support of its argument that Plaintiffs have not alleged "loss," in *Nexans*, the Court simply found that the plaintiff did not allege "loss" sufficient to establish the jurisdictional threshold; the court did not discuss whether lost profits would be recoverable as damages**.**

are terms of art used to define a jurisdictional threshold; they do not control or limit what damages are available in a civil action if the substantive and threshold standards are not met. Rather, Congress used the terms "compensatory damages" and "economic damages" to define the scope of recovery, and those terms will be given their ordinary meaning in interpreting the CFAA.")

As discussed at length above, both GPP and Ms. Friess have sustained damage and impairment to proprietary business information (including the India proposals) as a result of his unlawful access to Plaintiffs' email system.  *See* Facts 16-21, 24-26, 33, 39, 47-56.

In addition, Ms. Friess' claims include the impairment to confidential communications with her divorce attorney regarding her strategy and negotiations in her divorce action—communications which Defendant has admittedly viewed without authorization—and thereby entirely compromised Ms. Friess' intellectual property and negotiating position.  *See* Facts 44-45, 57-70.  Although Ms. Friess cannot presently quantify the precise amount by which her bargaining position in the divorce was compromised, Defendant has certainly obtained a decisive advantage in the divorce proceedings by accessing Ms. Friess' privileged communications with her attorney (which contained, *inter alia*, her settlement numbers) and sharing those communications with an attorney that was providing him legal advice regarding the divorce.  *Id.*

## III.   Plaintiffs Have Alleged, And Demonstrated, "Intent To Defraud" Pursuant To 18 U.S.C. §1030(a)(4)

In his Motion, Defendant argues that Plaintiffs' claim under Section 1030(a)(4) of the CFAA fails because Plaintiffs have not proved that Defendant acted with an intent to defraud and by means of such conduct furthered the intended fraud and obtained something of value.  While the Defendant is correct that the CFAA does not define "intent to defraud" as that term is used in 18 U.S.C. § 1030(a)(4), the term has been defined in case law in the context of this statute.

"Fraud," as used in 18 USCS § 1030(a)(4), means wronging of person in property rights by **dishonest methods or schemes,** rather than fraud in its common-law sense.  *Shurgard Storage Ctrs. v Safeguard Self Storage, Inc*. 119 F Supp 2d 1121, 1125-26 (W.D. Wash 2000) (citing *McNally v. United States*, 483 U.S. 350, 358, 97 L. Ed. 2d 292, 107 S. Ct. 2875 (1987) (superseded by statute on other grounds).

A defendant's intent is often, as it is in this case, a material issue of disputed fact.  A defendant's credibility is to be judged by the fact finder.  While Plaintiffs contend that they have established the dishonest methods required by this statute, at best all Defendant can do is create a factual dispute.  *Abilityone Corp. v. Brown*, 2005 U.S. Dist. LEXIS 32745 (M.D.N.C. Dec. 6, 2005) (holding that Defendant's dispute over whether she disclosed confidential data, whether she used such confidential data in subsequent employment, and whether she acted with intent to defraud created a material issue of disputed fact); *CapitalSource Fin., LLC v. Delco Oil, Inc*., 608 F. Supp. 2d 655, 667 (D. Md. 2009)  (denying summary judgment because material issues of disputed fact as to intent to defraud existed; both sides presented conflicting evidence of the extent of Defendant's knowledge and his intent to defraud);  *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 353 (4th Cir. Md. 2007) (noting that the lower court's credibility determination of a witness is not appropriate on summary judgment).

