Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

GLOBAL POLICY PARTNERS, LLC, :

and                          :

KATHERINE FRIESS YESSIN,     :

      Plaintiffs,          :   Civil Action No.:

v.                           :   1:09-cv-859 TSE/TRJ

BRENT YESSIN, et al.,        :

      Defendants.          :

- - - - - - - - - - -

HIGHLY CONFIDENTIAL

30(b)(6) Deposition of

KATHERINE FRIESS

VOLUME 1

Alexandria, Virginia

Tuesday, November 24, 2009

12:42 p.m.

Job No:  1-169330

Pages:  1 - 187

Reported by:  Kelly Carnegie, CSR, RPR



Page 2

1              30(b)(6) Deposition of KATHERINE FRIESS,

2     VOLUME 1, taken at the law offices of:

3

4

5

6              DiMuroGinsberg

7              Suite 200

8              908 King Street

9              Alexandria, Virginia   22314

10

11

12

13

14

15

16              Pursuant to Notice, before Kelly

17     Carnegie, Certified Shorthand Reporter, Registered

18     Professional Reporter, and Notary Public in and for

19     the Commonwealth of Virginia.

20

21

22

Page 3

```
 1                    A P P E A R A N C E S

 2

 3        ON BEHALF OF THE PLAINTIFFS:

 4              STEPHEN L. NEAL, JR., ESQUIRE

 5              DiMuroGinsberg

 6              Suite 200

 7              908 King Street

 8              Alexandria, Virginia  22314

 9              Telephone:  (703) 684-4333

10

11

12        ON BEHALF OF THE DEFENDANTS:

13              CHARLES M. SIMS, ESQUIRE

14              LeClair Ryan

15              Riverfront Plaza, East Tower

16              Eighth Floor

17              951 East Byrd Street

18              Richmond, Virginia  23219

19              Telephone:  (804) 343-5091

20

21        ALSO PRESENT:  Brent Yessin

22
```

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 4

1                    C O N T E N T S

2    EXAMINATION OF KATHERINE FRIESS              PAGE

3        By Mr. Sims                              6

4                    E X H I B I T S

5        (Exhibits attached to the transcript.)

6    FRIESS DEPOSITION EXHIBITS                    PAGE

7     1  Notice of Deposition                      6

8     2  July 1, 2009 E-mail                       22

9     3  July 19, 2009 E-mail                      24

10    4  Global Policy Partners, LLC's

11       Objections and Responses to Defendant's

12       First Set of Interrogatories and

13       Requests for Production of Documents      28

14    5  Amended Complaint                         33

15    6  July 1, 2009 E-mail                       100

16    7  July 1, 2009 E-mail Chain                 101

17    8  July 1, 2009 E-mail Chain                 108

18    9  July 10, 2009 E-mail                      109

19   10  July 22, 2009 E-mail                      124

20   11  From Concept to Completion Invoice

21       with Attachments                         152

22   12  Checking Register                         159

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 5

1        E X H I B I T S   ( C O N T I N U E D )

2    13 Global Policy Partners Invoice            160

3    14 Photocopy of iPhone with Text Message     164

4    15 July 19, 2009 E-mail                       166

5    16 September 24, 2009 E-mail

6       September 9, 2009 E-mail

7       Court Filings                              173

8    17 July 27, 2009 E-mail                       180

9    18 Confidential Proprietary Documents

10      Produced under Protective Order

11      Bates GPP-KFY01324 - GPP-KFY01522          182

12

13

14

15

16

17

18

19

20

21

22

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 31

1        Q    Okay.  So when you opened your

2   GPPWashington.com e-mail address, did you open it

3   using Outlook?

4        A    Most often, yes.

5        Q    So you have downloaded -- you have on your

6   computer system right now all of the e-mails that

7   existed on your GPPWashington.com e-mail address?

8        A    Correct.

9        Q    All right.  Now, you're able to produce to

10  Mr. Yessin today any document that you believe was

11  confidential that Mr. Yessin saw while accessing your

12  account?

13              MR. NEAL:  Objection to the form of the

14  question.

15  BY MR. SIMS:

16       Q    Is that true?

17       A    Well, I don't know what he saw because we

18  haven't gotten that information from the computer

19  forensics yet, so --

20       Q    Well, let me ask you this:  You brought a

21  lawsuit asserting Mr. Yessin saw confidential

22  information on your account?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 32

1       A    Correct.

2       Q    And by "your," I'm talking GPP, GPP

3    confidential information.

4       A    Correct.

5       Q    What information did he see?

6       A    We will know as soon as the computer

7    forensics are done.

8       Q    What was the basis for the --

9            MR. NEAL:  Sir, you're going to have to

10   -- you're going to have to let her answer the question

11   if you're going to ask it.

12   BY MR. SIMS:

13      Q    What was the basis of the lawsuit --

14           MR. NEAL:  I don't think she's done with

15   the answer.  Please read back the question.

16           (The reporter read the requested

17   testimony.)

18           MR. NEAL:  Have you finished your answer?

19   If you have, that's fine.  I'm not trying to testify.

20      A    We'll know as soon as the computer forensics

21   are done because that's the way we know which

22   documents he saw.  In any event, he had no authority

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 36

1          Q    So who in the new business proposals?   I

2    want to know -- these would be proposals that you had

3    received in your e-mail account by July 1, 2009.   So

4    in the May, June, July time period, what new business

5    proposals were located in your e-mail account?

6          A    You're only talking about the May, June, and

7    July of 2000 --

8          Q    And 9.

9          A    2009?   The client proposals that he would

10   have illegally surveilled would have been primarily

11   related to a project I'm working on in India.

12         Q    What's the name of that project?

13         A    It's called Watchful Guardian.

14         Q    Does GPP have a nondisclosure agreement in

15   that?

16         A    Yes.

17         Q    Who is the nondisclosure agreement between?

18         A    The nondisclosure agreement is between GPP

19   and Essem, E-s-s-e-m.

20         Q    Is that -- go ahead.

21         A    There is a nondisclosure agreement --

22              MR. NEAL:   You can answer the question.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 37

1          A    -- between GPP and General Dynamics.   There

2     is a nondisclosure agreement between GPP and Janus

3     Research Group.   There's a nondisclosure agreement

4     between GPP and Eagle Security Corporation.   There's a

5     nondisclosure agreement between GPP and Camber

6     Corporation.

7          Q    How do you spell that?

8          A    C-a-m-b-e-r.   There's a nondisclosure

9     agreement between GPP and Gleason Research Associates.

10    There's one between GPP and International Shield,

11    Incorporated.   I think that's it on that project.

12         Q    Okay.   Are you able to access those

13    nondisclosure agreements today?

14         A    Yes.

15         Q    Is there any reason why you haven't produced

16    those documents?

17         A    I'm waiting for the computer forensics to

18    see if he surveilled that particular project.

19              MR. SIMS:   Steve, that ain't going to

20    work.   You can't do this.   I'm here to take a

21    deposition.

22              MR. NEAL:   No, you're here to stall the

Page 42

1        Q    So the answer is no, you cannot tell me

2    today what that information is?

3                MR. NEAL:   Objection, asked and answered.

4    BY MR. SIMS:

5        Q    Is that correct?

6        A    I will say again --

7        Q    No.   I need you to answer my question.

8        A    I'm answering it.

9        Q    So the answer to my question is correct, you

10   cannot as you sit here today tell me what information

11   that Mr. Yessin looked at that allegedly caused harm

12   to GPP.   Is that a true statement?

13               MR. NEAL:   Objection, asked and answered.

14   You're just arguing with the witness at this point,

15   but you can answer again.

16       A    Again, I say since he accessed -- he

17   illegally accessed --

18               MR. SIMS:   I'm going to call the court.

19               MR. NEAL:   Go ahead and try and call the

20   court.

21       A    He illegally accessed the account without

22   authorization, and we will know once the computer

Page 43

1    forensics are done exactly which documents he

2    accessed.

3              MR. SIMS:  You haven't produced any

4    information to me.  This is what I get, okay?  I'm

5    going to move to compel.  This is not the way a

6    lawsuit gets run, okay?  You don't get to file a

7    lawsuit and say we'll find out later what the basis of

8    our claim is.  I mean, what is the basis of your claim

9    when you filed this?

10             MR. NEAL:  We have plenty of basis.

11   First of all, I'm not here to answer your questions.

12             MR. SIMS:  Well, then I'm going to ask

13   the court this question.  Can we get this in a

14   position so we can read it to the judge?

15             MR. NEAL:  Why don't you build your

16   record first, and then move to file.

17             MR. SIMS:  No, I'm not going to go

18   through this.  This is ridiculous.  You're hiding the

19   ball from me.  You have documents.  I didn't think you

20   had any documents.  You haven't produced anything.

21   You don't have -- you have not produced one document

22   from the GPPWashington.com e-mail address.  When are

Page 46

1    right question is.  I mean, you've got your witness

2    coached.  Let me go through this.  We'll go ahead.

3    We'll go back on the record.

4                    MR. NEAL:  I'm going to take one minute.

5                    (Discussion off the record.)

6                    MR. SIMS:  All right.  I'm going to try

7    to be very specific in my questions.

8    BY MR. SIMS:

9         Q    You and Mr. Weiss approved the filing of a

10   complaint against Mr. Yessin on behalf of GPP.

11                   MR. NEAL:  You have to answer the

12   question verbally.

13                   THE WITNESS:  That wasn't a question, it

14   was just --

15   BY MR. SIMS:

16        Q    What confidential information did you base

17   your decision on?  What information did you believe

18   had been disclosed to Mr. Yessin that you based your

19   allegations on in the complaint?

20        A    I didn't believe anything was disclosed to

21   him.  I believe he illegally accessed my e-mail

22   account and read confidential exchanges of information

Page 47

1    between me and my team.

2         Q    Okay.   Thank you for that correction.   So

3    tell me -- disclosures.   He sees it.   How he got it

4    it, I don't really care, okay?

5         A    Well, "disclosure" implies it was voluntary

6    on my part.

7         Q    Well, I think that's pretty clear that you

8    don't believe it was voluntary.   So what I want to

9    know is what information did you believe Mr. Yessin

10   had, as you state in the complaint, surveilled, all

11   right?   What did he surveil that caused harm to GPP?

12              MR. NEAL:   Objection, compound question.

13              You may answer.

14   BY MR. SIMS:

15        Q    And I'm asking for your belief --

16        A    You asked it in two separate sections.

17        Q    I'm asking you your belief at the time you

18   authorized the filing of the complaint.

19        A    I believed at the time when we authorized

20   the filing of the complaint, based on my belief that

21   the account was illegally and unauthorized accessed,

22   that during the time frame to which you refer, the

exchange of client proposals during that six-week time frame included confidential business proposals for the government of India, six different capacities.

Q And those are the NDAs that you just described earlier?

A You asked me --

Q Or is that something different?

A You asked me which clients. I said it was new business proposals covered by clients that had NDAs and teaming agreements in them. I did not say that the NDAs were part of the e-mail exchange. I said that the NDAs were part of the teaming agreement, which is what you asked me about. You asked which clients had the NDAs, separate and distinct from your question of what I actually expect was in the e-mails that were illegally surveilled.

Q Okay. So tell me again. What did you expect -- who are the clients? What is the information that you believed was seen by Mr. Yessin that caused GPP harm at the time you filed the complaint?

A Again, I say, one, no authorized access to

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 49

1    the account.

2          Q    I understand that.

3          A    Illegal surveillance of the e-mails.

4          Q    I understand that.

5          A    I described to you it's my expectation that

6    everything was read per Mr. Yessin's holding forth

7    that he read all of my e-mails in all of my accounts

8    for two years.  So with that said, keeping in mind the

9    time frame you just described, as I just said to you,

10   it is my belief that at a minimum the client proposals

11   that were put forth to the government of India of

12   which there were, I believe, six separate proposals,

13   during that time frame were illegally surveilled.

14              MR. SIMS:  Would you please produce those

15   to me now?

16              MR. NEAL:  I don't have them now.  You'll

17   need to take that up later.  Once again, you're

18   asking --

19              MR. SIMS:  Is there any reason why you

20   didn't produce that in response to the initial

21   disclosures?

22              MR. NEAL:  Yeah.  The same thing I've

Page 53

1    harm is we'll find out when we find out from the

2    computer forensics.

3         Q    So the answer to my question is as of the

4    time of you filed this lawsuit on behalf of GPP, you

5    weren't aware of any harm caused by Mr. Yessin's view

6    of any information on your GPPWashington.com e-mail

7    address, correct?

8         A    Well, illegal access, unauthorized access is

9    in and of itself harm.  Privacy invasion, unauthorized

10   access, by definition is harm.  We filed the lawsuit

11   to stop the continued access that was not authorized.

12        Q    Was there any information -- again, I'm

13   speaking here only on GPP, okay?  Was there any

14   information that you had on your e-mail, e-mail

15   address related to GPP, that you did not want Mr.

16   Yessin to see?

17        A    By definition, e-mails are private.  I

18   wouldn't want anyone to review my e-mails.

19        Q    I'm not asking that question.  My question

20   is, is there any information on your -- at your e-mail

21   address that GPP did not want Mr. Yessin, its manager,

22   to see?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 54

1          MR. NEAL:  Objection, form of the

2  question, lacks foundation.

3          You may answer.

4     A    He was not authorized to read any of those

5  e-mails, full stop.

6  BY MR. SIMS:

7     Q    No.

8          MR. NEAL:  Stop.

9  BY MR. SIMS:

10     Q    Let me print it down.  Let me make this easy

11  for you, Ms. Friess.

12     A    Friess.

13     Q    Let's say you print down the e-mail and you

14  put it on the table in front of Mr. Yessin.  My

15  question to you -- and I'm not trying to play word

16  games here -- was there a document that resided on

17  e-mail that had you printed it down and laid it on the

18  table, it would be GPP's position that Mr. Yessin

19  should not see that document?

20     A    Yes.

21     Q    Okay.  What document is that?  What

22  information was it that GPP did not want its manager

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 55

1    to see?

2                    MR. NEAL:  Objection, form of the

3    question.

