UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)

GLOBAL POLICY PARTNERS, LLC, et al.,

       Plaintiffs,

vs.                              Civil Action No.
                                  1:09-cv-859 TSE/TRJ

BRENT YESSIN, et al.,

       Defendants.

_____/


DEPOSITION OF:          JON HAGEMAN

TAKEN:                Pursuant to Notice by
                        Counsel for Plaintiffs

PLACE:                Knox & Givens, P.A.
                        607 West Horatio Street
                        Tampa, Florida

DATE:                 October 27, 2009

TIME:                 Began:  10:00 a.m.
                        Ended:  1:10 p.m.

REPORTED BY:            PATRICIA J. FOX
                        Notary Public
                        State of Florida at Large

                        Pages 1 - 103

ORIGINAL



EXHIBIT
6
ALL-STATE LEGAL®

```
1        APPEARANCES:
                   STACEY ROSE HARRIS, ESQ. (BY TELEPHONE)
2                  DiMuroGinsberg, P.C.
                   908 King Street, Suite 200
3                  Alexandria, VA  22314
                        Attorney for Plaintiffs
4
                   CHARLES M. SIMS, ESQ. (BY TELEPHONE)
5                  LeClairRyan
                   951 East Byrd Street, 8th Floor
6                  Richmond, Virginia  23219

7                        and

8                  C. MATTHEW HAYNES, ESQ. (BY TELEPHONE)
                   LeClairRyan
9                  225 Reinekers Lane, Suite 700
                   Alexandria, Virginia  22314
10                      Attorneys for Defendants

11                 RANDALL P. MUELLER, ESQ.
                   Carey, O'Malley, Whitaker & Mueller, P.A.
12                 712 South Oregon Avenue
                   Tampa, Florida  33606
13                      Attorney for Jon Hageman

14
         ALSO PRESENT:
15                 Katherine Friess Yessin (By Telephone)
                   Brent Yessin
16

17                           I N D E X
18

19                                          PAGE
```

```
20       INDEX TO EXHIBITS                       3
         EXAMINATION BY MS. HARRIS            4, 90
21       EXAMINATION BY MR. SIMS                34
         STIPULATION                            99
22       DEPONENT SIGNATURE PAGE               100
         ERRATA PAGE                           101
23       CERTIFICATE OF OATH                   102
         CERTIFICATE OF REPORTER               103
```

```
24                      * * * *

25
```

1

INDEX TO EXHIBITS

PAGE

2

Composite Exhibit 1            7
3   Hageman Exhibit 2           36
Hageman Exhibit 3             43
4   Hageman Exhibit 4           44
Hageman Exhibit 5             44
5   Hageman Exhibit 6           45
Hageman Exhibit 7             46
6   Hageman Exhibit 8           48
Hageman Exhibit 9             50
7   Hageman Exhibit 10          50
Hageman Exhibit 11            52
8   Hageman Exhibit 12          54
Hageman Exhibit 13            55
9   Hageman Exhibit 14          56
Hageman Exhibit 15            58
10  Hageman Exhibit 16          58
Hageman Exhibit 17            59
11  Hageman Exhibit 18          60
Hageman Exhibit 19            62
12  Hageman Exhibit 20          63
Hageman Exhibit 21            64
13  Hageman Exhibit 22          65
Hageman Exhibit 23            66
14  Hageman Exhibit 24          67
Hageman Exhibit 25            69
15  Hageman Exhibit 26          70
Hageman Exhibit 27            72
16  Hageman Exhibit 28          76
Hageman Exhibit 29            77
17  Hageman Exhibit 30          77
Hageman Exhibit 31            83
18  Hageman Exhibit 32          83
Hageman Exhibit 33            85
19  Hageman Exhibit 34          88

20

21                    * * * *

22

23

24

25

1    accurate to say that Mr. Yessin and Ms. Russell corresponded

2    with you to establish the domain names and Web site for GPP?

3        A.    Yes.

4        Q.    Did they have any role in setting up e-mail

5    accounts for GPP?