The record is replete with evidence that supports Defendant's intent to defraud and wronging by dishonest methods.  Indeed, Defendant has admitted that he accessed at least five of Plaintiffs' email accounts, including the primary account for almost two years.  *See* Facts 57-67. In violation of the Professional Rules of Conduct, Defendant has admitted that he accessed and copied privileged emails relating to Ms. Friess' divorce and settlement strategy and shared these privileged communications with another attorney who was providing legal advice regarding his

contested divorce with Ms. Friess.  *See* Facts 68-70.  After Ms. Friess changed her password, Defendant misrepresented his position at GPP to GPP's information technology specialist and his counsel in an attempt to convince them to permit his continued, unlawful access to Plaintiffs' email accounts.  *See* Facts 72-78.  Defendant continued these efforts even after this counsel advised him in writing that it would be against the law.  *See* Fact 77.  Defendant has admitted that he actively concealed his access of Plaintiffs' email accounts from Plaintiffs and specifically asked GPP's information technology specialist not to advise Ms. Friess that he was attempting to continue to access her email account.  *See* Facts 67, 74.  Defendant also executed and/or authorized the filing of the false Annual Reports which purported to remove the other managers of GPP in order to attempt to give him authority (as the sole Manager) to access Plaintiffs' email accounts. *See* Facts 79-84.  Defendant admits sending an email to GPP's key partner on Plaintiffs' multi-million dollar India Project which is based on false information, the only purpose of which was to destroy this relationship, prevent consummation of the project, and harm Plaintiffs.  *See* Facts 47-56.  Defendant also has admitted that he accessed Plaintiffs' email accounts on many other occasions, but despite claiming to have a photographic memory, he allegedly cannot remember how many times he accessed those accounts, or what emails he viewed.  *See* Fact 71.  These facts establish Defendant's dishonest methods necessary to establish the intent to defraud under the CFAA.  At a minimum, they create a genuine dispute of material fact sufficient to defeat summary judgment.  Defendant also obtained something of value as a result of his dishonest means, mainly, GPP's confidential and proprietary information (including India proposals) and Ms. Friess' attorney-client communications.

**IV.      Plaintiffs Have Established Actual Damages Under The SCA And Thus Can
            Recover Statutory Damages For Defendant's Unlawful Access.**

In his Motion, Defendant relies on *Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199,

205 (4th Cir. 2009) to argue that Plaintiffs have failed to prove actual damages and thus cannot

recover statutory damages of $1,000 per violation of the SCA.  18 U.S.C. § 2707(c).  This

argument is premised on the assumption that Plaintiffs were not actually harmed, an argument

which, as explained above, is demonstrably untrue.

Plaintiffs already have advanced substantial evidence of their actual damages.  *See* Facts

16-21, 24-26, 33, 39, 44-45, 47-70.  Indeed, even if Plaintiffs had not incurred all of these

pecuniary damages, case law suggests that only nominal damages need be proven under the SCA

as actual damages in order to obtain the $1,000 in statutory damages per violation.  In *Voicenet*

*Communs., Inc. v. Corbett*, 2006 U.S. Dist. LEXIS 61916 *25 (E.D. Pa. 2006), the court

observed in specifically citing 18 U.S.C. § 2707(c), which is the SCA's statutory damages

provision under the Electronic Communications Privacy Act ("ECPA"):

> The ECPA provides for all the remedies available under § 1983 -- declaratory
> relief, actual damages, attorney's fees and costs, and punitive damages for willful
> violations. 18 U.S.C. § 2707(b)-(c). Moreover, the ECPA provides for even
> greater relief than § 1983 in one respect: ***even if an ECPA plaintiff's actual***
> ***damages are nominal, he is entitled to receive at least $ 1,000 in a successful***
> ***suit. 18 U.S.C. § 2707(c).***  (emphasis added).

Plaintiffs' damages in this case more than satisfy the description of "actual damages"

adopted by the Supreme Court.  In *Doe v. Chao*, 540 U.S. 614, 627, n.12 (U.S. 2004), the

Supreme Court noted that Court of Appeals differ as to the definition and scope of "actual

damages" with some courts holding that the definition is restricted to pecuniary loss, while

others expand the definition to cover losses from mental anxiety as well as compensatory losses.