4                    You may answer.

5         A    Any of it.  He wasn't working on the client

6    project.  He did not have authorized access to the

7    e-mail account, full stop.  So by definition, any

8    documents that were on my e-mail account were not his

9    to be accessed.

10   BY MR. SIMS:

11        Q    It's true, is it not, that you did share

12   information on your e-mail account with Mr. Yessin

13   related to GPP's business?

14        A    That's a bit broad.  Can you tighten it up?

15        Q    No.

16        A    Did I share information on GPP?

17        Q    It's true you shared information about GPP

18   that was on your e-mail account with Mr. Yessin?

19        A    Specifically to what are you referring?

20        Q    GPP's business.

21        A    Broadly?

22        Q    Yes.

Page 56

1        A    There are e-mails.  Are you talking about

2    e-mails?  Are you talking about information about the

3    company?  I don't know what you're getting at.

4        Q    I'm talking about GPP's business.  Whether

5    it was contained within an e-mail, a document attached

6    to an e-mail, I really don't care, but you did

7    communicate --

8        A    Don't care?  Is that the question?

9        Q    -- with Mr. Yessin, did you not, about GPP's

10   business?

11       A    Yes, we occasionally communicated about

12   GPP's business and all of his businesses.

13       Q    All right.  And in fact, in connection

14   with -- let's back up.  With India, okay, explain to

15   me what the India proposal is.

16       A    The proposal for India is to do a full-scale

17   counter-terrorism, counter-insurgency campaign for

18   them implementing a broad array of security measures

19   including but not limited to border security, air

20   security, maritime --

21            MR. NEAL:  Slow down, slow down.

22            THE WITNESS:  Sorry.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 57

1       A    Security measures including but not limited

2  to maritime, airport, border security, oil and gas

3  security, sniper training, boots and guns, data

4  centers, fusion centers, command and control

5  operations.

6              MR. NEAL:  Slow down.

7  BY MR. SIMS:

8       Q    Okay.  And what role was GPP having in that

9  project?

10      A    I have the lead on that project, in

11  combination with a company called Essem Security in

12  India, and I lead a team of American companies in the

13  submission of a business proposal to the government of

14  India and various other entities for consideration of

15  our security projects.

16      Q    Has that business proposal been submitted to

17  the government of India?

18      A    I said proposals, and yes.

19      Q    How many proposals have been submitted to

20  the government of India?

21      A    A number of them.

22      Q    Can you tell me the number?

Page 58

1        A    Ballpark, nine.

2        Q    Did GPP participate in each of those

3    proposals?

4        A    Yes.

5        Q    What was its role?

6        A    I just said to you the role was we were, in

7    conjunction with Essem Security as a partner, leading

8    a team of American companies in the submission of

9    these proposals.

10       Q    So you're putting together groups of people

11   to provide services in a specific area, you're not

12   going to provide the services.  Is that right?  GPP is

13   the not going to provide --

14       A    That is not right.

15       Q    That's what I'm trying to get to.

16       A    Okay.  Ask the question.

17       Q    I'm trying to find what is GPP doing?  Let's

18   take proposal number one.  What service is GPP

19   providing to India?  Can we go down to that detail?  I

20   want to make this on the record how difficult this is

21   because I don't have these proposals, okay?  So you

22   can play games with me, but I don't have the

Page 59

1    information.  So I'm asking you for -- we're going to

2    walk through it, so give me proposal number one.

3                    MR. NEAL:  First of all, I want to make

4    an objection for the record.

5                    MR. SIMS:  You can see what you're doing

6    to me.

7                    MR. NEAL:  Stop.  Relax.  There's a fair

8    amount of tension going on, but I don't think you're

9    helping the witness answer your question.  So why

10   don't we keep the temperature down, ask the questions,

11   and she'll answer them.

12                   MR. SIMS:  All right.

13   BY MR. SIMS:

14       Q    So proposal number one, why don't you

15   describe that.

16       A    First of all, they're not enumerated.

17       Q    Well, how do you describe it?

18       A    I can tell you generally how the proposals

19   are put forth.

20                   I put together a team, as I've already

21   told you twice, of major U.S. defense contractors.  We

22   offer a menu of services in the counter-terrorism

Page 60

1    security space.  We have individually tailored

2    proposals to various entities in the government of

3    India.  GPP and Essem are the contracting entities for

4    those proposals.  GPP manages the proposals assuming

5    that they are accepted and executed.

6              So we create the team, we lead the

7    proposals, and we manage the contracts and do the work

8    in India if we were to get those done.  However, since

9    Mr. Yessin e-mailed the CEO of the company that is my

10   partner and essentially defamed me and undercut all

11   the work I'm trying to do there, none of those

12   proposals have actually been accepted right now.

13        Q    The e-mail that you're talking about, is it

14   an e-mail where he copied all the public records in

15   this case?

16        A    Yes, he did.

17        Q    Okay.  So you knew that was a possibility

18   when you filed the lawsuit that these public records

19   would be seen by folks in India, did you not?

20              MR. NEAL:  Objection, form of the

21   question, lacks foundation.

22        A    Certainly not.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 61

1    BY MR. SIMS:

2         Q    You don't believe that records filed

3    publicly are not available to the public?

4         A    I think it's highly unlikely that an Indian

5    CEO would be accessing American court records in a

6    divorce proceeding.

7         Q    Okay.

8         A    No.

9         Q    So other than the disclosure of the public

10   records, is there any other information that you

11   believe Mr. Yessin has disclosed to anyone else that

12   has caused the government of India, the government of

13   India and whoever else you're dealing with, not to

14   accept these proposals?

15        A    He intentionally poisoned the well with the

16   CEO of the partner company with which I was working.

17        Q    How did he poison the well?

18        A    You read the e-mail.

19        Q    It's that e-mail?

20        A    It's on its face.

21        Q    Other than that e-mail, you're not aware of

22   any other communications Mr. Yessin's had with that

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 62

1    CEO?

2        A    Well, we'll find that out when the computer

3    forensics comes back, won't we?

4        Q    So the answer to my question -- and I would

5    like an answer to my question -- the answer to the

6    question is no, you're not aware of any other

7    information?

8        A    Not yet.

9        Q    And you weren't aware of that information

10   when you filed the complaint, were you?

11            MR. NEAL:   Objection, form of the

12   question.

13       A    Aware of what information?

14   BY MR. SIMS:

15       Q    The e-mail that Mr. Yessin sent to the

16   CEO -- and we'll get that e-mail -- came after the

17   filing of the lawsuit, did it not?

18       A    Well, he certainly didn't copy me on it, so

19   yes, I was not aware of that at the time.

20       Q    So before the filing of the lawsuit, are you

21   aware of any communication between Mr. Yessin and

22   anyone associated with the Indian government related

Page 66

1      Q    -- if you were ordered to do that?

2           Now, let me ask you this:  Other than

3    the India project, is there any other information that

4    you believe Mr. Yessin saw when he accessed your

5    e-mail account that has impacted GPP's operations?

6      A    I assume based on his statements, Mr.

7    Yessin's statements, of reading all of my e-mails for

8    the entire time that he's known me that he read every

9    single e-mail during that time frame which, again, I'm

10   sticking this to the May to July time frame, which I

11   assume you are, but you didn't state --

12     Q    No.  I'm asking you are you aware of any

13   other information that Mr. Yessin reviewed on your

14   e-mail account related to GPP that as a result of his

15   review, GPP's business operations were adversely

16   impacted?

17     A    Again, illegal access, unauthorized access

18   of the e-mails on an e-mail system to which he didn't

19   even have an e-mail in-box or e-mail account of his

20   own is in and of itself harmful to the business of

21   GPP.  The communications he had with my partner client

22   in India were damaging, obviously; verbal

Page 67

1    communications he's had with one of my subcontracts,

2    verbally damaging as well; and I assume there have

3    been many others that I don't know about which is why,

4    again, we're undertaking the computer forensics.

5         Q    Okay.  Now, put aside your statement.

6    Answer my question.  Can you answer my question?

7              MR. NEAL:  Objection, asked and answered.

8    Again, you're arguing with the witness.

9              MR. SIMS:  I'm not.  I need an answer.

10   Either the answer is no or it's yes.  It's yes, I'm

11   aware of other information that he reviewed that

12   adversely impacted and this is the information, or no,

13   I'm not aware of it.  That's not to say, Ms. Friess,

14   that you may not later become aware of some

15   information.

16   BY MR. SIMS:

17        Q    I'm asking you as you sit here today as a

18   corporate representative of GPP, are you aware of any

19   other information -- put India aside -- that Mr.

20   Yessin looked at, reviewed, surveilled, whatever

21   definition you want to put on it, that was in your

22   e-mail account that adversely, because he looked at

Page 68

1     it, there was an adverse impact on GPP's operations?

2                    MR. NEAL:   Objection, asked and answered.

3     BY MR. SIMS:

4          Q    So the answer is yes or no.

5          A    Am I aware of what he reviewed?

6          Q    Are you aware of anything?

7          A    I don't know what he reviewed, which is why

8     we're getting the computer forensics.

9          Q    So the answer is no, you're not aware,

10    correct?

11                   MR. NEAL:   Objection, asked and answered.

12    BY MR. SIMS:

13         Q    Is that right?

14         A    The answer is I will be aware of what he

15    accessed once we get the results of the computer

16    search.

17         Q    So your subcontractor that you referenced,

18    who is that?

19         A    It's Gleason Research Group that you have on

20    your list of NDA-covered clients.

21         Q    And what did you learn in speaking to

22    Gleason Research Group?

Page 69

1          A    I learned in speaking with one of their

2     senior representatives, who is the one that brought

3     them to my project in India and with whom I was

4     working on a separate representation contract, not

5     just through the India project, that Mr. Yessin had

6     said to him on more than one occasion that my

7     communications were not secure, that they should not

8     be working with me, and that I had no chance of

9     closing the India project, thereby undercutting the

10    business I was doing and could have been doing with

11    Gleason Research Group.

12         Q    Who is that person?

13         A    His name is Dave Chandler.

14         Q    And when did you speak to Mr. Chandler that

15    he relayed that information to you?

16         A    Sometime in July.  I couldn't give you an

17    exact date.

18         Q    Was this one conversation you had with him

19    where he relayed this information?

20         A    It was two conversations because, as I said,

21    it was more than one incident with Mr. Yessin.

22         Q    All right.  So when was the first

Page 71

1      Q    Did Mr. Chandler tell you that he believed

2   what Mr. Yessin said to him?

3      A    I didn't ask him if he believed what Mr.

4   Yessin said.  You'd have to ask Mr. Chandler that.

5      Q    Did Mr. Chandler tell you that you needed to

6   do something to secure your e-mail system?

7      A    He did not.

8      Q    Did you later communicate with Mr. Chandler

9   to say you had taken action to secure GPP's e-mail

10  system?

11     A    I had already taken action to secure GPP

12  system at that point in time.  Being that the only

13  improper access to the system was Mr. Yessin, it was

14  pretty easy.

15     Q    And that easy fix was to change the password

16  on your e-mail system?

17     A    We changed out the whole thing.

18     Q    Okay.  But the easy fix was to change your

19  password, was it not?

20          MR. NEAL:  Objection, asked and answered.

21     A    Well, it's an initial fix.

22  BY MR. SIMS:

Page 72

1        Q    Okay.

2        A    Because we know -- when you know what the

3    single point of illegal access to the system is, then

4    you pinpoint that point of access to be able to

5    address the situation.  Since it was illegal and

6    unauthorized on Mr. Yessin's part, we took a variety

7    of measures to secure the system.  But it was easy,

8    quote, in that it was only one person, one access that

9    was coming in that was destroying our systems.

10       Q    Right.

11       A    It wasn't like a --

12       Q    That single access was Mr. Yessin using your

13   user name and password, correct?

14       A    That's what we believe.

15       Q    That's all you are aware of as you sit here

16   today, correct?

17       A    He says that he accessed Jeffrey Weiss's

18   account as well, so he accessed two of them.  It's in

19   his interrogatories, so --

20            MR. SIMS:  You know, this deposition

21   would really go more quickly if she'd just answer my

22   questions.

Page 77

1    aware of any fact.

2                    MR. NEAL:   Okay.   There's no question

3    pending.

4    BY MR. SIMS:

5        Q    So my question is, okay, as you sit here

6    today, the only point of access that you're aware of

7    Mr. Yessin into the GPP computer system is the use of

8    your user name and password?

9        A    The only access that I know that he

10   illegally obtained in the system is based on his

11   representation that he accessed and read everything in

12   the system.   I assume he did that by using my password

13   and my e-mail address.

14       Q    All right.   And when you learned or became

15   aware that he might be doing that, you changed your

16   user name, did you not?

17       A    I changed everything because I don't know

18   the extent of access that he has.   He may have access

19   in a variety of capacities.   He may have spyware on my

20   computer.   He may have any access -- any amount of

21   access.

22                    I don't know exactly how he accessed

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 78

1    it, so I took every step possible to secure the

2    company systems by changing servers, changing IT

3    vendors, changing e-mail addresses, changing

4    everything, because I don't know where he's

5    compromised the system.  All I know is that he is the

6    compromising person who has illegally gotten into the

7    system.

8         Q    Okay.  So the first thing you did is you

9    changed your password, correct?

10        A    Correct.

11        Q    All right.  And you did that -- and I think

12   you have the document.

13        A    June 24.

14        Q    You did it on June 24?

15             MR. NEAL:  Let him get his question out,

16   okay?

17   BY MR. SIMS:

18        Q    When you changed your password, did Mr.

19   Weiss change his password?

20        A    You'd have to ask Mr. Weiss.

21        Q    I'm asking you as the representative of GPP.

22   I'm asking the corporate representative.  Did Mr.

Page 80

1    of the firm?

2         Q    I would.

3         A    Are you not aware of the structure of the

4    firm?

5         Q    I am asking you for the structure of the

6    firm.

7         A    There are two managers, Mr. Weiss and

8    myself.

9         Q    I'm asking as of June 24.

10        A    As of June 24, there were three managers,

11   Mr. Weiss, myself, and Mr. Yessin who illegally

12   accessed the e-mail accounts.