6        A.    I believe they had me set up the initial ones

7    for Katherine and I believe Jeffrey.

8        Q.    Was there an e-mail account set up for

9    Mr. Yessin?

10       A.    No.

11       Q.    Do you know why not?

12       A.    They didn't ask me to set one up.

13       Q.    How did the GPP e-mail system run?

14       A.    I originally set it up with a hosting company

15   called OneandOne.com where I buy a hosting package, I

16   associate a domain name with it and then I set up accounts,

17   and the e-mail can be accessed using Outlook on your PC with

18   settings that I provide or through a web client that's

19   provided by the host.

20       Q.    And you said you initially set it up that way.

21   Was it later changed to a different host?

22       A.    It was changed twice.

23       Q.    Do you remember approximately when it was

24   changed?

25       A.    No.  I'd have to review the e-mails to find out

```
 1    BY MS. HARRIS:

 2         Q.    Why was that?

 3         A.    For fear of being involved in this ongoing

 4    litigation.

 5         Q.    Were you aware of litigation at the time

 6    that --

 7         A.    No.  I was afraid that there would be

 8    litigation.

 9         Q.    Litigation over what issues?

10         A.    Over the e-mail issue.

11         Q.    Okay.  What e-mail issue are you referring to?

12         A.    The fact that Brent wanted to read Katherine's

13    e-mail.

14         Q.    Okay.  Let's go through that.  If I could refer

15    you to document numbers 72 and 73.

16         A.    Okay.

17         Q.    Do you recognize this?

18         A.    Yeah.  It's just some correspondence between

19    Brent and myself.

20         Q.    And then in the second e-mail Mr. Yessin asks

21    you if GPP is paying directly or if -- I presume he means

22    Yessin and Associates is paying on behalf of GPP?

23              MR. SIMS:  I'm going to object to the form of

24         the question.

25         A.    He was just asking if they were paying for
```

1      GPP's hosting or if they were paying for it themselves.

2      BY MS. HARRIS:

3            Q.      Did you have any phone conversations related to

4      this inquiry?

5            A.      No.

6            Q.      Okay.  Turning to pages 36 and 37, do you

7      recognize these e-mails?

8            A.      Yeah.

9            Q.      Let's start with the first one, Friday, June

10     26th, 2009 at 9:27 p.m.  Was this the first communication

11     you received regarding what you have referred to as the

12     e-mail issue?

13               MR. MUELLER:  Are you referring to the earliest

14          e-mail in time?

15               MS. HARRIS:  Yes.

16           A.      Yes, that would be what I'm talking about.

17     BY MS. HARRIS:

18           Q.      After you received this e-mail did you have any

19     phone conversations with Mr. Yessin regarding his request?

20           A.      No, there was just a voice mail.  He had tried

21     to call but left a voice mail.  I never actually spoke to

22     him over the phone.

23           Q.      Do you remember what the voice mail said?

24           A.      Essentially, I think it was just the same thing

25     of what the e-mail was asking, if he could gain access to

1    Katherine's e-mail.

2           Q.     And what was your reaction when you read this

3    e-mail and heard that voice mail message?

4           A.     Well, I was confused, and after thinking about

5    it I wanted to ask my lawyer what I was supposed to do.

6           Q.     Why were you not sure of what you were supposed

7    to do?

8           A.     Well, because under my understanding, Brent

9    didn't own or was not part of GPP at all.  He had asked me

10   to set that up, but I understood that he asked me to do that

11   because he was involved with Katherine.  And this happens in

12   my business all the time, friends refer friends all the

13   time.  So it never once was mentioned to me that he had any

14   involvement in the company so that's why I hesitated to give

15   him access and then that's when I went to my lawyer.

16          Q.     And at the time of this e-mail communication,

17   I'm referring now to the top e-mail of Sunday, June 28th,

18   2009, Katherine was paying for any services being provided

19   to GPP?

20                 MR. SIMS:  I'm going to object as to form of

21          the question.  Go ahead.