However, the *Doe* court concluded that under any definition of actual damages, "out-of-pocket

expenses . . . suffice to qualify under any view of actual damages."  As demonstrated above, Plaintiffs have expended over $6,000 in out-of-pocket losses and damages in responding to Defendant's unlawful access.  *See* Facts 16-21.  Likewise, they accumulated approximately $27,500 in lost income investigating Defendant's unlawful access and taking remedial measures. *See* Fact 39.  Those are in addition to Plaintiffs' damages as a result of the loss of the India Project.  *See* Facts 26, 33, 36, 47-56.  Plaintiffs clearly have established actual damages for purposes of the SCA, and Defendants' Motion for Summary Judgment should be denied.

**V.**      **Plaintiffs Request Additional Discovery Pursuant to Rule 56(f)**

Plaintiffs move for an extension of time under Fed. R. Civ. P. 56(f) to conduct a forensic analysis of Defendant's computer hard-drive.  A complete forensic analysis is necessary to oppose this Motion because the analysis will further establish Plaintiff's actual damages and will provide evidence of precisely how many times Defendant unlawfully accessed Plaintiffs' email accounts and what he did with this information – both of which are necessary to establish actual, statutory and punitive damages.  Specifically, as set forth in Plaintiffs' January 1, 2009 Objections to Magistrate Jones' Order denying Plaintiffs' Second Motion to Compel Defendant's Computer for Forensic Analysis ("the Objections"), Plaintiffs have diligently sought production of a forensic analysis of an imaged-copy of Defendant's computer.  However, to date, Plaintiffs have not been able to conduct this examination.  Until they are permitted to do so, Plaintiffs cannot establish the full extent of Defendant's liability and Plaintiffs' damages.  *See* Affidavit of Stephen L. Neal, Jr. ("Neal Aff."), attached hereto as Exhibit 49.[8]

**CONCLUSION**

For the forgoing reasons, Defendant's Motion should be denied in its entirety.

---

[8]      Plaintiffs Objections are scheduled to be heard on January 8, 2010 and this issue may be resolved at that hearing.

**Dated: January 4, 2010**

**Respectfully Submitted,**

**PLAINTIFFS**
By Counsel

/s/
_____
Bernard J. DiMuro, Esq.
Virginia State Bar # 18784
Stephen L. Neal, Jr., Esq. (*pro hac vice*)
Stacey Rose Harris, Esq.
Virginia State Bar #65887
Stephen J. Stine, Esq.
Virginia State Bar. #66738
*Counsel for Plaintiffs*
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, VA 22314
Phone: (703) 684-4333
Fax: (703) 548-3181
E-Mails: bdimuro@dimuro.com;
sneal@dimuro.com; sharris@dimuro.com;
sstine@dimuro.com.

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2010, I electronically filed the foregoing Plaintiffs' Opposition To Defendant's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following counsel of record:

Charles M. Sims, Esq.
*Counsel for Defendants*
LeClairRyan
951 East Byrd Street, 8th Floor
Richmond, VA 23219
Phone: (804) 343-5091
Fax: (804) 783-7655
Email: charles.sims@leclairryan.com;

C. Matthew Haynes, Esq.
*Counsel for Defendants*
LeClairRyan
2318 Mill Road, Suite 1100
Alexandria, VA 22314
Phone: (703) 684.8007
Fax: (703) 684- 8075
Email: matthew.haynes@leclair.com

_____ /s/ _____
Bernard J. DiMuro, Esq.
Virginia State Bar # 18784
Stephen L. Neal, Jr., Esq. (*pro hac vice*)
Stacey Rose Harris, Esq.
Virginia State Bar #65887
Stephen J. Stine, Esq.
Virginia State Bar. #66738
*Counsel for Plaintiffs*
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, VA 22314
Phone: (703) 684-4333
Fax: (703) 548-3181
E-Mails: bdimuro@dimuro.com;
sneal@dimuro.com; sharris@dimuro.com;
sstine@dimuro.com.