13        Q    Were there any other employees?

14        A    No other employees.

15        Q    Any consultants?

16        A    We have consultants.

17        Q    Who are the consultants?

18        A    At that point in time, Peter McIllwain.

19        Q    Did he -- did Peter McIllwain have an office

20   at GPP?

21        A    These are consultants, so they don't work

22   for us.  They are on per case-by-case basis.  When we

Page 84

1             THE WITNESS:  L-a-l-i-t M-a-t-t-u.

2    BY MR. SIMS:

3         Q    When was the last time you spoke with Mr.

4    Mattu?

5         A    Shortly after the e-mail from Mr. Yessin to

6    Mr. Mattu.

7         Q    All right.  And tell me everything you

8    recall about the conversation you had with Mr. Mattu.

9         A    Everything that I recall about the

10   conversation?

11        Q    Yes.

12        A    I told him I was terribly embarrassed about

13   the e-mail Mr. Yessin sent and I was sorry he had to

14   be dragged into a domestic dispute.

15        Q    And what did he say in response?

16        A    He said I'm sorry, too.

17        Q    Was there anything else discussed?

18        A    Not that I remember.

19        Q    And was that the last conversation you had

20   with Mr. Mattu?

21        A    It is indeed.

22        Q    Okay.  Before that conversation, how often

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 85

1    were you speaking to him on a monthly basis?

2         A    Weekly.

3         Q    You were speaking with him on a weekly

4    basis?

5         A    If not more.

6         Q    Did you ever have difficulty in getting a

7    hold of him?

8         A    No.

9         Q    He's fairly responsive?

10        A    Uh-huh.

11        Q    You need to say yes.

12        A    Yes.

13        Q    Has Mr. Mattu told you that India is not

14   going to go forward with your proposals?

15        A    He has said that they are not going forward

16   with the proposals for security training in New Delhi.

17        Q    When did he tell you that?

18        A    Right around that same time.  I couldn't

19   give you the exact date.

20        Q    Was it before or after your conversation

21   about Mr. Yessin's e-mail?

22        A    After.

Page 87

1      A    As well as what?

2      Q    As well as the other ones that you're not

3  getting.

4      A    Yes.

5      Q    My question -- I'm not going to try to be a

6  wordsmith here.  Is Mr. Mattu your key point of

7  contact in India for all of these proposals?

8      A    I believe you asked me that a few minutes

9  ago, and the answer is still yes.

10     Q    Has Mr. Mattu indicated to you when the home

11 minister or the intelligence bureau, when these other

12 departments or states will be deciding whether to go

13 forward with your proposals or not?

14     A    The last time he told me about those was

15 prior to at the mail sent by Mr. Yessin, and they were

16 supposed to be, quote-unquote, imminent, and nothing

17 has happened.

18     Q    Are you aware of why nothing has happened?

19          MR. NEAL:  Objection.

20 BY MR. SIMS:

21     Q    Has anybody told you?

22          MR. NEAL:  Objection, form of the

Page 88

1    question.

2              You may answer.

3         A    I have no idea.

4    BY MR. SIMS:

5         Q    So do you know whether it was anything that

6    Mr. Yessin did that has caused these other proposals

7    not to be accepted by this point in time?

8         A    I don't know.  I would assume it didn't help

9    when you cast dispersions on a corporate partner who's

10   handling the security contracts.

11        Q    Let me ask you this:  Did Mr. Mattu tell you

12   that he had spoken to anyone within the Indian

13   government about the e-mail he received from Mr.

14   Yessin?

15        A    I've never had that discussion with him.

16        Q    So you're not aware either through

17   conversations with him or anyone else that Mr.

18   Yessin's e-mail went any further than Mr. Mattu?

19        A    I have no idea where Mr. Yessin's e-mail

20   went.

21        Q    Okay.  And Mr. Mattu --

22        A    Other than, of course, the other person who

Page 89

1    was cc-ed on it.

2        Q    Mr. Mattu is not the decision maker for any

3    of these proposals on behalf of India, is he?

4        A    He's a consultant to the government of India

5    and he is frequently on the security team flying with

6    the prime minister.  So yes, he's got a great hand in

7    these proposals.

8        Q    So he is a decision maker?

9        A    He is part of the decision making process.

10       Q    Okay.  But ultimately, who is it that must

11   accept the proposal for the intelligence bureau?

12       A    The national security advisor.

13       Q    And Mr. Mattu doesn't -- isn't the national

14   security advisor, is he?

15       A    No, he's not.  As I told you, he's the CEO

16   of Essem.

17       Q    Now, what is the relationship between GPP

18   and Essem?

19       A    As I told you, they are my partner company

20   for which we have come together to pitch security

21   projects in India.

22       Q    Do you have a joint venture agreement?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 90

1    That's what I'm trying to get to.

2         A    No.

3         Q    Do you have any sort of agreement with

4    Essem?

5         A    Yes.

6         Q    What kind of agreement is it?

7         A    We have a teaming agreement.

8         Q    Did Mr. Yessin review that teaming agreement

9    on behalf of GPP?

10        A    I asked him in the capacity as my husband

11   and as a corporate lawyer to take a spin through part

12   of the legal review of the document, yes.

13        Q    All right.  So Mr. Yessin was aware of the

14   teaming agreement?  As far as you had knowledge of, he

15   was aware of the teaming agreement between GPP and

16   Essem?

17        A    Of course he was.  We were married.

18        Q    He was also aware, was he not, of the

19   proposals that GPP was making?

20        A    He was aware of the proposals, but he was

21   not involved with the content of them.

22        Q    Okay.  Was there any -- do you have any

Page 95

1      account?

2           A    June 24 and July 1?

3           Q    July 1, yes.

4           A    That was the primary action that I took.

5           Q    Your e-mail account is an e-mail account

6      that's hosted on the GoDaddy.com Web site, correct?

7           A    When you say my e-mail account, I assume

8      you're referring to the GPP Washington e-mail account

9      --

10          Q    Yes.

11          A    -- at dispute here?

12          Q    I am.

13          A    Yes.

14          Q    All right.  GPP doesn't own a server, does

15     it?

16          A    Correct.

17          Q    It doesn't have a network system?

18               MR. NEAL:  Objection, form of the

19     question.

20          A    We have an e-mail network of systems for the

21     people that work at GPP of which, of course, Mr.

22     Yessin does not have one.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 96

1    BY MR. SIMS:

2        Q    That e-mail system that you're referring to

3    was what's hosted on the GPP -- excuse me, on the

4    GoDaddy.com Web site?

5        A    Yes, via Jon Hageman's company, Logical Web.

6        Q    GPP itself doesn't own any computers that

7    are networked?

8            MR. NEAL:    Objection, form of the

9    question, lacks foundation.

10           You may answer.

11   BY MR. SIMS:

12       Q    Do you understand what a computer network is

13   where you have a server that computers can log into?

14       A    Yes.    I'm well aware of what a computer

15   network is.

16       Q    You do, but you filed a complaint where you

17   make an allegation that GPP owned a computer server,

18   and it doesn't, does it?

19       A    I don't believe it was stated in the

20   complaint that we owned a server.

21       Q    Take a look at the complaint which we've

22   marked as Exhibit 5.    Look at paragraph two.

Page 99

1    system?

2          A    Yes.

3                MR. NEAL:   Objection, asked and answered.

4                Let me get my objection in, okay?   You

5    can say whatever you want, but let me get my objection

6    in.

7    BY MR. SIMS:

8          Q    What policies and procedures did GPP have in

9    place to ensure the security of its computer system?

10         A    We allocated e-mail addresses, e-mail names

11   and passwords to people that were authorized to access

12   the system.

13         Q    Did it have any written policies and

14   procedures?

15         A    We did not have written policies and

16   procedures.

17         Q    Look at paragraph 14.   There you write,

18   "Defendant was not an authorized user on the GPP

19   computer and e-mail system."   There you're

20   distinguishing between computer and e-mail system.   So

21   what computer are you referring to?

22               (Whereupon there was an interruption in

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 110

1        A    I couldn't tell you exactly.

2        Q    Do you recall having a conversation with him

3   between July 1 and July 10, 2009 related to this issue

4   with Mr. Yessin?

5        A    I have no specific recollection of a phone

6   call on those days.  Obviously we tried to set

7   something up.  I assume we probably did, and I

8   couldn't begin to tell you what we walked about.

9        Q    All right.

10       A    I really don't have any specifics for that.

11       Q    Do you have a recollection of any discussion

12   that you had with Mr. Hageman between July 1 and, say,

13   July 31, 2009?

14       A    Yes.

15       Q    Okay.  Which conversation do you have a

16   specific recollection of?

17       A    He told me that Mr. Yessin had called and

18   demanded my passwords and had told him that he was

19   going to be legally liable if he didn't hand over the

20   password, and that he needed to have an account set up

21   so that my e-mails would all forward to Mr. Yessin,

22   notwithstanding the fact that Mr. Yessin had no e-mail

Page 111

1    on the system.

2            Q    Okay.  Do you recall when that conversation

3    was?

4            A    Sometime in July.

5            Q    Okay.  Did Mr. Hageman tell you that he

6    wasn't willing to do that?

7            A    Yes.

8            Q    All right.  And other than what you just

9    described, is there anything else that was discussed

10    during that conversation?

11           A    Not to my recollection.

12           Q    Did you take any notes --

13           A    No.

14           Q    -- of the meeting?  Okay.  Is there anything

15    that you could look to that would help you refresh

16    your recollection as to what that conversation was

17    about?

18           A    If something exists, I don't remember it.

19           Q    Okay.  You didn't follow it on with an

20    e-mail exchange with him, as far as you're aware?

21           A    I don't believe so.

22           Q    All right.  Now, did you discuss with anyone

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 112

1    else what your discussion was with Mr. Hageman, other

2    than your lawyer?

3         A    I discussed it with Jeffrey Weiss.

4         Q    Okay.  Did you talk with him that day that

5    you had the conversation, or shortly after the

6    conversation?

7         A    Within a reasonable time frame thereafter.

8         Q    And what did you tell Mr. Weiss?

9         A    I repeated the conversation with Mr.

10   Hageman.

11        Q    And what did Mr. Weiss say in response?

12        A    He said good when I said Jon said he

13   wouldn't do it, it's a violation of the law.  Mr.

14   Yessin was asking him to violate the law, Hageman said

15   no, Jeffrey said sounds good to me.

16        Q    Okay.  Now, during this time period between

17   June 24, 25 when you changed your password and the

18   conversation you had with Mr. Hageman where he

19   indicates that Mr. Yessin is asking him to get access

20   or have your e-mails transferred, had you taken any

21   other steps other than changing your password to

22   protect your e-mail account?

Page 113

1       A    Between what date and what date, please?

2       Q    Well, let's do this.  What was the next --

3    after you changed your password, what was the next

4    step you took in order to remedy or correct the

5    circumstances of Mr. Yessin having access to your

6    e-mail account?

7       A    The next step I took to correct and remedy

8    the illegal breach was to remove e-mails, set up a new

9    server, a new IT host, new passwords, new e-mail

10   addresses.  Excuse me.

11      Q    All right.  Did all that occur at the same

12   time?

13      A    Virtually.

14      Q    All right.

15      A    Probably over a period of a couple weeks,

16   because you have to bid on sites and go through

17   Network Solutions and purchase your domain names and

18   stand it up and find a new IT guy.  I mean, it all

19   happened in the course of two weeks, but --

20      Q    So this happened in the July time period?

21      A    Correct.

22      Q    All right.  So it would be the first part of

Page 114

1    July?

2         A    First two weeks, correct.

3         Q    All right.  When you say "remove e-mails,"

4    what do you mean by that?

5         A    I don't think I said "remove."

6              MR. NEAL:  You did, if you want to

7    clarify your answer.

8              THE WITNESS:  I'm sorry.

9         A    I misspoke then.

10   BY MR. SIMS:

11        Q    All right.

12        A    I'll restate it.

13        Q    Restate it.

14        A    We got new domain names, new e-mails, new

15   passwords, new e-mail addresses, new web host, new IT

16   guy.

17        Q    Okay.  Now, to getting a new -- excuse me.

18   Let me ask a new question:  The domain name that GPP

19   had before July 1, what was that domain name?

20        A    Before July 1?

21        Q    Yes.

22        A    GPPWashington.com.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 115

1          Q    And who owned that?

2          A    Who owned the domain name?

3          Q    Yes.

4          A    It was registered by Jon Hageman and it was

5    registered at Brent Yessin's request.

6          Q    Okay.  So did he own it?

7               MR. NEAL:  Objection, form of the

8    question.

9          A    It was registered in Hageman's name.

10   BY MR. SIMS:

11         Q    Did GPP --

12         A    GPP own the domain name?

13         Q    That domain name.

14         A    I don't believe so, no.

15         Q    Okay.  That's why GPP went out after July 1

16   and got a domain name?

17         A    Yes.  We got a new -- we got a new domain

18   name because of the threats from Mr. Yessin.

19              MR. NEAL:  Just hold on a second.

20         A    The original domain name --

21              MR. SIMS:  Hold on.

22              MR. NEAL:  Just for one second.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 116

1              MR. SIMS:   You've answered.

2              (Discussion off the record.)

3              MR. NEAL:   I'm sorry.   You can go ahead.

4    BY MR. SIMS:

5         Q   You, I think, were going to complete your

6    answer.   If you need to do that, go ahead.

7         A   The original domain name, which was

8    registered by Hageman and was registered in Brent

9    Yessin's name at the time, at the time Mr. Yessin was

10   a manager of GPP, and therefore there was an

11   association between GPP and the manager of the

12   ownership of the domain name.

13        Q   When you moved the domain name or changed

14   the domain name, was that after you had removed him as

15   manager?

16        A   I believe, yes.

17        Q   So having to purchase a new domain name is

18   something GPP needed to do after it removed Mr. Yessin

19   as a manager?

20             MR. NEAL:   Objection, form of the

21   question, lacks foundation.