22                 MS. HARRIS:  I'll fix it.

23   BY MS. HARRIS:

24          Q.     Who was paying for the services provided to GPP

25   at this point?

```
 1              A.      GPP was.

 2              Q.      And who's the contact person for GPP that was

 3      writing the checks?

 4              A.      Well, I mean, my contact at GPP was Katherine.

 5                      MS. HARRIS:  Did we just have someone else join

 6              us?

 7                      MS. YESSIN:  Hi, this is Katherine.  I'm sorry,

 8              I got dropped off.

 9                      MS. HARRIS:  Oh, okay.

10      BY MS. HARRIS:

11              Q.      I'd like to refer you to documents 30, 31 and

12      32, Mr. Hageman.

13              A.      Okay.

14              Q.      Do you recognize these documents?

15              A.      Yeah.  It's just further on in that same

16      conversation, I think.  Yeah.

17              Q.      And what continued to happen through the course

18      of this conversation with Mr. Yessin?

19                      MR. SIMS:  I'm going to object to the use of

20              the word conversation.

21              A.      Well, originally he had asked if he could

22      access the e-mails.  And I had said that, you know, I

23      wouldn't be able to access their e-mail without changing the

24      passwords.  And I thought they had used Outlook, which means

25      if they were using Outlook the e-mails would have been
```

1    downloaded off of the e-mail server and put onto their PCs

2    and there would be no e-mails to look at on the server.  So

3    even if I did have the passwords or granted him access, I

4    didn't think there would be any e-mails to see anyway, but

5    that was just my guess.  So then after thinking about that

6    more I decided that I didn't want to go any further without

7    talking to my lawyer first.

8         Q.   And then he said -- referring to the top

9    e-mail, when Mr. Yessin says to you you can tell her I am

10   the only officer of the company, did you know that to be

11   true?

12             MR. SIMS:  What e-mail are you referring to?

13             MS. HARRIS:  I'm on page 30.

14        A.   No, I did not know that to be true.

15   BY MS. HARRIS:

16        Q.   Did Mr. Yessin ever send you documentation to

17   support that claim?

18        A.   Yes, he did.

19        Q.   What did he send you?

20        A.   An operating agreement for GPP.

21        Q.   And did you read the operating agreement?

22        A.   Yeah, at the time.  I can't remember exactly,

23   but I do remember it was not signed by anyone.

24        Q.   Did you ask Mr. Yessin for a signed version?

25        A.   Yes.

26

```
 1              Q.      I'm sorry, but if you answered, I couldn't
 2      hear.
 3              A.      Yes, I did ask him for one.
 4              Q.      And did he provide one to you?
 5              A.      No.
 6              Q.      After he was unable to provide it to you did
 7      you draw any conclusions?
 8              A.      Yeah.  It just made me think more that he was
 9      not a manager of the company.
10              Q.      To your knowledge, who did have an e-mail
11      account with GPP?
12              A.      Katherine had one, Jeffrey had one and there
13      were a couple more.  It's hard to remember because they had
14      changed a couple times.  But it was always Katherine and
15      Jeffrey have always had one.
16              Q.      And for the others who had GPP e-mail accounts,
17      who established those with you?
18              A.      Katherine did.
19              Q.      So you were taking your instructions from her.
20              A.      Yes.
21              Q.      And was it your understanding that the only
22      people who would have e-mail accounts would be the people
23      who she told you would have e-mail accounts?
24              A.      Yes.
25              Q.      I'd like to refer to document number starting
```

1      9, and I believe it's an e-mail that goes 9, 10, 11 and 12.

2          A.     Okay.

3          Q.     I'm looking at the June 29th, 2009 at 9:10

4      a.m. --

5          A.     Okay.

6          Q.     -- e-mail from you.  It appears to be going to

7      Brent Yessin.  It starts with I just spoke with my lawyer.

8          A.     Yes.

9          Q.     Tell me about this e-mail that you sent.

10     Specifically what I'd like to point you to is where you say

11     you and I don't have a contract in place for the hosting of

12     GPP's e-mail that would require me to do so.  Could you

13     elaborate on that?