22        A   No.   We could have continued to use GPP, but

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 117

1    in order to secure the systems, we changed everything

2    because we didn't know exactly how he was accessing

3    the systems.  We knew it was illegal, we knew it was

4    inappropriate, and we knew we needed to protect

5    ourselves.  So we changed out everything, and we

6    changed -- we did the changeout -- actually, we did do

7    the changeout prior to -- prior to eliminating him as

8    manager of the company.  So please fix that for the

9    record.  It was beforehand.

10   BY MR. SIMS:

11       Q    So had you decided to remove him as a

12   manager at that point in time?

13       A    No, actually not.  Can I clarify one thing

14   in that context?

15       Q    Yes.

16       A    Once I discovered that he was in the e-mail

17   system illegally and he was trying to access it by

18   requesting illegal activity of our IT guy, that was

19   the point in time we decided everything needed to be

20   changed out.  The password was changed immediately,

21   and we started the process of changing the Web site,

22   the domain, and everything at that point in time.  So

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 118

1    it really would have gone back to June 25, but it

2    takes time to get all that done, so it didn't actually

3    take effect until the middle of July.

4           Q    Okay.

5           A    So the decision to go forward with that was

6    in fact based upon the realization of the breach.

7           Q    Okay.  I've got that receipt and I can't

8    find it in here.  I thought I had it right here.  The

9    invoice -- who was it?  Who was the IT person that GPP

10   used when it transferred to the new domain name?

11          A    His name is Shawn.

12          Q    Shawn?

13          A    Shawn Hilbig, H-i-l-b-i-g.

14          Q    Okay.  And who paid for that?

15          A    I did.

16          Q    Personally, or on behalf of GPP?

17          A    On behalf of GPP.

18          Q    Now, how was that transfer effected from the

19   old GPPWashington.com e-mail account to the new

20   account?  Were those e-mails just -- was there a

21   computer program that would just transfer those

22   e-mails over?  That's what I'm asking.  How was that

Page 120

1    transfer of old data?

2          A    Correct.

3          Q    Now, when you opened up Outlook to access,

4    would those -- would those, the two e-mails either

5    from GPP Washington or Global Policy, all be part of

6    the same Outlook e-mail?

7          A    Yes.

8          Q    Okay.  Did you commence using the

9    GlobalPolicyPartnersLLC.com e-mail address before

10   shutting down the GPPWashington.com e-mail address?

11         A    Shutting it down in what respect?

12         Q    Where you stopped using it.

13         A    Yes.

14         Q    Okay.  At any time before you started using

15   the GlobalPolicyPartnersLLC.com e-mail address, did

16   you see or have any evidence of e-mails or data on the

17   GPPWashington.com e-mail address that appeared to be

18   corrupted or you had lost data?

19              MR. NEAL:  Objection, form of the

20   question, lacks foundation.

21         A    Corrupted how?

22   BY MR. SIMS:

Page 121

1          Q    In any way where you couldn't access the

2     information, you felt like it had been altered, you

3     had seen it in one form before and now it was in a

4     different form.

5          A    No.

6          Q    Okay.  So other than -- is it fair to say

7     other than Mr. Yessin seeing your e-mails in the

8     GPPWashington.com e-mail address, as you sit here

9     today you don't have any evidence to suggest that Mr.

10    Yessin altered or changed data that was located or

11    resided on that e-mail address?

12              MR. NEAL:  Objection to form, calls for

13    speculation, lacks foundation.

14         A    That he corrupted data in my in-box?

15    BY MR. SIMS:

16         Q    Yeah.  What I'm asking is as you sit here

17    today, you don't have any reason to believe that Mr.

18    Yessin altered or changed any data that was residing

19    on the GPPWashington.com e-mail address?

20         A    I don't have any --

21              MR. NEAL:  Same objection.

22              You can answer.

Page 122

1          A    Yeah.  I have no idea what he did with the

2    e-mails that he opened.

3    BY MR. SIMS:

4          Q    Right.  But you don't have -- sitting here

5    today, you're not aware of any evidence that suggested

6    he did corrupt it?

7               MR. NEAL:   Same objection.

8    BY MR. SIMS:

9          Q    That all he did was look at the information?

10              MR. NEAL:   Same objection.

11         A    Well, I know that he forwarded the

12   information because you've given us a whole one copy

13   of that.

14   BY MR. SIMS:

15         Q    Right.

16         A    So he did more than just look at it, if

17   that's your point.  He looked at it, he forwarded it,

18   he copied, he cut and pasted.  I don't know what else

19   he did, but we know for sure that he opened it, and we

20   know for sure he forwarded it to somebody else at

21   least in one instance.

22         Q    That e-mail that you're referring to is an

Page 126

1   unauthorized access is by itself harmful to the

2   company.  He did not have access, he did not have

3   authority to access the accounts, and because we knew

4   he was accessing the account and we didn't know what

5   the damage was, we needed to stop it immediately.

6        Q   As of July 22, 2009, had GPP lost any

7   business as a result of Mr. Yessin's actions?

8             MR. NEAL:  Objection, form of the

9   question, calls for speculation.

10       A   As of July 22?

11  BY MR. SIMS:

12       Q   Yes.

13       A   I don't think we knew at that point.

14       Q   Sitting here today, can you tell me whether

15  it is GPP's position that as of July 22, 2009 it had

16  suffered a loss of any business as a result of Mr.

17  Yessin's activities?

18            MR. NEAL:  Objection, same objection as

19  last time, and now I'll add asked and answered.

20       A   As of this point in time -- and again, until

21  we find what the computer forensics say in terms of

22  what he did with the information, what he did with the

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 127

1      data -- the fact that we haven't received any of the

2      proposals back or any confirmation from India after he

3      used the information he accessed to send defamatory

4      e-mails to my partner client and others, I would say

5      that we certainly have a suspicion if that's the case.

6      BY MR. SIMS:

7           Q    All right.  As of July 22, 2009, had there

8      been any interruption in GPP's business caused by

9      Brent Yessin's conduct?

10               MR. NEAL:  Objection, objection, asked

11     and answered.

12               You may answer it again.

13          A    There's tremendous interruption caused by

14     this, not the least of which is the time we had to

15     spend dealing with this, removing the e-mails --

16     excuse me, moving the system over to another system,

17     having to inform clients and colleagues that we had

18     new systems up and new information, new contact

19     information.  There was tremendous disruption to the

20     business.

21     BY MR. SIMS:

22          Q    Quantify that.  Can you?

Page 128

1      A    I can't.

2      Q    How about interruption in -- was there any

3  point in time where your potential customers could not

4  communicate with GPP via e-mail as a result of Mr.

5  Yessin's actions?

6      A    Well, for potential clients and other

7  professional contacts, if there are people that don't

8  have our new e-mail address, they cannot contact us,

9  full stop.

10     Q    Well, I thought you told me you kept the old

11  GPPWashington.com e-mail address up at the same time

12  you had the Global Policy?

13     A    It was a concurrent switchover.

14     Q    Okay.  Are you aware of any customer -- did

15  any customer tell you, potential customer, that they

16  had trouble communicating with you, that e-mails got

17  bounced back?

18     A    Yeah, we have.  I have gotten calls about

19  bounce-backs.  But also, if they couldn't contact us,

20  then how would I know that they couldn't contact us?

21  By definition, if they can't contact us, I wouldn't

22  know that.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 129

1        Q    All I can ask you is what you know.  So has

2    anybody -- you've had calls with people who said they

3    got bounce-backs on e-mails?

4        A    Bounce-backs.

5        Q    Okay.  Who were those people?

6        A    I couldn't begin to tell you.  Just, you

7    know, random phone calls --

8        Q    All right.  How about anybody --

9        A    People that say what happened to your

10   e-mail.

11       Q    I'm sorry.  I didn't mean to speak over you.

12   Are you done?

13       A    Yes.

14       Q    Has anyone e-mailed you to tell you I had a

15   hard time getting a hold of you?  Do you have my

16   written communications?

17       A    Well, if they e-mailed the account and it

18   bounced, then by definition they couldn't e-mail me.

19   So I wouldn't be able to receive an e-mail saying that

20   they couldn't reach me.

21       Q    I'm not asking you that.  I'm asking you

22   whether -- I will disagree with you, Ms. Friess.  I

Page 130

1    will say that if somebody goes to your

2    GPPWashington.com Web page, they will find your

3    e-mail, will they not?

4              MR. NEAL:  First of all, objection.

5    BY MR. SIMS:

6         Q   So if they get a bounce-back, they can look

7    and they can e-mail you and say, you know, we didn't

8    communicate.  That's all I'm asking, did you get an

9    e-mail, because if you didn't, just say you didn't.

10             MR. NEAL:  Objection.

11   BY MR. SIMS:

12        Q   Did you get an e-mail?

13             MR. NEAL:  Objection, asked and answered.

14   You're arguing with the witness again.

15        A   Mr. Sims --

16             MR. NEAL:  Just answer the question.

17   BY MR. SIMS:

18        Q   Yeah.  My issue here is I've got to ask the

19   questions.  I've got to know whether you've got

20   something in writing because you haven't produced it

21   to me.  So if you don't have anything, that's fine.

22             So if I can, did anybody write you,

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 131

1    communicate to you in any way that was in written form

2    to say we weren't able to contact you, we've had

3    difficulty, there's an interruption in your service?

4    Any of those written communications?

5             MR. NEAL:  Same objection.

6             You can answer.

7        A    I'm going to help you.  I think your

8    contention is that if they e-mailed the old address

9    and it bounced that they then went to the Web site and

10   they found the new e-mail address.  Is that what

11   you're trying to say?

12       Q    Okay.  No.  I'm just asking whether you

13   have --

14       A    Because they wouldn't be able to get to the

15   new Web site because you wouldn't know there was one.

16       Q    I'm asking you whether you have something in

17   writing from somebody?

18       A    No.  By definition, not.

19       Q    Thank you.

20       A    That's ridiculous.

21       Q    What clients did you notify about the change

22   in the e-mail address?

Page 134

1      Q    What comprises the hours that you are

2   contending supports your damage claim?

3              MR. NEAL:  Objection to the form of the

4   question.  Which part of the damage claim, or all of

5   it?

6              MR. SIMS:  I'll tell you what.  Let me --

7   I'll tell you what.  We'll have you --

8              MR. NEAL:  Give me one second.  I'm

9   trying to help you get your documents, so I need to

10  get something.

11             MR. SIMS:  Okay.

12             (A brief recess was had.)

13             MR. NEAL:  Go ahead.  I'm sorry.

14             MR. SIMS:  If you need to, go ahead.

15             MR. NEAL:  No, no.  When she comes in,

16  she'll take back a couple things, and they're yours.

17             MR. SIMS:  All right.

18  BY MR. SIMS:

19      Q    Ms. Friess, if you would take a look at what

20  we had marked as Exhibit 4, which is GPP's Objections

21  and Responses to Defendant's First Set of

22  Interrogatories, and turn to page 11.  The first full

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 135

1    paragraph on page 11 starts with, "In addition, Ms.

2    Friess Yessin suffered loss of income in the amount of

3    at least $27,500 by spending more than 50 hours of her

4    time for which she billed $550 an hour investigating

5    defendant's intrusion, securing the Web site, and

6    transferring the Web site and e-mails."

7                  So I understand that that's a component

8    of your personal damages in this case.  Is that

9    correct?

10                 MR. NEAL:  Objection to form of the

11   question, lacks foundation.

12                 You can answer.

13       A    That's part of the damages.

14   BY MR. SIMS:

15       Q    All right.  And I want to be clear.  That's

16   damages for you individually as opposed to GPP?

17                 MR. NEAL:   Objection to form, lacks

18   foundation.

19       A    No, that's actually for both because it's

20   time away from GPP that I would otherwise be spending

21   doing business.  So it's twofold.

22   BY MR. SIMS:

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 136

1          Q    So who gets the damages?   If the jury comes

2     back and awards damages, is it GPP, or is it you?

3                MR. NEAL:   Objection, calls for

4     speculation.

5     BY MR. SIMS:

6          Q    I need to know what you're claiming.

7                MR. NEAL:   Objection, calls for

8     speculation, lacks foundation.

9                You may answer.

10         A    The claims are stated in the document, and I

11    have no idea what the jury is going to come back with.

12    BY MR. SIMS:

13         Q    All right.   Well, let's do it this way:   You

14    only get paid if GPP makes money, right?

15         A    That's correct.

16         Q    So the only way you can lose income is if

17    GPP generates revenue --

18                MR. NEAL:   Objection as to form.

19    BY MR. SIMS:

20         Q    -- to pay you, right?

21                MR. NEAL:   Objection as to form.

22         A    The only way I lose income is if GPP

Page 141

1    we had.

2         Q    Okay.  What did you typically bill?

3         A    We had flat retainers for our clients.

4         Q    So what does that mean?  You just set an

5    amount?

6         A    A set amount paid monthly in advance,

7    correct.

8         Q    Did you ever work out what the billing rate

9    would be for those retained clients?

10        A    Billing rates are not relevant to retainer

11   clients.

12        Q    So the answer is no, you never did that?

13        A    No.

14        Q    Okay.  Well, I do want to make clear if we

15   look back -- this is GPP's response.  Sitting here

16   today as GPP's 30(b)6 designee, is it GPP's position

17   that it suffered a loss of income, and that would

18   be -- I'm using the term "income" to mean net profit

19   for GPP -- as a result of your efforts to investigate

20   defendant's intrusion and securing the Web site,

21   transferring the Web site, and e-mails?

22                  MR. NEAL:  Objection, asked and answered.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 142

1          A   Yes.

2   BY MR. SIMS:

3          Q   Is it also GPP's position that Ms. Friess

4   suffered a loss of income as a result of her actions?

5                  MR. NEAL:  Same objection.

6                  Answer again.

7   BY MR. SIMS:

8          Q   You can say yes or no.

9          A   That's -- it states what it states in the

10  complaint, full stop.

11         Q   I want to know GPP's position, because what

12  it says in the complaint, GPP says -- as I understand

13  it, you're taking a different position today.  You're

14  taking the position today that GPP suffered a loss of

15  income in the amount of at least $27,500.

16         A   For my lost time, yes.

17         Q   All right.  But that's not what's stated

18  here.  You agree with me on that, don't you?