14         A.     Well, there was no contract that said that I at

15     any time had to give access to Brent for anything that I had

16     set up for GPP, e-mail or Web site.

17         Q.     And then he replied to you with the e-mail

18     above where he says I think we just shut it down then, don't

19     you?

20         A.     Well, there was confusion on my part about the

21     domain name itself gppwashington.com.  Because Brent had

22     asked me to reserve that domain name, I was just relying on

23     the fact that he essentially owned it.

24                When I actually purchased the domain name I put

25     myself in as the registered owner because I didn't have a

28

```
 1        company name to register it to yet because it was just asked
 2        of me by Brent to do so.  And I was still under the
 3        impression that he owned that domain name, which means that
 4        I couldn't give him the e-mail hosting but he owned the
 5        domain name.  To shut it down would mean to just point the
 6        domain name somewhere else so that e-mails stopped going to
 7        the hosting account that I had set up with GoDaddy.
 8             Q.     And was that in fact the case, that he still
 9        owned that domain name?
10             A.     Well, as far as who decided that, I guess I
11        did.  Because he's the one who asked me to buy it, and when
12        I had it in my name and I didn't want to be associated with
13        it anymore I put his name in as the registered owner of that
14        domain name.  So I just gave him the domain name because he
15        asked me to buy it.
16             Q.     And then what happened with the domain name
17        ultimately?
18             A.     I don't know.  As soon as I transferred the
19        account -- transferred the domain name to an account set up
20        for Brent, I sent him the account number and the password to
21        manage it with Network Solutions and that's the last I ever
22        checked up on the domain name.
23             Q.     And just to clarify, when you shut down the
24        domain name, did that have any effect on the e-mail system?
25                    MR. SIMS:  I'm going to object to the use of
```

```
 1                  to call back in.

 2                        (Break in the proceeding.)

 3      BY MS. HARRIS:

 4           Q.    Mr. Hageman, just two follow-up questions and

 5      then I think I'm pretty much done on my end.

 6                  I would like to refer you to pages 27 through

 7      29 and tell me if you recognize this document.

 8           A.    Yeah.  It's an e-mail exchange between me and

 9      Brent.

10           Q.    And what were you discussing here?

11           A.    Looks like he was sending me the operating

12      agreement that was supposed to say that he's the manager of

13      GPP.

14           Q.    I'd like to refer you to an e-mail on the

15      second page that appears to be from you on June 26th, 2009.

16           A.    Okay.

17           Q.    Please read that and let me know if this

18      refreshes your recollection as to whether Katherine had

19      changed her password?

20                  MR. SIMS:  Well, I think he has already

21            testified as to her changing the password.

22                  MS. HARRIS:  I wasn't sure that that was clear

23            from his prior testimony.

24           A.    Okay.  Yeah, I guess this means that the

25      password had changed.
```

1    BY MS. HARRIS:

2         Q.    Prior to -- it had changed prior to

3    Mr. Yessin's initial inquiry to you to have access to the

4    e-mail accounts, correct?

5         A.    I don't remember what day the -- well, yeah, he

6    had asked me earlier that day, so it must have changed

7    before then.

8         Q.    Okay.  And then I would like to refer you to

9    page 310 through 312.

10        A.    Okay.

11        Q.    And are you familiar with this document?  You

12   can take some time to review it if you need.

13        A.    Okay.  It's just an e-mail from Brent to me

14   asking about I guess what the -- clarifying the term hosting

15   and him claiming that it's his Web site and I should give

16   him access to it.

17        Q.    And I'd like to refer you to the second page,

18   the e-mail from Brent Yessin to you on July 22nd at 1:27

19   p.m.

20        A.    Okay.

21        Q.    Referring to the sentence where he says, "Do

22   you have that or is there any way to retrieve it?  I thought

23   you said you could set up a mirror account do everything

24   that went to @gppwashington.com went into an account that

25   pushed to me; is that right?"  What was --

1         A.     That was most likely from a conversation a long

2   time ago about how you can set up e-mail so that it can go

3   to two places at the same time, meaning I can set up an

4   e-mail to deliver e-mail to an inbox and have it forwarded

5   to a completely separate address as well.