19                 MR. NEAL:  Objection to form.

20         A   I don't agree with you.

21  BY MR. SIMS:

22         Q   Okay.  Let's take paragraph ten of GPP's

Page 143

1    answers to interrogatories.  That's where you were.  I

2    just need you to turn to page 10.

3                Here GPP was asked to state each item

4    of damage you contend Brent Yessin caused Global to

5    incur and the amount you attribute to the item, and

6    describe the method by which you calculate or value

7    the damage.  And GPP's answer at page 10 is, "Subject

8    to and without waiving the general and specific

9    objections set forth above, plaintiff states plaintiff

10   has incurred damages as alleged in the complaint,

11   including costs to engage technology experts to

12   investigate intrusions and secure plaintiff's e-mail

13   accounts and documents, which to date include $4,500

14   in setting up a new Web site and e-mail system."

15               That $4,500, that was expended for the

16   benefit of GPP, was it not?

17        A    Correct.

18        Q    The $500 fee to register and purchase a new

19   domain name, that was also expended for the benefit of

20   GPP, was it not?

21        A    Correct.

22        Q    And that $500 expense is related to the

Page 144

1    GlobalPolicyPartnersLLC.com domain name?

2         A    Correct.

3         Q    The $926 which was expended to establish a

4    new domain name for GlobalPolicyPartnersLLC.com with

5    Network Solutions, that was expended on behalf of and

6    for the benefit of GPP, was it not?

7         A    Yes.

8         Q    And the $499 in establishing a new domain

9    name for GlobalPolicyPartners.com with Network

10   Solutions, that was expended on behalf of and for the

11   benefit of GPP, was it not?

12        A    Yes.

13        Q    All right.  Now, what's the difference

14   between the $500 fee to register, to purchase a new

15   domain name -- it's $926 establishes the new domain

16   name, and then the $499 establishes a new domain name?

17             MR. NEAL:  Objection, compound.

18        A    There's numerous hurdles you have to go

19   through in establishing a domain names.  Registering

20   with Network Solutions -- there's bidding processes.

21   You have to put in bids and monitor the bids and watch

22   the bids, and there's time frames you have to wait for

Page 145

1    to make sure that your bid isn't taken or that you're

2    outbidding other people who are bidding on the site

3    because there were other bids going on for the domain

4    names, so they're all different.

5    BY MR. SIMS:

6         Q    How much of the -- the $4,500 is just

7    setting up a new Web site and e-mail system?

8         A    That's fees for the IT guy that did all the

9    work.

10        Q    Okay.  Why did GPP set up a new Web site?

11             MR. NEAL:  Objection, asked and answered.

12        A    We didn't create a new Web site, we created

13   a new Web site host.

14   BY MR. SIMS:

15        Q    For your e-mail system?

16        A    For the Web site and the e-mail system,

17   correct.

18        Q    Now, also it's stated in here, "Attorney's

19   fees and costs incurred since defendant's unlawful

20   activity came to light to date in the amount in excess

21   of $100,000."  Do you see that?

22        A    I do.

Page 148

1        A    The first?

2        Q    Yeah.  Are you able to identify today what

3    those other projects are that might have been

4    interfered with?

5              MR. NEAL:  Objection, asked and answered.

6        A    I don't know what interference he's

7    accomplished until the computer forensics report comes

8    back.

9    BY MR. SIMS:

10       Q    Okay.  And I take it as of today you're not

11   able to quantify what the loss is that's associated

12   with defendant's intentional tortious interference

13   with GPP's project with India?

14       A    Correct.

15       Q    Now, with respect to your time, the 50 hours

16   of time you spent investigating defendant's intrusion,

17   did you record that time anywhere?

18       A    I did not.

19       Q    How did you come up with the 50 hours of

20   time?

21       A    I looked back at the time that I spent with

22   the IT guy, with Network Solutions, and I calculated

Page 149

1    it based on the time I knew I spent.

2         Q    Are you able to differentiate how much of

3    that time was spent getting a new domain name versus

4    setting up the new Web site and e-mail address?

5         A    I can ballpark it, but I couldn't give you

6    down to five-minute increments.

7         Q    Go ahead and ballpark for me.

8         A    Ballpark what?

9         Q    Can you ballpark the difference in time

10   spent?

11        A    Can you ask the question differently,

12   please?

13        Q    Yes.  How much time did you spend in

14   connection with setting up a new Web site and e-mail

15   system?

16        A    Setting up the new Web site and e-mail

17   system was probably 80 percent of the time, 85.

18        Q    Okay.  And what are you basing that on?

19        A    Because I spent about 85 percent of the time

20   setting it up.

21        Q    Okay.  There's nothing you would look to to

22   figure out how much time, actual time, you spent doing

Page 150

1      that?

2            A    No.  I told you I could ballpark it.

3            Q    All right.  So would the other 15 to 20

4      percent then be on setting up the new domain names?

5            A    Well, the new domain names are part and

6      parcel of the new Web site and e-mail.

7            Q    All right.  So what's the other 15 to 20

8      percent then?

9            A    That is investigating the intrusions.

10           Q    What did you do to investigate the

11     intrusions?

12           A    I talked to GoDaddy, or tried to talk to

13     GoDaddy, talked to our IT guy.

14           Q    That's Mr. Hageman, or the new IT guy?

15           A    Both.

16           Q    Both?

17           A    I spoke with other security professionals

18     about what problems there might be or what other

19     intrusions -- what other methods of intrusion could

20     happen and what I should look for.

21           Q    Did you undertake any of those steps that

22     they told you to look for?

Page 151

1              MR. NEAL:   Objection, lacks foundation.

2         A   Who says they told me to take steps?

3    BY MR. SIMS:

4         Q   I thought you just said that.

5         A   I said I asked them what I should look for,

6    what kind of intrusion might happen.

7         Q   Okay.  So they didn't answer your question?

8         A   They didn't say take this step to look for

9    X, Y, and Z.  They said here's the type of intrusions

10   that might be able to be accomplished.

11        Q   You used the word "investigate," all right?

12   So I figured you investigated.  So what did you do?

13   Did you do any analysis on your computer to

14   investigate?

15        A   You've asked me that, and I told you I have

16   not had it swept.

17        Q   Okay.  I don't know if swept is the only way

18   to do it.  You talked to the IT guys, they tell you

19   what to look for.  I'm trying to figure out did you do

20   anything other than sweep?  And the answer is no, I

21   take it?

22        A   And I also didn't do a sweep.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 154

1        A    Did it support his work?  What do you mean,

2    "support his work?"

3    BY MR. SIMS:

4        Q    Were you on the phone with him when he was

5    contacting people, or --

6        A    Part of the time.

7        Q    Now, was it possible for GPP to set up a new

8    e-mail address and maintain its existing Web site?

9              MR. NEAL:  Objection, calls for

10    speculation.

11              You can answer.

12        A    Is it technologically possible to set up an

13    e-mail address and maintain a Web site?

14    BY MR. SIMS:

15        Q    Yeah, its current Web site.

16        A    Well, the Web site is different from an

17    e-mail address, so obviously they'd be separate items.

18    That would be possible.

19        Q    Okay.  So what about Mr. Yessin's actions

20    caused GPP to set up a new Web site?

21              MR. NEAL:  Objection, asked and answered.

22        A    Because he intruded into the systems.

Page 155

1    BY MR. SIMS:

2        Q    Into the e-mail, and you just told me the

3    e-mail is different than the Web site, so I'm

4    trying to -- I'm asking you what about his actions

5    caused GPP to purchase a new Web site?

6        A    Well, he threatened to shut down the Web

7    site.

8        Q    And that's because he owned the domain name?

9            MR. NEAL:  Objection, lacks foundation.

10   BY MR. SIMS:

11       Q    Is that right?

12       A    Yes.

13       Q    Okay.  And you were in the process of having

14   a divorce.  You were separated from Mr. Yessin at that

15   point in time?

16       A    Yes.

17       Q    All right.  So -- all right.  So --

18       A    His threat to destroy the business we took

19   very seriously.

20       Q    Well, the business owes him $150,000,

21   doesn't it?

22            MR. NEAL:  Objection, lacks foundation.

Page 157

1    understand that to be related to the Web site as well?

2         A    Correct.

3         Q    And then number six, creating, updating, and

4    uploading content, do you also understand that to be

5    associated with the new Web site?

6         A    Correct.

7         Q    And then modifying images and creating slide

8    show, is that also related to the Web site?

9         A    It is.

10        Q    Support calls, Q and A, is that calls to

11   you?

12        A    Yes.

13        Q    All right.  So the only item on here that

14   relates to e-mail address setup is number two?

15        A    No, it's all tied together.

16        Q    Well, that's your contention, they're all

17   tied together?

18        A    It is all tied together because you have to

19   change the content on the Web site and the contact

20   information on the Web site.  It's all interrelated.

21        Q    What about this -- what's this other

22   information that's attached?  Do you recognize these

Page 158

1    documents?  What are they related to?

2          A    Which question do you want answered?

3              MR. NEAL:   Why don't you identify what

4    document you're talking about.

5    BY MR. SIMS:

6          Q    Take a look at Bates 353, NameJet.  What do

7    you understand that document to be?  Is that

8    purchasing the new domain name?

9          A    Yes.

10         Q    And Bates 354, there's a charge for $925.40.

11   What do you understand that charge is for?

12         A    That's the Network Solutions charge to get

13   the domain names.

14         Q    All right.  And then Bates 356, the $499 is

15   also related to the domain name?

16         A    Correct.  Actually, that's not true.  That's

17   related to the hosting activities for the e-mail

18   account as well because that's the web hosting, both

19   of those.  There's the auction, which is to purchase

20   the domain name, and then there's the web hosting you

21   have to have in order to host the domain name and the

22   e-mail.

Page 159

1        Q    All right.

2        A    So the Network Solution charges are related

3   to the e-mail systems and the Web site.  It's a

4   hosting charge.  If you'll notice, it says

5   MessageGuard, et cetera, in the details of the

6   invoice.

7        Q    All right.

8             MR. SIMS:  Mark this as Exhibit 12.

9             (Friess Deposition Exhibit 12 was marked

10  for identification and was attached to the deposition

11  transcript.)

12  BY MR. SIMS:

13       Q    Do you recognize these documents --

14       A    I do.

15       Q    -- which is marked as Exhibit 12?  Do you

16  recognize these as, I guess, Global Policy Partners --

17  I guess this is a check register?

18       A    It is.

19       Q    All right.  If you take a look at the last

20  page, which is Bates 1106, the check -- the last check

21  there is January 2, 2009.  Do you see that?  Are there

22  other records of checks between January 2, 2009 to the

Page 161

1      Q    All right.  When was this invoice created?

2      A    When was it created?

3      Q    Yes.

4      A    Probably March 16 or 17, either the date it

5   was sent or the day before.

6      Q    Who created the invoice?

7      A    I did.

8      Q    All right.  What's redacted here?  Is it the

9   name and then the project?  Is that what you're

10   redacting?

11            MR. NEAL:  She didn't redact it, I did.

12   BY MR. SIMS:

13      Q    Do you know what was here?

14      A    Yes.

15      Q    Was it the project name?

16      A    If it's redacted --

17            MR. NEAL:  Well, I'll tell you what.

18   You've already testified exactly what was on there.

19            MR. SIMS:  I know.

20            MR. NEAL:  So go ahead and tell him

21   exactly what it is.

22      A    It's an invoice to Alan Gerson, re: the

Page 162

1    Michael Huffington project.

2    BY MR. SIMS:

3        Q    All right.  Did you provide time sheets with

4    this?

5              MR. NEAL:  Objection, asked and answered.

6    This is the third time you've gone through this set of

7    questions.

8              MR. SIMS:  No, I didn't.  I've not ever

9    asked her --

10             MR. NEAL:  You asked whether or not she

11   had any backup information to justify her hours.

12             MR. SIMS:  No, I'm asking whether she

13   provided time sheets.

14             MR. NEAL:  All right.  Go ahead.

15       A    Yes.

16   BY MR. SIMS:

17       Q    Okay.  Do you have those time sheets?

18       A    Yes.

19       Q    Okay.

20             MR. SIMS:  I'd ask you to produce those

21   time sheets.

22             MR. NEAL:  Okay.  May I ask why?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 163

1           MR. SIMS:  You know, you're objecting to

2    me.

3           MR. NEAL:  Tell me why you need time

4    sheets since we're on the record and may be going back

5    before the judge.

6           MR. SIMS:  Because this is the only time

7    that she's billed for $550 an hour, okay?

8           MR. NEAL:  And she swore under oath that

9    she did it.

10          MR. SIMS:  Right, and I'd like to see the

11   time sheets.  This is -- you know what, this is

12   litigation.  I get to look.  If she's going to make

13   this claim, I get to look at it because maybe I've got

14   something in there I can impeach her with.

15          MR. NEAL:  Okay.

16          MR. SIMS:  I mean, it's the nature of the

17   business.

18          MR. NEAL:  When do I get to look at Mr.

19   Yessin's discovery responses?  When is he going to

20   produce all the things he looked at?

21          MR. SIMS:  I have produced.

22          MR. NEAL:  You have?  We'll see about

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 1
CONDUCTED ON TUESDAY, NOVEMBER 24, 2009

Page 167

1    disclosure of this e-mail?

2         A    No.

3         Q    In this e-mail, if I understand your

4    allegations, is that you disclosed a potential

5    settlement posture that you might have with Mr.

6    Yessin --

7         A    Correct.

8         Q    -- is that right?  All right.  As of June

9    19, 2009, did you have any indication that Mr. Yessin

10   would settle any of the matters in dispute with you?

11        A    Yes.

12        Q    Okay.  What indication did you have?

13        A    He told me he wanted to hire a moderator --

14   a mediator and get the divorce finalized quickly.

15        Q    Okay.  Did you exchange proposals at that

16   point?

17        A    We had not yet exchanged proposals.

18        Q    At any time before June 19, 2009, had you

19   disclosed anything that's listed in here as a concept

20   in terms of a proposal to Mr. Yessin?