6         Q.     Was it your understanding that Mr. Yessin

7   wanted access to any e-mails going to or from a GPP e-mail

8   account or just Katherine's?

9         MR. SIMS:  I'm going to object.

10        A.     Any e-mails at this point.

11  BY MS. HARRIS:

12        Q.     Any e-mails going to GPP?

13        A.     Right.

14        Q.     Okay.

15        MS. HARRIS:  I don't have anymore questions for

16        Mr. Hageman right now.

17                   EXAMINATION

18  BY MR. SIMS:

19        Q.     Hi, Mr. Hageman.  This is Charles Sims.  I

20  represent Brent Yessin and I'm going to ask you some

21  follow-up questions.  Hopefully, I won't keep you here too

22  long.

23        A.     Okay.

24        Q.     Looking at this document which is Bates 310 to

25  311, I think you testified that you had a conversation with

1    you in the signature line of her e-mail, did she ever

2    provide you with any documentation to show that she was an

3    officer, manager or owner of GPP?

4         A.    The only documentation would have been what she

5    had me put on the Web site as far as who was a principal.  I

6    can't remember the exact titles, but whatever was on her Web

7    site.

8         Q.    Now, in this time period of July, August,

9    September 2007 when you were setting up the Web hosting for

10   GPP, did you have any contract -- did you enter into a

11   contract with GPP?

12        A.    No.

13        Q.    At any time did your company enter into a

14   contract with GPP?

15        A.    No.

16        Q.    At any time did GPP provide you with a

17   confidentiality agreement that asked you to enter into that

18   agreement?

19        A.    No.

20        Q.    What did you understand was the business of

21   GPP?

22        A.    Honestly, I didn't even know.

23        Q.    All right.  Now, I think you testified that it

24   was at least your understanding that Brent Yessin owned the

25   domain name for GPP.  Is that accurate?

```
 1              A.      Yes.

 2              Q.      And the domain name that you're referring to is

 3      what?

 4              A.      Gppwashington.com.

 5              Q.      All right.  And I think you also testified that

 6      when you set up an e-mail account like with GoDaddy.com, you

 7      have to have a domain name in order to set that up?

 8              A.      No, you don't have to have a domain name to set

 9      it up, but it's essentially useless without one.  So you

10      should have one if you're going to set one up.

11              Q.      Okay.  So explain that to me.  Why is it

12      useless?

13              A.      Because you can buy Web site hosting and it's a

14      service that GoDaddy will provide and it will give you the

15      control panel and you can log in and create accounts, but if

16      there is no domain name associated with it, e-mails are

17      never going to go there and Web site requests are never

18      going to be made.

19              Q.      All right.  Now, if you move the domain name

20      away from the Web site, I guess then at that point in time

21      the e-mails won't go to that Web site, will they?

22              A.      That's right.

23              Q.      All right.  Now, there was some question right

24      at the end of Mrs. Yessin's counsel's questions to you about

25      going -- I think your testimony was you had gone onto the
```

```
 1          2009, did Ms. Yessin ever ask you to change her password?

 2                   A.    Not that I can recall.

 3                         MR. SIMS:  I'm going to skip what I had marked

 4          as Defendant's Exhibit 2.  If we could hand the

 5          witness what I've marked as Defendant's Exhibit 3.

 6                         MR. MUELLER:  Do you want us to turn to the

 7          next document in sequence?

 8                         MR. SIMS:  Yes.  The next document in sequence

 9          is -- I'm skipping the one that has my number

10          Defendant's 2 on it and I'm asking you to put before

11          the witness Defendant's 3 which is invoice number 445.

12                         MR. MUELLER:  Okay.

13                         MR. SIMS:  And we'll mark that as Hageman

14          Exhibit 3.

15      BY MR. SIMS:

16          Q.    Sir, I've handed you what we've marked as

17      Hageman Exhibit 3.  Do you recognize this document?

18          A.    Yes.  It's invoice 445 to Yessin and

19      Associates.

20          Q.    And here there are various -- are these domain

21      name registrations that you're billing Yessin and Associates

22      for?

23          A.    Yes.

24          Q.    If you'll turn to the next document which I've

25      marked as Defendant's No. 4, we'll mark that as Hageman
```

INDEPENDENT REPORTING SERVICE

1        Exhibit 4.

2              A.      Okay.

3              Q.      Mr. Hageman, I've handed you what we've marked

4        as Hageman Exhibit 4 which contains a number of invoices.