21        A    No.

22        Q    At any time after June 19, 2009, did you

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 200

1      A    At this -- I don't know where he is.   I

2   don't know if he's traveling right now.   I don't know

3   what he's doing right now because I haven't talked to

4   him.

5      Q    All right.   I want to back up in time back

6   to the summer of 2007.   Can you tell me briefly just

7   how the concept of forming GPP came about.

8      A    I was with a previous consulting firm called

9   Global Policy Group with a partner of mine.   We split

10   the partnership, decided to form a new company.

11   Jeffrey and I talked about working for years, decided

12   to do this company.   Brent said I think it's a great

13   idea, I'll stand it up for you, I'll give you guys

14   some money.   We said great.   So we started formulating

15   it, and here we are.

16      Q    At the time -- as of July 2007, did the

17   formation of GPP contemplate three partners?

18           MR. NEAL:   Objection to the form of the

19   question.

20      A    In July 2007 when we stood this up, per the

21   articles of incorporation, we initiated it with three

22   managers.

Page 201

1    BY MR. SIMS:

2        Q    I asked whether you had three partners.

3    That's what --

4        A    We did not have three partners.

5        Q    Okay.

6        A    We had three managers.

7        Q    Did you have three members?

8        A    We did not have three members.

9        Q    Who were the members of Global Policy

10   Partners, LLC?

11       A    Jeffrey Weiss and myself because we're the

12   lobbyists.

13       Q    I'm sorry?

14       A    Because we're the lobbyists.  That's what

15   the firm does.

16       Q    Okay.  So at the time -- did you have

17   discussions with Mr. Yessin in that July time period

18   where you discussed the management and the ownership

19   concept around GPP?

20       A    Not per se.  We threw it together in rather

21   quick form.  It was pretty -- pretty quickly stood up,

22   and he said I'd love to help, I'll fund this, and we

Page 210

1           A    And some of these are my own documents, so

2     in fact, now that I've gotten through the 17 pages of

3     this, which are mostly unrelated.

4           Q    The GPP/KFY 6 document, Bates number 6 --

5           A    If you'll give me a second to get through

6     all of them.  Page 6?

7                     MR. NEAL:  Page 6.

8                     THE WITNESS:  Yes.

9     BY MR. SIMS:

10          Q    Where did you obtain this document from?

11          A    I think Dawn Russell is the one who provided

12    this initially because she did the filing.

13          Q    All right.  Whose handwriting is on here, if

14    you know?

15          A    I have no idea.  This?

16          Q    Yes.

17          A    No idea.

18                    MR. NEAL:  Let me -- just for the record,

19    it's mine.

20                    MR. SIMS:  Okay.

21    BY MR. SIMS:

22          Q    Is there any document that you're aware of

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 211

1    that lists the members of GPP?

2          A    I don't believe so, no.  It was an oral

3    agreement between Jeffrey and me.

4          Q    When did you reach that oral agreement with

5    Mr. Weiss?

6          A    It's just been -- it's always been an

7    understood situation with Mr. Yessin as well.  We

8    stood this up.  Again, it was for Jeffrey and me to

9    have a lobbying and consulting firm.  Mr. Yessin,

10   having five companies of his own, thought this would

11   be a great idea, and he offered to give me the money

12   to get it started because we were newly engaged.

13         Q    My question was more specific.  You said

14   there was an oral agreement.  My question was when did

15   you have an oral agreement with Mr. Weiss?

16         A    I couldn't put a specific date on it.

17         Q    Okay.  What were the terms of that oral

18   agreement?

19         A    The oral agreement pertaining to?

20         Q    GPP.

21         A    Overall?

22         Q    Yes.

Page 212

1        A    That it would be a 50/50 run show.  We would

2    be equally in charge of the company, and we would be

3    the members and two-thirds of the managers of the

4    company.

5        Q    Why was Mr. Yessin made a manager of the

6    company if he wasn't going to be a member?

7        A    Because he was my fiance and he wanted to be

8    involved, just like I am a manager in his company,

9    MODUS Health Care, LLC.  We were equally involved in

10   each other's businesses and companies, things you do

11   when you're madly in love and you think you're going

12   to be married for the next 50 years.

13       Q    Now, initially when the GPP e-mail system

14   was set up, that was set up by Mr. Yessin, was it not?

15       A    It was set up by Jon Hageman.

16       Q    Didn't he -- didn't Mr. Yessin hire Mr.

17   Hageman to do that for GPP?

18              MR. NEAL:  Objection, lacks foundation,

19   lacks personal knowledge.

20              MR. SIMS:  I'm asking GPP's corporate

21   rep.  If she doesn't know, I think -- she can answer

22   that question.

Page 213

1              MR. NEAL:  I didn't say she couldn't

2    answer.

3              MR. SIMS:  All right.

4        A    I believe that Dawn Russell was the one that

5    reached out to Jon Hageman.

6    BY MR. SIMS:

7        Q    Who is Dawn Russell?

8        A    Dawn Russell is the former assistant to Mr.

9    Yessin.

10       Q    So she was taking her direction, as far as

11   you're aware, from Mr. Yessin?

12       A    And myself.

13             MR. NEAL:  Same objection.  Objection,

14   lacks foundation.

15   BY MR. SIMS:

16       Q    Did she work for you?

17             MR. NEAL:  Objection, lacks foundation.

18   BY MR. SIMS:

19       Q    Did Dawn Russell work for you?

20       A    No, she did not work directly for me.

21       Q    All right.

22             MR SIMS:  We'll mark this as Exhibit 20.

Page 215

1       Q    Ms. Friess, do you recognize -- and I'll do

2    it this way from here on out.   Exhibit 20 is an e-mail

3    from Dawn Russell dated Tuesday, July 17, 2007 to you

4    at your Katherine_Friess@hotmail.com e-mail address.

5       A    I do indeed.

6       Q    And is this an e-mail you received on or

7    about Tuesday, July 17, 2007?

8       A    Yes, it is.

9       Q    And in this e-mail -- you understood, did

10   you not, by this e-mail that Dawn Russell, who was an

11   agent and employee of Brent Yessin, was forwarding you

12   information related to your -- the creation of the

13   GPPWashington.com e-mail address?

14      A    Yes.

15      Q    Okay.   And she provided you with the

16   password to use with that GPPWashington.com e-mail

17   address, did she not?

18      A    She did.

19      Q    And that password was global1, was it not?

20      A    Yes, it was.

21      Q    And you used that global1 password on or

22   about November of 2008, did you not?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 216

1          A    I think it was December, but yeah, right

2     about then.

3          Q    Okay.  And after that you changed it to

4     global2, did you not?

5          A    I did.

6          Q    And you kept it as global2 up until the

7     point of about June 24, 25 --

8          A    Correct.

9          Q    -- of 2009.  Is that correct?

10              MR. NEAL:  Let him finish his question.

11         A    Yes, it is.

12    BY MR. SIMS:

13         Q    All right.  Now, at the time that this

14    e-mail account, the GPPWashington.com e-mail address

15    account, was created, did GPP come up with any

16    policies or procedures for protecting the user names

17    or passwords of folks that were providing access to

18    the GPPWashington.com e-mail address?

19         A    The understanding among the people that had

20    e-mail addresses, which was myself and Jeffrey Weiss,

21    was that we would keep them preserved.  They were only

22    given to us from Dawn, from Jon Hageman to Dawn to me

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 219

1          A    Yes, I do.

2          Q    And ultimately do you understand that Mr.

3     Yessin acquired the GlobalPolicyPartners.com domain

4     name?

5          A    Honestly, at the time I thought it was

6     registered in the company's name and that there's a

7     subsequent e-mail from Jon Hageman that says it should

8     have been switched from Brent to GPP as ownership, and

9     it never got done.  But it wasn't something that I was

10    specifically aware of at the time.

11         Q    All right.  My question, though, was are you

12    aware that he acquired the domain name?

13              MR. NEAL:  Objection to the form of the

14    question.

15    BY MR. SIMS:

16         Q    Either yes, he did acquire it -- you may

17    have thought he was doing something else, but --

18         A    It was my understanding that Jon Hageman

19    acquired it on behalf of GPP, and I did not know until

20    relatively recently that it was actually registered

21    under Brent's name.  I thought it was registered under

22    the corporate name.

Page 220

1        Q    Okay.  What steps did you take in the July

2   time period to determine who owned the domain name?

3                MR. NEAL:  Just to be clear, July 2007?

4                MR. SIMS:  Yes.

5                MR. NEAL:  Okay.

6   BY MR. SIMS:

7        Q    Did you take any steps?

8        A    No.

9        Q    Did you request that it be purchased in the

10  name of Global Policy Partners?

11       A    I assumed it would be, but I don't know that

12  I specifically requested it.

13       Q    All right.  It's a true fact, is it not,

14  that GPP never acquired the GPPWashington.com domain

15  name?

16                MR. NEAL:  Objection, form of the

17  question.

18       A    Again, I thought it was registered to the

19  company name.  I didn't know it was registered

20  directly to Brent, but as he was a manager of the

21  company and has a fiduciary duty to the company, the

22  fact that it was under his name should not have been

Page 221

1    anything that was dangerous for the company's

2    interest.

3    BY MR. SIMS:

4         Q    So is it GPP's position that it owned the

5    GPPWashington.com e-mail address?

6         A    No, not any longer.

7         Q    You understood, did you not, at this time,

8    July of 2007, that Mr. Yessin was funding the money to

9    purchase the domain name for GPP?

10        A    Yes.

11        Q    Okay.  And in fact, Mr. Yessin was providing

12   all the funding for the start-up of GPP at that time,

13   was he not?

14        A    He was indeed.

15        Q    Okay.

16             MR. SIMS:  We'll mark this as 21.  Is

17   that right?

18             THE REPORTER:  22.

19             MR. SIMS:  22.

20             (Friess Deposition Exhibit 22 was marked

21   for identification and was attached to the deposition

22   transcript.)

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 222

1    BY MR. SIMS:

2         Q    Ms. Friess, I've hand to you as Exhibit 22 a

3    copy of a check made payable to the order of Global

4    Policy Partners, LLC by Brent Yessin.  Do you

5    recognize this check?

6         A    I do.

7         Q    Was this the initial -- was this a payment

8    made by Brent Yessin for the purposes of funding

9    Global Policy Partners?

10        A    It was indeed.  And I'd like to clarify that

11   the first time I saw the physical check is for the

12   court case, that I hadn't seen the actual physical

13   check until this court case came about.

14        Q    Before that, you just were aware that money

15   had been deposited into the GPP account?

16        A    Correct.

17        Q    All right.  So I take it until this court

18   case, you didn't see that there was a notation made on

19   the check that it was for a loan?

20        A    Correct.

21        Q    But that was your expectation, was it not?

22        A    It was not.

Page 223

1     Q   Well, if he's not a member of the LLC, what

2   could it be other than a loan?

3     A   A gift to your fiancee.

4     Q   So you treated this as a gift?

5     A   I did.  He said I'd be happy to help you

6   start up the firm, I'll give you the money to do it.

7   That was the discussion we had.  And I said great, I

8   really appreciate it.

9         He was spending money left and right like

10  there was no tomorrow and was happy to do it, and

11  spending money on other companies and other expenses.

12  And at the time, while it seems like a lot of money,

13  I'm sure, to people reading it right now, he was

14  spending money left and right of this caliber for

15  other things, and it didn't occur to me that it was

16  something that was other than a gift at the time.

17    Q   Did Mr. Yessin later put $50,000, another

18  $50,000, into the company?

19    A   We put $50,000 into the company.

20    Q   Okay.

21    A   We were married and it was marital money.

22    Q   All right.  So another $50,000 came from

Page 224

1    either both you and Mr. Yessin?

2         A    Correct.

3         Q    Okay.

4         A    In December, I believe, of '07.

5         Q    Was there any other money put into the

6    company by either you or Mr. Yessin?

7         A    I don't believe so.

8         Q    Was there anyone else who made gifts to the

9    company?

10        A    No.

11        Q    Was there anyone else who made loans to the

12   company?

13        A    No.

14             MR. SIMS:  We'll mark this as 23.

15             (Friess Deposition Exhibit 23 was marked

16   for identification and was attached to the deposition

17   transcript.)

18   BY MR. SIMS:

19        Q    Ms. Friess, I've handed you an e-mail from

20   you to Brent Yessin dated Monday, August 6, 2007.

21   We've marked it Exhibit 23.  Do you recognize this as

22   an e-mail that you sent to Mr. Yessin?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 236

1    purposes."  That's suggests that there was a

2    discussion of membership, but not percentages.  Do you

3    recall -- does that refresh your recollection of any

4    discussion with him about membership?

5         A    I would assume that to be accurate, and as

6    well as the fact that he hadn't discussed -- we hadn't

7    come to an agreement on it.

8         Q    Was Mr. Weiss at that meeting?

9         A    He was not.  That meeting took place in

10   Florida.

11        Q    Did you have follow-on discussions with Mr.

12   Weiss about what was discussed with Mr. Clarke?

13        A    Yes.

14        Q    And what did you tell him?

15        A    I told him that Mr. Clarke was going to put

16   together draft documents and send them to us for our

17   consideration.

18        Q    Okay.  Now, the reference in here is also to

19   a $200,000 note.  What was that about?

20        A    That's a good question, because there was

21   never $200,000 anywhere.  So this was, again, just

22   something that Brent and Philip Clarke put together

1    and sent off to us for consideration which, of course,

2    we never executed.

3         Q    Was there any discussion in that meeting

4    about the fact that Mr. Yessin had put in $100,000

5    already into the company and would be funding

6    additional money and wanted a note back?

7         Q    I don't --

8              MR. NEAL:  Objection, form of the

9    question.

10             You may answer.

11        A    I don't remember the specifics of the

12   discussion.  I assume we discussed it at some point,

13   but that money is a genuine question of fact as to

14   what it was qualified as, because in various

15   iterations it's been referred to as a capital

16   contribution, it's been referred to as a loan.

17             It was initially -- my understanding,

18   Mr. Weiss's understanding was that it was a gift to

19   get this all started up and get it going.  And since

20   we never came to any sort of agreement on it between

21   the three of us, none of that was ever executed.