5        Do you recognize these documents?

6              A.      Yeah.   It's another invoice to Yessin and

7        Associates for those domain names.

8              Q.      Okay.   And the next document I'd like to put

9        you before, sir, is what I have as Defendant's Exhibit 5 and

10       we'll mark that as Hageman Exhibit 5.

11             A.      Okay.

12             Q.      Sir, do you recognize this document?

13             A.      Yes.   It's a report of all the transactions

14       between Yessin and Associates and me.

15             Q.      And the number, if you look at the third column

16       there, those numbers refer to invoices?

17             A.      Yes, for invoices.   The payments look like they

18       refer to check numbers.

19             Q.      Okay.   And I take it you printed this document

20       down in response to the subpoena that was served on you?

21             A.      Yes.

22             Q.      And so if we look to the various invoices, we

23       can see which invoices Yessin and Associates paid for?

24             A.      Yes.

25             Q.      Okay.   Now, the next document I'd like to put

```
 1    background.

 2         A.     Ashley would have been on the phone, Ashley

 3    McRae, my lawyer.

 4         Q.     Okay.  And you believe Steve Neal was.  Was

 5    Katherine Yessin on the phone?

 6         A.     Yes, I think so.

 7         Q.     And what specifically do you recall Mr. Neal

 8    asking?

 9              MS. HARRIS:  Objection.  Hearsay.

10         A.     Just what was the chain of events of Brent

11    wanting to gain access to the -- to Katherine's e-mail.

12    BY MR. SIMS:

13         Q.     Okay.  And did you tell Mr. Neal that -- well,

14    what did you tell Mr. Neal?

15              MS. HARRIS:  Objection.  Calls for hearsay.

16         A.     I had just said that Brent made a request to

17    view her e-mail, and I had said after talking with my own

18    lawyer I would not do that unless he provided a document

19    that said he was the owner of that company.  And then I said

20    he provided a document that said he was the owner but it

21    wasn't signed by anybody and so we basically said no you

22    can't see this e-mail.  And that's the last part of the

23    requests that I had from Brent, so that's where I said it

24    ended.

25    BY MR. SIMS:
```

1          Q.    Okay.  Did Mr. Neal ask you whether there was

2     any reason to believe that Mr. Yessin was capable of

3     reviewing Katherine Yessin's e-mails after her password was

4     changed?

5           MS. HARRIS:  Objection.  Calls for hearsay.

6          A.    No.  He was just asking what Brent was asking

7     for.

8     BY MR. SIMS:

9          Q.    Okay.  How did Mr. Neal identify himself?

10         MS. HARRIS:  Objection.  Hearsay.

11        A.    As Katherine's attorney.

12    BY MR. SIMS:

13        Q.    Did he indicate that he was also GPP's

14    attorney?

15        A.    I don't recall if he specifically said

16    Katherine or GPP.  I considered them one and the same.  So I

17    don't remember if he said either.

18        Q.    All right.  Do you recall anything else being

19    talked about at that meeting or conversations you had with

20    him on the phone?

21        A.    No.

22        Q.    Okay.  Did you take any notes during that

23    conversation?

24        A.    No.

25        Q.    Did Mr. Neal ask you any questions about the

1   password?

2       A.      Yes.

3       Q.      Did they have to change it through you?

4       A.      No.

5       Q.      How could they go about changing it themselves?

6       A.      Log in through the Web client and there is a

7   link on there that says change password.

8       Q.      Okay.  Now I'd like to direct your attention

9   back to my Exhibit No. 1, pages 36 and 37.