22        Q    You would agree with me, would you not, that

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 243

1    BY MR. SIMS:

2        Q    Do you recognize what I've handed you as

3    Exhibit 27?

4        A    I do.

5        Q    Did you ever have any discussions with Mr.

6    Yessin about this draft of the $200,000 promissory

7    note?

8        A    This draft was e-mailed to me from Mr.

9    Clarke along with the draft operating agreement for

10   our consideration, I believe October -- yeah, October

11   2007.  We didn't discuss it.  We didn't address it.

12   We didn't agree to it.  We didn't execute it.

13   Frankly, I don't know where $200,000 came from because

14   there was no $200,000 contribution.  It was

15   re-e-mailed to me by Mr. Yessin in January of 2008.

16   And again, we didn't discuss it, we didn't execute it,

17   we didn't agree to it.

18       Q    Are you aware of any document that refers to

19   Mr. Yessin's initial $100,000 input into the company

20   as a gift?

21       A    No.  That was just an oral discussion when

22   we were sitting around talking about standing up this

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 244

1    LLC and getting it off the ground.

2         Q   At this time in October of 2007, was it

3    contemplated that GPP would bring in other members,

4    owners?

5         A   We had -- initially we wanted it just to be

6    Jeffrey Weiss and me, and Brent would be one of the

7    managers as well.  We then -- and I couldn't give you

8    the exact date again -- discussed with yet another

9    gentleman named Devinda --

10                   MR. NEAL:  You need to spell that.

11                   THE WITNESS:  I'll try.

12                   MR. SIMS:  I'll get you that spelling if

13   you need it.

14                   THE WITNESS:  I can do it.  D-e-v-i-n-d-a

15   S-u-b-a-s-i-n-g-h-e, and his title is ambassador.

16                   MR. NEAL:  I don't know.  Did you finish

17   your question?

18                   MR. SIMS:  I think -- let me ask that

19   again because we got interrupted on that.

20   BY MR. SIMS:

21        Q   I was asking about whether there was any

22   contemplation in that time period, the September 2007

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 270

1    and husband, as we were.

2        Q    Now, the first page of this document, the

3    last e-mail in here, there's an e-mail.  It's from

4    you to -- and I apologize for this, but I'm just going

5    to use his first name -- Devinda.

6        A    That's fine.

7        Q    I think it's easier, if I don't insult him.

8        A    No, not at all.

9        Q    And others.  The last line in there you make

10   reference to "the only people authorized by law to

11   sign binding documents on behalf of GPP are Brent

12   Yessin and me."  Do you see that?

13       A    I do.

14       Q    Okay.  Now, why did you say that?

15       A    I thought it was -- I thought it was

16   accurate, but I think I'm absolutely wrong on the law

17   on that.  As I said, looking into it subsequently, I

18   believe if you've got three managers for an LLC that

19   any one of the managers has authority to sign

20   documents that aren't significantly huge binding

21   documents.  Small little things, you know, small

22   things each of them can sign.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 271

1      Q    How come you didn't include Mr. Weiss in

2    that as one of the three people authorized to sign

3    binding documents on behalf of GPP?

4      A    Absolute flat mistake on my part.

5      Q    So was it -- at the time you wrote this, did

6    you have a conscious decision not include Mr. Weiss?

7      A    I don't think so.  But it was, again, just a

8    absolute mistake on my part.

9      Q    All right.  Now, in here you also indicate

10   on the line right above it that you're the only one

11   financially contributing.  "I'm the only financially

12   contributing person in this venture through Brent's

13   $150,000 capital contribution of which you have been

14   availed $20,000."  What did you mean by that?  Had you

15   used some of that money that had come in to pay

16   Devinda?

17     A    Well, as money is fundable -- and we had

18   clients paying as well.  It wasn't necessarily the

19   money that Brent initially gave us, just because it's

20   all in the bank account together, so I don't know that

21   I can attribute it directly to that contribution.

22                 What we were doing is we were giving

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 283

1      Q    All right.  When was the last time you

2   received compensation from GPP?

3      A    I think it was November or December of 2008.

4      Q    Okay.  So I guess in 2009, the revenue into

5   GPP has not exceeded its expenses?

6      A    Correct.

7      Q    Okay.  And is that because you haven't been

8   able to get new clients in?  What is the reason -- do

9   you have a reason what you think is going on?  Is it

10  the economy or what?

11     A    It's a whole mix.

12     Q    Okay.

13     A    It's 1,500 lobbyists out of work in

14  Washington and a change in administration, but also we

15  had a number of things that were not related to the

16  political system that were more along the lines of new

17  business, and we've really been focusing primarily on

18  getting the India project over the finish line.  That

19  is really what we were banking on.

20     Q    Okay.

21     A    And until my husband walked out on me, I was

22  working a lot on his businesses, on MODUS Health Care,

Page 284

1    and the plan was at a point in time that MODUS would

2    then hire GPP as its political operations in

3    Washington to handle outreach to the administration

4    and the agencies, to be able to do business

5    development for sales of the prefabricated hospitals

6    into the Department of Defense, Department of Veterans

7    Affairs, all the government clients.

8              So we had a couple of things we were

9    banking on, one of which was MODUS, which of course

10   isn't going to happen in a brutal divorce, and the

11   other one of which was India, which he has potentially

12   successfully tanked for us as well.

13        Q    If you look at Bates 207.

14        A    Yeah.

15        Q    There's a reference in there under expenses

16   of loan repayment with interest, $25,000.  What loan

17   is that referring to?

18        A    That is probably contemplating trying to

19   repay Brent.

20        Q    Okay.  At any point between, I guess,

21   September 2007 through today, has any money been

22   repaid to Brent?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 293

1    joint venture agreement, had you had him look at

2    anything else related to the India project?

3          A   I don't think so, but I couldn't be entirely

4    sure, because John Lauderdale is a partner of Brent's

5    at REPI and he drafted it and wanted Brent to be in

6    the loop because it's his business partner that was

7    drafting the agreement, so --

8          Q   Did you -- you asked him to review the

9    documents.  Did you want him to provide comments on

10   that joint venture agreement?

11         A   Not necessarily.

12         Q   Okay.  All right.  Did he provide comments?

13         A   I think he provided comment when I asked him

14   a question at a later date about venue for potential

15   litigation problems that were included in the

16   contract, but I don't think he necessarily came back

17   to me with anything on this.  I think he just took it

18   under advisement and had it --

19         Q   The proposals that you sent before this, so

20   before the Mumbai bombings, what were those -- how

21   many proposals were there?

22         A   I think it was just one major one.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 294

1      Q    Okay.  And to what governmental entity were

2   you making that proposal?

3      A    I sent the proposal to our partner, Lalit

4   Mattu.

5      Q    Okay.

6      A    And he submitted the proposals, I believe,

7   directly to the prime minister.

8      Q    Did he copy you on the transmittal of the

9   proposal to the prime minister?

10     A    It was delivered by hand.

11     Q    Okay.  He delivered that by hand in a

12  meeting with the prime minister?

13     A    Correct.

14     Q    And it was just Lalit?

15     A    Lalit.

16     Q    Lalit?  Nobody, I guess, on your side, the

17  GPP side?

18     A    Yes, just representatives Essem.

19     Q    Okay.  Did he report back to you about the

20  prime minister's response to the proposal?

21     A    Uh-huh.

22     Q    What did he say?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 295

1      A    He said, you know, we had a good meeting,

2   everything looks terrific, they're very excited about

3   the proposal, they're interested in further

4   discussions.  Lalit and I had frequent conversations

5   just as he would update me on how the meetings were

6   coming along.

7      Q    All right.  Now, did you get word back after

8   Mumbai -- I know you all submit different proposals.

9   Did you get word back from the Indian government or

10  the prime minister that they wanted expanded proposals

11  or anything along those lines?

12     A    They wanted -- after the bombings happened,

13  they came back.  They wanted more proposals targeted

14  to different aspects of the government, and they

15  wanted my team to come over for a visit to pitch the

16  business in person.  So it would be the primary people

17  that were involved in that time, which is me and the

18  defense subcontractors, and one member of the five key

19  companies essentially.

20     Q    I take it the Indian government doesn't have

21  the same sort of bid process we have here in the

22  United States.  Is that fair to say?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 296

1        A    That's fair to say.

2        Q    Okay.   Now, at least when you made the first

3    proposal, do you know whether there were others that

4    were also making proposals at that time?

5        A    It was my understanding that they only

6    wanted to work with an American team, and the only

7    American team with which they were meeting was my

8    team.

9        Q    All right.   Now, after the Mumbai bombings

10   when they came back to GPP and said we want more

11   expanded proposals, did they indicate that they were

12   asking for proposals from other American teams or

13   companies?

14       A    No.   In fact, they specifically said that

15   the only team they were dealing with was our team.

16       Q    As of today, have you heard anything

17   different from the Indian government that the only

18   team they're dealing with is GPP?

19       A    The last I heard when I last spoke with

20   Lalit is that we were still the only team at the

21   finish line.   There's foreign teams that have pitched

22   for the business, but the Indian government has stated

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 297

1    to Lalit that they only want to work with American

2    teams for this particular work.

3         Q    So the other three teams are non-American?

4         A    I wouldn't say three, but there are other

5    teams that are foreign.

6         Q    Okay.

7         A    And again, when I say "teams," I think it's

8    individual companies.  There's no team like I have.

9    We have a very unique -- we're the only people that

10   have brought together the top-notch talent in

11   counter-terrorism and national security and putting in

12   one team to provide a list of menu options to the

13   client for what their particular needs are.

14        Q    So your understanding at least of these

15   other proposals from foreign companies is as a single

16   company?

17        A    Single companies, yeah.

18        Q    You haven't heard anything out there on the

19   streets that any of these other companies had gotten

20   the work from India?

21        A    No.

22        Q    Okay.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 298

1       A    And I've asked.

2       Q    So I guess as you sit here today, it's still

3   possible for GPP to get this work, right?

4       A    I hope so, but I don't know.  It doesn't

5   look good.  It certainly doesn't help when you have a

6   member of the company or a manager of the company who

7   was not authorized to work on the client calling up

8   the CEO of the business partner and undercutting the

9   whole deal.  That spooks people, especially in

10  national security work.

11      Q    Now, going back to Exhibit -- I forget where

12  we're at -- 39, I take it this JV agreement is what

13  ultimately became the teaming agreement between GPP

14  and Essem?

15      A    I'd have to review what this actual

16  attachment was.  But yes, the final agreement that we

17  had was the teaming agreement which we provided to

18  you.

19      Q    Right.  Let me go ahead and mark that then

20  as 40.

21              MR. NEAL:  Hold on one second.

22              MR. SIMS:  Was there more -- I see what's

Page 305

1          A    It was -- I know the home minister rejected

2     it, and I think I mentioned that yesterday.

3          Q    You did, but I -- other than the fact that

4     the home minister rejected it, you don't know why he

5     rejected it?

6          A    I think they're going to end up keeping --

7     they're going to have local contractors do the

8     training, but it's not going to go to a foreign entity

9     and it's not going to any other Americans, and I don't

10    think it's been let to anyone, anyway.

11         Q    Now, going back to the Rough Order of

12    Magnitude for project Watchful Guardian, looking at

13    this -- I'm just trying to get a feel for -- I guess

14    in looking at this document, are you able from looking

15    at the document to determine how much time that GPP,

16    either you or Mr. Weiss, would have been spending in

17    terms of what your projected revenues would have been

18    had this proposal been accepted?

19         A    I can tell you what we -- what we billed it

20    at.

21         Q    Okay.

22         A    I think it's in here.  I think the dollar

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 306

1    figures on this one are in here.  You'll have to give

2    me a minute to go to exactly where it is.  This is a

3    $10 million contract, and essentially our time and

4    effort comes to about ten percent of that, and we

5    would be spending most of our time over in India.

6    This would be -- if we got this, it would be the

7    kick-off and we'd move over and continue to work the

8    other contracts.

9         Q   Okay.  So the -- all right.  So explain that

10   to me.  So this is -- the document we're looking at,

11   which is the project Watchful Guardian, you just

12   described it as being the kick-off.  What do you mean

13   by that?  Is that like a master agreement?

14        A   No.  If one of these were to move forward,

15   then that would allow us to be on the ground over

16   there, which would allow us then to go and work the

17   other proposals in person, meaning that they'd more

18   likely go to the finish line.

19        Q   I understand.  Okay.

20        A   And it doesn't have to be this one, it could

21   be any of them.

22        Q   I gotcha.  Now, each of these agreements

Page 307

1    have certain dates on them, like this one has June 17

2    and this is June 1.  Do those dates reflect about when

3    they were presented to the various Indian entities?

4         A    Yes.

5         Q    All right.  Did these -- each of these

6    documents appears, looks like -- you can go through

7    here, but there's a forwarding e-mail from you to

8    Stacey Rose and Steve Neal on or about October 24.  It

9    may be off as I look through it.  Where did you go

10   into your computer system to pull these documents out?

11        A    Outlook.

12        Q    Okay.  So they were in your Outlook e-mail

13   folder?  Before they were produced today or yesterday,

14   had you shared with Mr. Yessin any of these documents?

15        A    Not to my knowledge.  I generally did not

16   share any of these proposals with him.

17        Q    Did you discuss with him anything about

18   these proposals?

19        A    I discussed my excitement at the possibility

20   of getting the work.

21        Q    Right.  How about in terms of the nature of

22   what these proposals were?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 308

1      A    He knew the gist of it, obviously, but he

2  doesn't have a defense and counter-intelligence

3  background, so it's not really relevant to what he's

4  done, and I'm not sure he really cares about the

5  technical aspects of it, nor should he.

6      Q    Now, would you -- with respect to the key

7  players involved on your team, was he aware of who

8  those folks were?

9      A    I don't think he could probably list them

10  and he had never met any of the defense contractors,

11  except for one guy that was a secondary addition to

12  the team, which was GRA.

13      Q    All right.  Are you aware of -- other than

14  the e-mail that went out that we talked about, and

15  we've already plowed that ground, are you aware of any

16  conversations that Mr. Yessin has had with any of the

17  defense contractors or any of the persons that are on

18  this team?