10      A.      Okay.

11      Q.      Are you there, Mr. Hageman?

12      A.      Yeah, I've got it.

13      Q.      I believe this is part of an e-mail chain we

14  looked at previously.  Do you recognize this document?

15      A.      Yes.

16      Q.      And at the top here of the last e-mail in the

17  chain, Sunday, June 28th, 2009 at 4:09 p.m., you told

18  Mr. Yessin that it was not clear to you that he would have

19  authority -- that Mr. Yessin would have the authority to

20  receive GPP's e-mails, correct?

21              MR. SIMS:  I'm going to object.  That misstates

22          what the e-mail says.

23              MS. HARRIS:  I'll clarify that.

24  BY MS. HARRIS:

25      Q.      Mr. Hageman, you state, quote, "It is not clear

1    to me that you would have the authority to have me forward

2    their e-mail to you.  It is my understanding that you are

3    not a partner in Global Policy Partners."  You wrote that?

4         A.    Yes.

5         Q.    Did Mr. Yessin ever say anything to you or show

6    you anything to convince you that he had such authority?

7         A.    Nothing that convinced me.

8         Q.    Okay.  I'd like to refer you to pages 413

9    through 415 of my Exhibit No. 1.

10        A.    Okay.

11        Q.    On page 413, this is an e-mail from you,

12   correct, to Katherine alerting her to charges that are

13   overdue?

14        A.    Yes.

15        Q.    And she responds that Jeffrey has put the check

16   in the mail?

17        A.    Yes.

18        Q.    Do you believe she was referring to Jeffrey

19   Weiss of GPP?

20        A.    Yes.

21        Q.    So at this point Yessin and Associates was not

22   paying the bills for the services you were providing to GPP,

23   correct?

24        A.    That's correct.

25        Q.    I'd like to refer you to pages 395 through 401,

1      an e-mail chain.

2             A.     Okay.

3             Q.     And the last e-mail in this chain from

4      Katherine Friess to you on Thursday, November 6th, 2008, she

5      tells you that her password is still the password that you

6      originally set up, global1, correct?

7             A.     Yes.

8             Q.     And that was your understanding at the time?

9             A.     Yes.

10            Q.     Okay.  I'd hike to refer you to page 393.

11            A.     Okay.

12            Q.     Pages 393 and 394 are an e-mail chain.  Do you

13     recognize this document?

14            A.     Yes, the e-mail we talked about earlier.

15            Q.     Okay.  And Katherine -- this is November 8th,

16     2008, and here she asks you to change her password to

17     global2.

18            A.     Yes, she does.

19            Q.     And did you in fact change her password to

20     global2?

21            A.     I'm sure I did, yes.

22            Q.     Do you remember if you changed the password of

23     any other GPP account holders?

24            A.     No.  She didn't request that I do that and I

25     don't remember changing anybody else's password.

1    Q.    So going back to your testimony on direct

2    before Mr. Sims' questions, does this clarify or at all

3    affect your answer to my question as to whether Katherine

4    Friess Yessin's password was the same in July 2009 as when

5    you initially set it up?

6    A.    Yes, other than -- well, can you --

7    Q.    I'll clarify.  It was my understanding that you

8    testified, and please correct me if I'm wrong, that

9    Katherine Friess Yessin's password was initially set at

10   global1 and was not changed at all until July of 2009 when

11   you had discussions with Brent Yessin about his attempts to

12   access her e-mail account.

13   A.    Okay.  So I guess my answer was I said I would

14   have no way of knowing.  So let me add, unless she would

15   request that I change it like she did here.

16   Q.    So you did in fact change her password to

17   global2 in November of 2008.

18   A.    Yes, I would have done that.

19   Q.    Okay.  And do you remember telling anyone else

20   about the change in the password other than perhaps

21   Mr. Jeffrey Weiss who's cc'd on this e-mail?

22   A.    The password global2, no, I would not have told

23   anyone else that.

24   Q.    I'd like to refer you to Hageman Exhibit No.

25   20.  Actually, no.  I'm sorry, I'll stick with -- page 393