19      A    Dave Chandler with Gleason Research

20  Associates that we've talked about.

21      Q    You talked about that person.

22      A    Those are the ones I know of.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 312

1    sending it off to Lalit.

2         Q    All right.

3         A    If not the day of.

4         Q    And so you don't know how long that e-mail

5    from Mr. Hof sat on the GoDaddy Web site before it was

6    downloaded into your Outlook, correct?

7         A    No idea.

8         Q    And then did you make revisions to the

9    proposal?

10        A    Probably not.  I've made them just to -- you

11   know, minimal revisions in some places, but I

12   generally would edit them, send them back to Charlie.

13   Charlie would say thumbs up, he would give it back to

14   me, and then I'd ship it to Lalit.

15        Q    Okay.

16        A    I'm the only point of contact with Lalit.

17        Q    All right.  So did all of that occur during

18   the same day, time period?

19        A    It would be, yeah, within a day or so.  And

20   sometimes they required no editing.

21        Q    And so what you just described would be

22   consistent with all of these proposals that are part

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 325

1   again, but the one that flagged my attention was the

2   text message.

3        Q    All right.  Now, before this e-mail came to

4   you on July 14, 2009, do you recall a discussion with

5   Mr. Yessin about what his contributions to the firm

6   had been to GPP, whether it was a loan, a capital

7   contribution, those issues?

8        A    Yeah.  And again, just to restate for

9   clarity, when we first did this, he said I'm happy to

10  do this for you, I'll stand this up, I'll kick this

11  off for you guys, and there was no definition to it

12  whatsoever.  At a subsequent date a draft promissory

13  note came from his counsel.  We had draft promissory

14  notes.  He referred to it as capital contributions, he

15  referred to it as loans.

16          There was never, ever an agreement at

17  any point in time as to what that money was going to

18  actually be defined as.  So the only thing we ever

19  agreed on, the three of us, at one point is when we

20  first sat down and we did this, and he said let me

21  give this to you and let you start this off, kick this

22  off.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 326

1          And then within the context of that, of

2    course, $50,000 of it was during the marriage, so

3    that's as much my money as it is his at that point,

4    and $20,000 we gave back to him because he needed

5    money.  So really at the end of the day, we're

6    disputing 80 grand which, to me, again, goes back to

7    the initial meeting of the minds, which was I give

8    this to you.

9          Q    Okay.

10          A    Lots of iterations about what is it in

11    discussions.

12          Q    Right.

13          A    But no actual --

14          Q    All I'm trying to get to is did you have a

15    discussion with him before this e-mail that

16    precipitated this e-mail from him?

17          A    Before this e-mail?

18          Q    Right.

19          A    Any time before?  I'm sorry.

20          Q    Right before, just right before, that you

21    recall.

22          A    This -- on July 14?

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 327

1            MR. NEAL:  That's part of the problem, I

2    think.  Are you talking about the top e-mail, which

3    is --

4            MR. SIMS:  Yes.

5            MR. NEAL:  -- July 14, or the January

6    e-mail?

7            MR. SIMS:  As I understand what's

8    happening here -- tell me if I'm wrong -- is that Mr.

9    Yessin writes you to say, "Just a sampling.  You

10   acknowledged the note."  Then what he's done is he's

11   cut and pasted e-mails that he has and he's sending

12   that to you.

13           MR. NEAL:  Gotcha.

14   BY MR. SIMS:

15       Q    I think that's what's going on here, and

16   what I'm trying to get at is what led to that?  Did

17   you have a conversation with him about this, and then

18   he sends the e-mail and says no, you said this was a

19   loan?

20       A    On July 14, this would have been -- he

21   served divorce documents on me at my birthday party on

22   July 12, which is a Saturday night birthday party --

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 360

1    me take a 30-second break.  If I can have the stack of

2    exhibits, please.

3                    (A brief recess was had.)

4              EXAMINATION BY COUNSEL FOR THE PLAINTIFF

5    BY MR. NEAL:

6          Q    Katherine, let me put before you again

7    Exhibit 18.  These are the proposals you identified

8    with respect to the project in India, correct?

9          A    Correct.

10         Q    Okay.  Do each of the proposals identify how

11   much money GPP would make if this project went

12   through?

13         A    It specifically identifies the total billing

14   for the projects.

15         Q    Okay.  And what would be GPP's percentage or

16   take of those total billings?

17         A    Generally ten percent off the top of

18   whatever is billed.  Could be a little bit more or a

19   little bit less, but mostly a little bit more.

20         Q    If all these proposals went through, what

21   would they be worth to GPP roughly?

22         A    Close to $10 million, 10, 15.  There are

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 361

1    various proposals, so $10 million to 15 per proposal,

2    which is one to one-five per proposal for us.  Close

3    to $10 million for GPP based on proposals that we

4    have, but it could be significantly more because many

5    of the proposals have higher total dollar figures than

6    just $10 million, but that's a basic minimum.

7         Q    Is if Mr. Yessin is successful in scuttling

8    the India project, is that the amount of money GPP

9    would lose?

10                MR. SIMS:  Object to the form of the

11   question.

12        A    At a minimum.

13   BY MR. NEAL:

14        Q    Now, yesterday you testified that you and

15   Mr. Weiss had a meeting and authorized the filing of

16   this lawsuit against Mr. Yessin on or about July 22.

17   Is that correct?

18        A    I believe that's what my testimony was.

19        Q    All right.  Now, on December -- I'm sorry.

20   Strike that.

21                On July 10 of 2009, I sent Mr. Yessin

22   and his counsel a cease and desist letter which also

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 363

1    filed on July 31 and served on his counsel.  Are you

2    aware of that?

3           A    Yes.

4           Q    And have you seen all the e-mails from me to

5    Mr. Yessin providing notice of both the filing of the

6    original and amended complaint?

7           A    Yes, I have.

8           Q    All right.  As to costs, you testified

9    yesterday or today regarding the costs that GPP paid

10   in order to remedy the unlawful surveillance conducted

11   by Mr. Yessin.  Do you recall that?

12          A    Yes.

13          Q    Now, who actually -- and the costs for the

14   e-mail system and the Web site, which you said are

15   joined, were approximately just over $5,000, correct?

16          A    Yes.

17          Q    All right.  Who paid?  Who actually paid the

18   $5,000?

19          A    GPP.

20          Q    Right.  And did you pay any part of that?

21          A    I made a loan to GPP for part of that, and

22   then GPP paid the fees.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 364

1      Q   Right.  So the money came out of your

2   pocket?

3      A   Yes.

4          MR. SIMS:  What portion of the money came

5   out of her pocket?

6   BY MR. NEAL:

7      Q   What portion of that money came out of your

8   pocket?

9      A   I'd have to look that up, but I think -- I

10  think probably all of it at that point in time.

11     Q   All right.  Now, you testified earlier that

12  you spent roughly $25,000 of your time to help remedy

13  or to fix the -- to address the unlawful surveillance

14  by Mr. Yessin, correct?

15         MR. SIMS:  I'm going to object, form of

16  the question.

17     A   Yes.

18  BY MR. NEAL:

19     Q   Okay.  Now, that approximately $25,000 that

20  you spent in your time didn't go to GPP, correct?

21         MR. SIMS:  I'm going to object to the

22  form of the question.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 365

1        A    Correct.

2    BY MR. NEAL:

3        Q    And because GPP didn't get the $25,000 worth

4    of your time, you also didn't get any of that money,

5    correct?

6              MR. SIMS:   I'm going to object, form of

7    the question.

8        A    Correct.

9              MR. SIMS:   Leading.

10   BY MR. NEAL:

11       Q    You've seen any number of operating

12   agreements today, and your testimony has been that

13   none of them were executed.   Is that correct?

14       A    That is correct.

15       Q    All right.   Now, each of those and perhaps

16   other operating agreements identified a certain

17   membership interest for Mr. Yessin, right?

18       A    Yes.

19       Q    Did you agree with the membership interests

20   that were allocated to Mr. Yessin in those operating

21   agreements?

22       A    Not in any of them, no.

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 370

1    money?

2         A    Yes.

3         Q    The domain name, you testified earlier today

4    that Mr. Yessin purchased the domain name.  Is that

5    correct?

6         A    Correct.

7         Q    When -- was it your understanding that --

8    withdrawn.

9              When did he purchase the domain name?

10        A    The date?

11        Q    Yeah.  Do you know the date?  Give me a

12   month and a year.

13        A    July of 2007.

14        Q    Okay.

15        A    Jon Hageman purchased it at Brent's request.

16        Q    Who paid for it?

17        A    Brent.

18        Q    Okay.  Now, at that time was Brent a manager

19   of GPP?

20        A    Yes.  Well, what is the date of the articles

21   of incorporation?  Sorry.

22        Q    I don't know where I laid them.  Articles of

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 371

1    organization are dated July 16, 2007.

2         A    So yes, he was a manager when he purchased

3    on behalf of GPP.

4         Q    Okay.  And was that your understanding, that

5    he was purchasing the domain name on behalf of GPP?

6         A    Yes.

7         Q    Did you ever have a conversation with him

8    about that?

9         A    Yes.

10        Q    And based upon those conversations, that was

11   your understanding?

12        A    That was my understanding.

13        Q    All right.  Did Mr. Yessin have a user name

14   on the GPP e-mail system?

15        A    No.

16        Q    Did he have an e-mail account?

17        A    No.

18        Q    Did he have a password?

19        A    No.

20        Q    Mr. Yessin has admitted to looking at at

21   least three of your e-mail accounts.  Did you ever

22   give Mr. Yessin your password to those e-mail

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 372

1    accounts?

2         A    Absolutely not.

3         Q    Did you ever store them on one of his

4    computers?

5         A    I don't store passwords on any computer.

6         Q    Not even your own?

7         A    Not even my own.  I certainly wouldn't store

8    it on his.

9         Q    Did you ever give Mr. Yessin permission to

10   go into any of these -- to access any of these e-mail

11   accounts?

12        A    No.

13        Q    Did you ever give him authorization to

14   access any of these e-mail accounts?

15        A    Never.

16        Q    Mr. Yessin has also admitted going into Mr.

17   Weiss's GPP e-mail account.  Did you give Mr. Yessin

18   the password to Mr. Weiss's e-mail account?

19        A    No.

20        Q    Do you know if Mr. Weiss did?  Do you know

21   if Mr. Weiss gave Mr. Yessin the password to his

22   e-mail?

Page 373

1          A    No, he did not.

2          Q    Did anyone at GPP give Mr. Yessin

3     authorization to go into these e-mail accounts?

4          A    No, absolutely not.

5               MR. NEAL:   Pass the witness.

6      FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

7     BY MR. SIMS:

8          Q    When you left your prior employment -- what

9     was it, Global Partners, or Global what?

10         A    Global Policy Group.

11         Q    Global Policy Group.  Was there -- did

12    issues arise between you and the group --

13         A    It was a partnership between me and one

14    other person.  So there wasn't a group, it was just

15    two of us.

16         Q    Right.  I'm just shortening up the group,

17    the name.  Was there at some point contemplation that

18    there might be litigation between you and your other

19    partner?

20         A    Litigation between us?

21         Q    Yes.  Are you aware that Mr. Yessin has

22    indicated that he -- you asked him to go onto your

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 374

1    e-mail account with Global Partners Group?

2         A    I saw that he stated that in one of the

3    responses, but it's not accurate.

4         Q    Okay.

5         A    There's no sensical reason why I would have

6    him randomly go into my e-mail system to look for what

7    I don't know, but I absolutely did not do that.

8         Q    Well, was there issues or concerns at the

9    time you left with a potential defamation claim or

10   other type of claim?

11        A    Yes.

12        Q    And did you ask him to investigate the basis

13   of bringing such a claim?

14        A    I asked him -- yes.  I asked him about

15   defamation and what it would take from a legal

16   standpoint because, again, he's a transactional

17   attorney.

18        Q    All right.  And did you -- so you don't

19   recall at any point in time asking him to look at

20   information that might be on your e-mail account?

21        A    I might have shown him an e-mail or two, but

22   I certainly didn't give him passwords and access to my

HIGHLY CONFIDENTIAL DEPOSITION OF KATHERINE FRIESS - VOLUME 2
CONDUCTED ON WEDNESDAY, NOVEMBER 25, 2009

Page 375

1    e-mail account.

2         Q    Okay.  Well, the question --

3         A    Let me rephrase that.  Also the

4    transactional work that he's done is previous

5    corporate transactional work.  He doesn't do it now.

6         Q    So if I understand your testimony, it's

7    possible that you may have accessed your account while

8    he was there, or he may have accessed your account

9    while you were standing over his shoulder or next to

10   him?

11        A    No.

12             MR. NEAL:  Objection, lacks foundation.

13        A    He's never accessed my e-mail accounts with

14   my knowledge, with my acquiescence.

15   BY MR. SIMS:

16        Q    All right.  In response to a question by

17   your counsel, you said you had an understanding from a

18   conversation with Mr. Yessin in July of 2007 that he

19   was purchasing the domain name on behalf of or for the

20   benefit of GPP.

21        A    Correct.

22        Q    Describe that conversation to me.  What was

Page 376

1    said?

2         A    I could only paraphrase it, but we were

3    talking about setting up the domain name, and he said

4    I'll take care of it, I'll call my IT guy, and Jon

5    then worked through Dawn Russell, and Dawn Russell

6    sent me the information on it.

7         Q    All right.  Now, in July of this year, 2009,

8    or August of -- July of 2009, let's put it there --

9    before GPP went about changing its domain name, you

10   had sent a letter through counsel to Mr. Yessin

11   setting forth a cease and desist, right?

12        A    Correct.

13        Q    Did you also demand return of the GPP domain

14   name or demand that he exercise papers to assign the

15   domain name to GPP?

16        A    I wasn't aware at that time that it was in

17   his name.

18        Q    Okay.  At any point in time did you make

19   that demand, GPP make that demand to him?

20        A    Brent threatened to turn off the Web site

21   and turn off the e-mail systems in order to tank the

22   company.  I don't think he was in a position of