Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTER DISTRICT OF VIRGINIA

(ALEXANDRIA DIVISION)

- - - - - - - - - - - - - - - x

GLOBAL POLICY PARTNERS, LLC,　:

et al.,　　　　　　　　　　　:

　　　　Plaintiffs,　　　　　:

　　vs.　　　　　　　　　　　:　Civil Action No.

BRENT YESSIN, et al.,　　　:　1:09-cv-859 TSE/TRJ

　　　　Defendants.　　　　　:

- - - - - - - - - - - - - - - x


Deposition of BRENT W. YESSIN

(CONFIDENTIAL PORTIONS REDACTED)

Alexandria, Virginia

Tuesday, December 8, 2009

10:20 a.m.


Job No.: 1-169460

Pages: 1 - 347

Reported by: Sarah M. Bickel



DEPOSITION OF BRENT W. YESSIN – 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

## Page 2

1     Deposition of BRENT W. YESSIN, held at the
2   offices of:
3
4     LECLAIR RYAN
5     2318 Mill Road
6     Suite 1100
7     Alexandria, Virginia 22314
8     (703) 684-8007
9
10
11
12
13
14
15
16     Pursuant to agreement, before Sarah M.
17   Bickel, Court Reporter and Notary Public in and for
18   the Commonwealth of Virginia.
19
20
21
22

## Page 3

1          A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFFS:
3       STEPHEN L. NEAL, JR., ESQUIRE
4       STACEY ROSE HARRIS, ESQUIRE
5       DiMuroGinsberg, P.C.
6       908 King Street
7       Suite 200
8       Alexandria, Virginia 22314
9       (703) 684-4333
10
11
12   ON BEHALF OF THE DEFENDANTS:
13       CHARLES M. SIMS, ESQUIRE
14       LeClair Ryan
15       Riverfront Plaza, East Tower
16       951 East Byrd Street
17       Richmond, Virginia 23218
18       (804) 783-2003
19
20
21
22

## Page 4

1      A P P E A R A N C E S   C O N T I N U E D
2   ON BEHALF OF THE DEFENDANTS (CONT.):
3       C. MATTHEW HAYNES, ESQUIRE
4       LeClair Ryan
5       2318 Mill Road
6       Suite 1100
7       Alexandria, Virginia 22314
8       (703) 684-8007
9
10
11     ALSO PRESENT:  Katherine Friess (via telephone)
12
13
14
15
16
17
18
19
20
21
22

## Page 5

1          C O N T E N T S
2   EXAMINATION OF BRENT W. YESSIN          PAGE
3     By Mr. Neal              7
4
5
6          E X H I B I T S
7      (Attached to the transcript.)
8   DEPOSITION EXHIBIT              PAGE
9   Yessin 1   Answers to First Set of
10     Interrogatories          97
11  Yessin 2   Supplemental Answers to First
12     Set of Interrogatories      97
13  Yessin 3   E-mail String         189
14  Yessin 4   E-mail String         190
15  Yessin 5   E-mail String         191
16  Yessin 6   E-mail String         199
17  Yessin 7   E-mail String         201
18  Yessin 8   E-mail with Attachments     205
19  Yessin 9   E-mail String         207
20  Yessin 10  Photocopy from Phone      213
21
22

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 6

1    EXHIBIT CONTINUED
2    DEPOSITION EXHIBIT                PAGE
3    Yessin 12   12/8/09 E-mail            231
4    Yessin 13   E-mails with Attachments      231
5    Yessin 14   E-mail String             239
6    Yessin 15   Articles of Organization for
7             Global Policy Partners, LLC    255
8    Yessin 16   2008 Annual Report        258
9    Yessin 17   2009 Annual Report        284
10   Yessin 18   E-mail String             289
11   Yessin 19   E-mail with Attachments       296
12   Yessin 20   E-mails with Attachments      304
13   Yessin 21   E-mails with Attachments      306
14   Yessin 22   Operating Agreement       311
15   Yessin 23   6/3/08 E-mail             312
16   Yessin 24   Operating Agreement       316
17   Yessin 25   Promissory Notes and Photocopy
18             of Check                 323
19
20
21
22

Page 7

1        PROCEEDINGS
2         BRENT W. YESSIN
3    having been first duly sworn, testified as follows:
4    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
5      BY MR. NEAL:
6      Q  Good morning.  You're an accomplished
7    lawyer, so I will not go through all the procedures
8    of taking a deposition because I'm sure you know.  I
9    will remind you you're under oath.
10         What did you do to prepare for today's
11   deposition?
12      A  I reviewed copies of e-mails, deposition
13   exhibits, and corporate documents.
14      Q  Do you remember what specific documents
15   you reviewed?
16      A  Operating agreements, security interests,
17   and loans.
18      Q  How about e-mails?  What e-mails were you
19   reviewing?
20      A  An entire stack of -- you know, inches of
21   e-mails that are all Bates-stamped already.
22      Q  Did you review any documents that didn't

Page 8

1    have Bates stamps on them?
2      A  I'm sure I did, but I couldn't tell you
3    where the line between one began and the other ended.
4      Q  I know you had conversations with your
5    counsel.  I'm not --
6      A  Right.  I understand.
7      Q  Let me be more clear.  I know you've had
8    conversations with Mr. Sims, and I'm really not
9    interested in those conversations.
10     A  Right.
11     Q  Did you talk to anybody else about this
12   deposition besides Mr. Sims or Matt?
13     A  Yes.
14     Q  Who?
15     A  I talked to Jim Cusack, who is also
16   counsel for me in other matters that are tangentially
17   related; to Phil Clarke, who is corporate counsel for
18   GPP.  That's about all I can come up with off the top
19   of my head.
20     Q  You don't recall anyone else?
21     A  Other than to say I'm going to a
22   deposition.

Page 9

1      Q  I mean substantively.  I don't mean
2    logistically.
3      A  No, no, no.
4      Q  Who did you talk to?
5      A  No other substantive conversations.
6      Q  Not Ms. Glover?
7      A  Not Ms. Glover.
8      Q  Tell me about the conversation with
9    Mr. Cusack.
10     A  That would be privileged.
11     Q  I don't understand.
12         Is he helping you with the divorce?
13     A  Yes.
14     Q  He's providing legal counsel regarding the
15   divorce?
16     A  He's providing legal counsel with regard
17   to every legal matter that I'm involved in.
18     Q  So the answer is "yes"?
19     A  Yes.
20     Q  And what kind of -- generally, what kind
21   of advice is he giving you regarding the divorce?  I
22   don't want specific conversations --

3  (Pages 6 to 9)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 10

1     MR. SIMS: I'm going to object on that.
2     MR. NEAL: I haven't even gotten the
3 question out.
4     MR. SIMS: You're asking him what the
5 advice is.
6     MR. NEAL: No, I wasn't. If you'd let me
7 get my question out, then you'll know, and then you
8 can object. Just let me ask my question, and then
9 you can object, and then you can instruct him not to
10 answer.
11     BY MR. NEAL:
12     Q So let me rephrase.
13     What other kinds of advice -- general
14 advice does Mr. Cusack give you? I'm not asking for
15 conversations.
16     Is it corporate advice? Is it employment
17 advice? Is it labor advice?
18     A All of those.
19     Q Anything else?
20     A Jim's a general counsel for one of my
21 companies, so he also, I would say, gives business
22 advice in that he is a corporate executive as well as

Page 11

1 general counsel.
2     Q What company is that?
3     A That's MODUS.
4     Q Any other kinds of general advice he's
5 giving you? Again, I'm not asking for specific
6 conversations yet.
7     A Jim is like my Godfather. He gives me
8 advice on every issue you might imagine.
9     Q Okay. That's not my question. I don't
10 want to know about every issue that I might imagine.
11 I want to know what other kinds of legal advice he
12 gives you.
13     A Well, I think I've answered that, but I'll
14 do it again. He gives me general legal advice,
15 corporate, civil, commercial, contract, employment,
16 labor.
17     Q Okay. Now, you mentioned -- I know you
18 didn't do it intentionally, but is he still giving
19 you legal advice regarding your divorce or your
20 pending divorce with Ms. Friess?
21     A Yes.
22     Q And what about Mr. Cusack?

Page 12

1     A That is Mr. Cusack.
2     Q I'm sorry.
3     By the way -- back up. Do you have a
4 retainer agreement with Mr. Cusack?
5     A No.
6     Q Not for any of your companies?
7     A No.
8     Q Not for any of the legal work he performs?
9     A No.
10     Q Does he bill you for the work?
11     A Sometimes.
12     Q Presumably not for MODUS, but in other
13 circumstances?
14     MR. SIMS: I'm going to object to the form
15 of the question.
16     MR. NEAL: Withdrawn.
17     BY MR. NEAL:
18     Q Does he bill you time for work he spends
19 on MODUS?
20     A No.
21     Q So it lacked foundation, but I was right.
22     A He doesn't bill me for MODUS.

Page 13

1     Q What about all these other kind of --
2     A He has a percentage of MODUS, so that's
3 how he is compensated like the rest of us.
4     Q That was the basis of my presumption.
5     A Right. Yes.
6     Q Now, when Mr. Cusack provides you other
7 legal advice, does he bill you for it in all these
8 other areas of law that you just went through?
9     A I have received legal bills from Jim, and
10 we have paid Jim's bills.
11     Q Now, Mr. Clarke, who's Mr. Clarke?
12     A Phil Clarke is GPP's corporate counsel.
13 Also represents me, represents MODUS, represents
14 REPI. Phil is general corp- -- general, I would say,
15 corporate attorney. He would assist us in -- and has
16 assisted us in organization of all the companies that
17 we've set up in the last, you know, three years.
18     Q Okay. I'm going to be asking you some
19 questions about Mr. Clarke today, and I really don't
20 care about -- with respect to him, your other
21 companies or other advice he's given those companies.
22 I really don't. I'm not in the least bit interested,

MERRILL L.A.D. REPORTING & DIGITAL VIDEOGRAPHY  301-762-8282
CONFIDENTIAL REDACTED

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 18

1    A No.
2    Q Okay. Other than that conversation with
3 Mr. Clarke, did you have any other conversation with
4 Mr. Clarke about this deposition?
5    A Merely the existence of it, and I was
6 going to be out of town for it. No substantive
7 discussions, if that's your question.
8    Q That's fair enough.
9    I know you use Mr. Clarke for the
10 corporate work for a number of your different
11 companies. Do you also consult with him regarding
12 your divorce?
13    A Yes.
14    Q Do you consider him to be giving you legal
15 advice regarding your divorce?
16    A Yes.
17    Q Is he a divorce lawyer?
18    A No.
19    Q And I take it you -- you believe those
20 conversations to be privileged?
21    A Yes.
22    Q Would you also agree with me, though, sir,

Page 19

1 that with respect to anything he did for GPP or
2 conversations he had with you regarding GPP, that
3 those would not be privileged conversations?
4    MR. SIMS: I'm going to object. You're
5 asking for a legal conclusion.
6    A I would not agree.
7    BY MR. NEAL:
8    Q Why would you believe that there's a
9 privilege there?
10    A Because I hired Phil to represent my
11 company, Phil gave me advice regarding my company,
12 and that advice should be privileged.
13    Q "My company" being GPP?
14    A Being GPP, yes.
15    Q Okay. Well, you're a manager of -- we'll
16 get into whether you're a manager or not a manager
17 and whether you're the only manager at some length
18 today. Just for right now, anyway, let's assume that
19 there are three managers.
20    Does he represent all three of them or
21 just you?
22    MR. SIMS: I'm going to object. I don't

Page 20

1 think it's proper to ask a fact witness to assume
2 facts.
3    MR. NEAL: Okay. Your objection is noted.
4    BY MR. NEAL:
5    Q You can answer the question.
6    A I'm not willing to assume that they are
7 managers.
8    Q So when you say "my company," I mean, your
9 understanding is that the GPP is 100 percent yours?
10    A That's my contention.
11    Q We'll explore that a little bit later.
12    You're an attorney, correct?
13    A Yes.
14    Q Where are you licensed to practice law?
15    A Florida and inactive in Kentucky.
16    Q What's your Florida bar license number?
17    A 780766.
18    Q Have you ever been sanctioned or censured
19 or suspended or disbarred by the State of Florida?
20    A I have been suspended for C- -- inactive
21 CLE or not enough CLE or whatever, and I went back
22 and got the CLE and --

Page 21

1    Q I understand how that can happen.
2    A Right. Given the amount of time that I
3 actually practice, it's not top of --
4    Q You know, I asked a very poor question, so
5 let me start again.
6    Have you ever been disbarred?
7    A No.
8    Q By Florida or Kentucky?
9    A No.
10    Q Have you ever been censured or sanctioned
11 by Florida or Kentucky?
12    A No.
13    Q You were suspended by the Florida bar for
14 CLE -- by not keeping up with your CLE?
15    A Yes. They were sending notices somewhere
16 else. I didn't get the notices, you know. It's
17 happened to a lot of us.
18    Q I can understand that.
19    So when were you suspended from the
20 Florida bar?
21    A I don't know. That's been maybe three
22 years, four years.

MERRILL L.A.D. REPORTING & DIGITAL VIDEOGRAPHY  301-762-8282
CONFIDENTIAL REDACTED

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 22

1    Q  Four years ago?
2    A  2006 maybe.  I'm guessing.  I don't know
3  specifically.
4    Q  Let me ask you this.  Was it before
5  April 2007?
6    A  I don't know.
7    Q  How long was --
8    A  I believe so, but I wouldn't swear to
9  that.  I think so.
10    Q  Fair enough.
11     How --
12    A  I didn't review that.  I didn't expect
13  that to be within the scope, so I did not, frankly,
14  review that.  Had you asked, I would have looked that
15  up --
16    Q  I'm not doing it to be a jerk.  I'm
17  actually -- there's a reason I'm doing it, which I'm
18  going to get to real quick.
19     How long was the suspension, as far as you
20  know?
21    A  I don't know because I didn't know about
22  it until it was -- until some time into it.

Page 23

1    Q  Tell me this.  When did the suspension
2  end?
3    A  I don't -- I don't know that.
4    Q  Can you give me a year?
5    A  No.  If you say 2007 -- you may have
6  better information than I do.  If you do a public
7  record search, I'm sure you have better information
8  than I do.  I don't recall.  It's been quite some
9  time.
10    Q  You say it's been quite some time.  So it
11  wasn't last year?
12    A  It wasn't last year.  I would be surprised
13  if it was 2007.  I think it was 2006, but, again --
14    Q  But it could have been sometime in 2007?
15    A  It could have been sometime in 2007.
16    Q  Was it three months?  Five months?  Seven
17  months?
18    A  I don't know because, as I said, I don't
19  know when it had begun because I wasn't getting the
20  notice.
21    Q  Okay.  You said earlier today -- not much
22  earlier, a few minutes ago -- that you were removed

Page 24

1  from the daily practice of law, and that surprised me
2  a little bit because your lawyer has been telling me
3  and the Court that you're actively giving legal
4  advice.
5    A  I do.
6    Q  So --
7    A  But I don't go to a law office in the same
8  sense that you do, and I'm not in court like I used
9  to be.  I used to be an associate at a posh law firm
10  and --
11     (Simultaneous conversation.)
12    A  I know.  We've all -- many of us are
13  refugees from large law firms.  And I then had my
14  firm where I showed up every day, and I did the kind
15  of practice, generally speaking, that you all do.  I
16  don't do that anymore.  My time is much less time in
17  the office, much more time on the road, but my
18  clients clearly rely on both my legal advice and the
19  fact that they can discuss those things with me with
20  privilege.
21     So in the sense that do I practice and do
22  I assert privilege and do I have confidential

Page 25

1  communications with my clients, yes, I do.  Do I show
2  up at a law office and act like a, you know, regular
3  lawyer day to day, I try not to.  No offense.
4    Q  No, no, no.  You've graduated.
5     Let me -- so when you were -- so there was
6  a time when you were actively practicing law,
7  correct?
8    A  There was a time when I had a traditional
9  legal practice, I would say.
10    Q  Okay.  Let's use that.
11    A  Yeah.
12    Q  When did that traditional legal practice
13  stop?
14    A  I started doing as much consulting as
15  legal work in about 1993.
16    Q  Okay.  So --
17    A  But I didn't close my practice.  I simply
18  spent as much time giving consulting advice, which
19  was kind of more broad business advice, and my
20  carrier would not have been happy had I been giving
21  broad business advice under my malpractice coverage.
22  So I tried to bifurcate that as do some as a

MERRILL L.A.D. REPORTING & DIGITAL VIDEOGRAPHY  301-762-8282
CONFIDENTIAL REDACTED

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

**Page 26**

1  consultant and some as an attorney beginning in about
2  1993. I started consulting in 1990, but I hit sort
3  of a tipping point where I did mostly labor and
4  employment consulting work starting in around 1993,
5  1994.
6      Q  So let's take it -- just flash forward to
7  2007 to the present.
8      From 2007 to the present, are you actively
9  providing legal advice to clients?
10     A  I do.
11     Q  And what clients are those?
12     A  Those would be --
13     MR. SIMS:  You want the types of clients
14  or --
15     MR. NEAL:  No.  I want the clients.
16     MR. SIMS:  Why?
17     MR. NEAL:  Because I want to establish
18  that there's either an attorney-client relationship
19  or there's not.
20     MR. SIMS:  Why?
21     MR. NEAL:  Because of your assertions of
22  privilege.

**Page 27**

1      MR. SIMS:  Why?  What's it relevant --
2      BY MR. NEAL:
3      Q  Answer the question, sir.
4      MR. SIMS:  No.
5      What's it relevant before we get into --
6      MR. NEAL:  Relevance is not a discovery
7  objection.  We're not going to have --
8      (Simultaneous conversation.)
9      MR. NEAL:  -- on the record.  I'm going to
10  ask him questions; you're going to object.
11     MR. SIMS:  I object --
12     MR. NEAL:  You can instruct --
13     MR. SIMS:  -- and I'll instruct him not to
14  answer.
15     MR. NEAL:  Really?
16     MR. SIMS:  Yes.
17     BY MR. NEAL:
18     Q  You're going to accept that instruction?
19     A  Well, faced with the advice of opposing
20  counsel or my own counsel, I'm going to take my own
21  counsel's advice.
22     Q  All right.  So you're not going to tell me

**Page 28**

1  with whom you allegedly have attorney-client
2  relationships in the last two years?
3      MR. SIMS:  Who his clients are.
4      MR. NEAL:  How else would you establish an
5  attorney-client relationship, Mr. Sims?
6      MR. SIMS:  How is it relevant to this
7  case?
8      MR. NEAL:  Because of the assertions of
9  privilege that you have asserted on his behalf for
10  giving legal advice.  That was the modicum upon which
11  you argued to the judge --
12     MR. SIMS:  If you want to --
13     MR. NEAL:  -- that we could not have the
14  computer because of all of Mr. Yessin's legal advice
15  for the last two years.  So what I'm doing is
16  exploring exactly what legal relationships he could
17  even have.
18     MR. SIMS:  He has legal relationships.  Do
19  you want to know the types of clients that he's had,
20  or do you went the specific names?  Because some of
21  these clients don't want to know that they've
22  hired --

**Page 29**

1      BY MR. NEAL:
2      Q  What I'm trying to establish, Mr. Yessin,
3  is for the time period of the alleged unlawful
4  surveillance with whom you had attorney-client
5  relationships where you were dispensing legal advice.
6  That's what I want to know.
7      In the last two years, just for those
8  clients where you're dispensing legal advice, I'd
9  like to know who those clients are.
10     MR. SIMS:  If you have clients that aren't
11  concerned with disclosures of their identities, you
12  can identify them.
13     MR. NEAL:  That is not my question.
14     BY MR. NEAL:
15     Q  I am asking you to disclose those clients
16  with whom you provided legal advice in the last two
17  years so I can establish whether there truly is an
18  attorney-client relationship.
19     MR. NEAL:  Now, Mr. Sims, if you want to
20  instruct him not to answer, you can do it.  We'll
21  just take it up.
22     MR. SIMS:  I'm going to let him answer to

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 54

1    A You're not reviewing my billing, are you?
2    Q No, I'm not.
3    A No. It's less than 5 percent.
4    Q 2008?
5    A I'd say the same.
6    Q 2009?
7    A Less than that.
8    Q All right. Who owns --
9    A Not less than less 5 percent, but on the
10   lower end of 5 percent.
11   Q Got you.
12     Employee Advocates, LLC, who owns it?
13   A I own Employee Advocates, LLC. I don't
14   think there are any other interests.
15   Q And in 15 seconds or less, what do they
16   do?
17   A Employee Advocates does direct persuader
18   work as defined by LRMA.
19   Q What does that mean?
20   A Labor Management --
21   Q I know what that means.
22     I meant for us non-labor lawyers, what

Page 55

1    is --
2    A Direct persuader work is defined by the
3    -- well, that's a moving target --
4       (Simultaneous conversation.)
5    A I would say direct persuader work is
6    defined by the Act traditionally, until this
7    administration, has been defined as consulting work
8    that you do where you talk directly to employees.
9    Where you're retained by an employer to talk directly
10   to employees about the exercise or nonexercise of
11   their Section VII rights.
12     BY MR. NEAL:
13   Q Okay.
14   A I understand that it's going to be more
15   broadly defined now, probably to incorporate law
16   firms such as your own.
17   Q I hope not.
18     Now, in 2007, how much time did you spend
19   on this enterprise? That being Employee Advocates,
20   LLC.
21   A You know, I would say -- I counted that
22   time under Yessin & Associates --

Page 56

1    Q Okay. So it's subsumed in that already?
2    A Yes.
3    Q All right. Same thing for 2008 and 2009?
4    A Yes.
5    Q All right. Start at GPP.
6       When was GPP incorporated, if you can
7    recall -- or when was it organized, to use the right
8    vernacular?
9    A July of 2007.
10   Q All right. Now, based upon your
11   understanding, what does GPP do?
12   A It provides governmental relations,
13   consulting advice, and offers, though it does not --
14   has not provided since its organization lobbying
15   services in the legal sense, in the sense it has to
16   be reported as lobbying services.
17   Q What kind of consulting -- not labor
18   consulting, I take it?
19   A No -- well, you know, our Web site says we
20   do labor consulting, too.
21   Q What other kind of consulting do you think
22   GPP does?

Page 57

1    A It provides clients with assistance in
2    understanding and advantaging themselves under our
3    procurement provisions or our appropriations process
4    or our regulatory scheme. So it offers a full suite
5    of governmental affairs, consulting services to
6    people who want to navigate through or advantage
7    themselves in relationship with the U.S. government
8    or I suppose, for that matter, state entities,
9    although their focus is D.C.
10   Q And I take it that these areas you
11   discussed are not your areas of expertise; is that
12   correct?
13   A I wouldn't agree with that.
14   Q In what you've just described to me, which
15   would you consider your areas of expertise?
16   A I do not have an expertise in
17   appropriations.
18   Q Okay.
19   A But I have a considerable resumé in
20   politics as well, so I would say governmental
21   relations is -- in fact, governmental relations is
22   one of the things that I would advise clients of in

15  (Pages 54 to 57)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 58

1    my other businesses, although I would recommend the
2    hiring of GPP, just as I would recommend, if there
3    was any videos, to use RMI. So prior to GPP, I
4    provided some of that advice under Yessin.
5        Q You and I have been around this town for a
6    while, and we understand politics a little better
7    than some people.
8        So when you say governmental relations,
9    what do you mean by that?
10       A I mean getting government contracts,
11   getting favorable regulatory treatment, avoiding
12   regulatory problems, work both with the
13   administration or with the Hill to advantage your
14   company.
15       Q Let me ask the question a little
16   differently.
17       Do you equate governmental relations with
18   lobbying?
19       A Not entirely.
20       Q Do you think it's broader than lobbying?
21       A I think it's broader than lobbying.
22       Q Okay. I understand. So --

Page 59

1        A Well, lobbying has to be reported, and
2    governmental --
3        Q That's where I'm -- I'm going -- that's
4    kind of where we're heading.
5        Have you ever lobbied in D.C. such that
6    you had to report your activities?
7        A No.
8        Q But you do provide governmental
9    regulations work, and you think that's one of your
10   areas of expertise?
11       A It's an area of professional competence.
12       Q Okay. And you've given government
13   relations advice on behalf of GPP?
14       A GPP has so few clients. You know, I
15   couldn't tell you -- if you're talking about for a
16   paying client, there were only two that I can think
17   of, Nomadio and ICSC, and I would not --- and ICSC
18   was a European retainer, not a U.S. retainer.
19   Nomadio did -- I certainly met with them, talked with
20   them. Broadly governmental affairs, maybe.
21       Q Did you provide any -- let me ask a very
22   clear question for the record because I'm not sure my

Page 60

1    last one was very clear.
2        Since the inception, the organization, if
3    you will, of GPP, have you provided any government
4    relations services to any of its clients?
5        A Not on a regular basis, I would say.
6        Q On any basis?
7        A You know, not trying to be cute about it,
8    but honestly, arguably to Nomadio on a very limited
9    basis. They were a paying client. Beyond that --
10   there were only two paying clients, Nomadio and ICSC.
11   So ICSC, no, European in nature; Nomadio -- you know,
12   I'm also a shareholder in Nomadio. I invested in
13   Nomadio so that GPP could continue to get paid. So,
14   you know, is my advice to them as a shareholder or is
15   my advice to them as a --
16       Q I think you've answered my question.
17       Whose idea was it to create or organize
18   GPP?
19       A Katherine and I.
20       Q And Jeffrey Weiss didn't have any part in
21   that?
22       A No.

Page 61

1        Q Okay. What --
2        A I --
3        Q Go ahead.
4        A Clarify. I don't want to suggest Jeffrey
5    had no part in GPP. You're talking about -- if you
6    can ask it more specifically, I can --
7        Q Well, let me ask the same question -- I
8    think it was pretty good. Let me try to improve upon
9    it.
10       Whose idea was it to organize GPP?
11       A It was Katherine and my idea.
12       Q Did she come up with the idea first and
13   say, Hey, Brent, I think this is a great idea, or did
14   you come up with the idea, Hey, this is something
15   that you ought to do? I mean, tell me about it.
16       A Katherine and I were in Bermuda when her
17   then boss/partner -- the owner of the firm -- you
18   call one another partner. So Trey Barnes owned
19   Global Policy Partners, Limited, I think, in the UK.
20   Had the D.C. office. Katherine was the D.C. office.
21   Card said principal or partner or something. But in
22   reality the money was all put out by Trey. So when

16 (Pages 58 to 61)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 62

1    the guy with the money pulls out, you're fired. I
2    mean, you can be a partner, you know, but you're not
3    making any money.
4         So Trey fired her. Nice enough to do it
5    on her birthday. We had gone to Bermuda for our
6    mutual birthdays -- or birthday, I should say. He
7    fired her, and he turned her phone off, and we were
8    left stranded in Hamilton with no phone and no
9    business. It was something reminiscent to the --
10   it's a Tom Cruise movie. "Show me the money." Jerry
11   Maguire scene where both of them were scrambling to
12   try to contact clients and get their spin out and
13   maintain control of the company.
14        From our hotel room we founded GPP. I
15   came up with the idea of incorporating it in Florida
16   as an LLC because we could grab the name. She was
17   concerned about Jeffery having just left Black Kelly,
18   got in a splash (phonetic) in Politico and Roll Call
19   and --
20        (Simultaneous conversation.)
21        A   -- for having left Black Kelly and joined
22   Global Policy Partners. So she felt like there was

Page 63

1    cache in the name. To protect Jeffrey and herself,
2    they needed to come up with something. So I
3    incorporated it in Florida. Clearly they had talked
4    for years about setting up a consulting firm.
5         BY MR. NEAL:
6         Q   Right.
7         A   But, you know, not Global Policy Partners
8    as such. You asked about GPP, whose idea was it. It
9    was Katherine and I sitting on the bed in Bermuda
10   trying to put the pieces back together as quickly as
11   possible with one phone, which was -- as soon as they
12   fixed her phone, they killed my phone. So it was
13   challenging circumstances. But that's the genesis of
14   GPP.
15        I hope that answers your question.
16        Q   I think you've answered my question.
17        While you say you shared with Katherine
18   the idea to create this entity, would you agree with
19   me, sir, that the services that this entity was going
20   to perform were much more suited to what Katherine
21   had done than necessarily what you were doing with
22   all your other companies?

Page 64

1         A   Absolutely.
2         Q   That's really where I'm trying to go with
3    this.
4         All right. So --
5         A   I wish you had just asked that.
6         Q   I should have asked a better question.
7    Mr. Sims usually helps me when I ask a bad question.
8    Maybe he'll chime in and let me know.
9         2007, GPP is organized. Who are the
10   managers?
11        A   July of '07?
12        Q   When it was organized.
13        A   It was organized July of '07.
14        Q   I agree with you.
15        Who are the managers?
16        A   We did not have a written operating
17   agreement. So when it was organized, I would say I
18   operated as the only manager. We certainly -- we
19   reported -- in our articles of incorporation, my
20   paralegal did the initial articles, that Jeffrey and
21   Katherine and I were the three managers.
22        Q   Okay. So when it's organized, you just

Page 65

1    told me that there was no written operating agreement
2    in place.
3         A   Until later in the year.
4         Q   Understood.
5         A   Well, actually, there was no written
6    operating agreement draft until later in the year.
7    There was no written operating agreement in place
8    until the following year.
9         Q   Okay. I promise you, we're going --
10        A   I know --
11        Q   We're going to get into all this in what
12   you will find to be excruciating detail later this
13   afternoon. For now I'm just trying to lay the
14   foundation for a few questions.
15        Now, who were the members when GPP was
16   organized in July of 2007?
17        A   The members in an LLC are the owners, and
18   there was only one owner at that time.
19        Q   And --
20        A   And I was the owner.
21        Q   And you had 100 percent interest in that?
22        A   I funded 100 percent, and I had

17 (Pages 62 to 65)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 78

1  backbone of that team.
2      Q  Right.  And they were providing the
3  background data, correct?
4      A  They were providing the background
5  information on India and contacts for Pakistan and
6  ISI and the security arrangements in India.  That's
7  their lifelong expertise.
8      Q  Right.
9      A  So in that sense, again, Katherine more of
10  a general for that project.
11      Q  And you --
12      A  So I helped her with the presentation.
13  You know, we talked about who they were going to see,
14  where they were going to see them, what to emphasize,
15  how to manage the various personalities involved in
16  that project, which are numerous and which is not an
17  insignificant task, and holding them together is a
18  substantial achievement on her part.
19      So, you know, we consulted through that.
20  I paid for the trip, obviously, and continued to
21  discuss with them a strategy in terms of take the
22  smallest contract -- take any contract.  Take any

Page 79

1  contract you get there.  Let's get our foot in the
2  door, and then you've got an established track
3  record.
4      I was talking to Rohini on a regular
5  basis about sort of imparting that sort of wisdom to
6  them to try to get them to stop always reaching for
7  the homerun ball, swinging for the fence.  Just take
8  the small projects, get them in hand, deliver, and
9  then you can leverage that to get larger contracts.
10  So, you know, in that sense I had a fairly
11  substantial involvement in it.
12      Q  You didn't draft the presentations,
13  though, correct?
14      A  I edited presentations -- reviewed and
15  edited.
16      Q  You didn't draft the presentations?
17      A  No.  I believe Brian Lesieur drafted most
18  of that presentation.
19      Q  The proposals that were ultimately --
20      A  Or Brian's partner, I should -- Janus did
21  that.
22      Q  The proposals that were ultimately made to

Page 80

1  various constituencies in India, did you have any
2  part in the creation of those proposals?
3      A  The proposals that you --
4      Q  Produced at the last deposition --
5      A  -- produced at the last deposition.
6      Q  -- over my objection.
7      Yes, those.
8      A  Did I have any role?
9      Q  Well, yeah.
10      A  Early on reviewed the content of them
11  but -- I mean, the content, the actual content of
12  those things is very technical and not my area of
13  expertise.  So I can read and edit and generally
14  advise, but it's not -- that's not my field.
15      Q  So you didn't take part in the drafting of
16  those proposals, correct?
17      A  No, I would not have drafted them.
18      Q  And before Katherine's deposition, had you
19  ever seen those proposals in final form before?
20      A  I had not seen them in final form, no.
21      Q  But you had seen drafts of them, I take
22  it?

Page 81

1      A  I believe I saw drafts of them early on.
2  I certainly saw the material that became, you know,
3  part of those presentations, all part of the
4  presentations that came out of the India trip in
5  March or April.  But final presentations, no, I
6  didn't see those.
7      Q  So I take it before Katherine's
8  deposition -- withdrawn.
9      Before Katherine's deposition, in the last
10  week, whenever it was, had you shared those proposals
11  with anyone before?
12      A  No.
13      Q  Or their content?
14      A  No.
15      Q  How about after her deposition?
16      A  No.  I just got them yesterday.
17      Q  You got them from Mr. Sims, I take it?
18      A  Yes.
19      Q  You also understand --
20      A  Yes.
21      Q  -- that they're subject to a protective
22  order?

21  (Pages 78 to 81)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 86

1  business card for GPP that says you're the general
2  counsel, correct?
3      A  No.
4      Q  Do you have keys to the D.C. office?
5      A  Yes.
6      Q  You did?
7      A  Yes.
8      Q  You had keys to the office base where GPP
9  has its offices?
10      A  Yep.
11      Q  You still have them?
12      A  I came across the Siemens card the other
13  day, yeah.  It's in a drawer.  I've got a -- it's got
14  a little swipy card and a key.
15      Q  Did you have signature authority on the
16  bank account for GPP?
17      A  No.
18      Q  Did you have a bio on the GPP Web site?
19      A  I did not.  My partners, Cusack and Wido
20  Schmitz, did because they were not as associated with
21  the labor side.  You know, we all share office space,
22  and if anyone wants to peer beneath the service, they

Page 87

1  know that One Tampa City Center is also, you know --
2  Suite 1825 is both my address and Wido's and Jim's
3  and GPP's, you know.  These are union guys.  I mean,
4  they're not going to --
5      Q  Okay.  Did you have a GPP e-mail account?
6      A  No need.
7      Q  The answer is "no"?
8      A  There was no need, so I did not have one.
9      Q  Did you have a GPP username?
10      A  No.
11      Q  Did you have a GPP password?
12      A  I did not assign myself a GPP password or
13  a GPP account because I didn't need them.  Katherine
14  needed it, Jeffrey needed it, so I gave them
15  accounts.  As we brought people in, Devinda, Jeff
16  Balabon, et cetera, we would assign -- Jim Sense- --
17  not Jim Sensenbrenner, he was a congressman.
18  Whatever his son -- Frank Sensenbrenner.  We would
19  give them accounts, take accounts away as they left.
20      Q  Have you ever told anybody you have a
21  photographic memory?
22      A  I don't know.  I may have -- I may have.

Page 88

1      Q  You don't remember ever telling Jim Cusack
2  in the presence of Katherine that you have a
3  photographic memory?
4      A  I don't remember that.
5      Q  You don't recall ever telling anybody that
6  you have a photographic memory?
7      A  I don't remember any specific example of
8  that.  I probably have said that to somebody before.
9  It would not be, strictly speaking, accurate, but I
10  have a pretty good memory.  I don't know what the
11  definition of it is.  I would say, yeah, I probably
12  have a photographic memory to a certain extent.
13      Q  You have a good memory?
14      A  I have a good memory.
15      Q  Right.  You see things; you can visualize
16  them; you remember them, correct?
17      A  I look up to remember them, yes.
18      Q  Again, law school.
19      A  Right.
20      Q  First guy I ever met with a photographic
21  memory literally would read a case one time, two
22  years later he could tell you on what page --

Page 89

1      A  Yeah.  I'm not that good.  I know where it
2  is on the page.
3      Q  But you do have a good memory.  All right.
4      So for the last two years for all of your
5  businesses, I take it you have a number of e-mail
6  accounts?
7      A  No.
8      Q  You don't have any?
9      A  Of course I have some.
10      Q  Okay.  That's a number.
11      So how many do you have?
12      A  I have a Gmail account that I use
13  regularly because it pops to my iPhone.
14      Q  And what is -- I'm not going to ask for
15  the password, but what is the account?  What is the
16  address, if you will?
17      A  BrentYessin@Gmail.
18      Q  And you use that account over the last
19  couple years?
20      A  That's my principal account.
21      Q  And you have another, I take it?
22      A  I used to have a Hotmail account.  I still

23  (Pages 86 to 89)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 90

1  have a Hotmail account, I just don't check it.
2  Hotmail now pushes to Gmail. Gmail is the only
3  account I check.
4      Q And do you have any other -- in the last
5  two years have you had any other e-mail accounts?
6      A I have an account at MODUS that's on my
7  MODUS cards that would say, you know, Brent@MODUS or
8  whatever it is. Brent@MODUShealthcare.com I think is
9  what it is. It just pops to the Gmail. You've got
10  to have some that isn't Gmail, I think, for MODUS.
11  And for Yessin I have one that is -- or I had one.
12  We don't use it anymore. It used to be
13  Brent@betteremployeerelations.com. Again, all
14  forwarding --
15      Q Pushed to your Hotmail? -- I'm sorry,
16  your Gmail?
17      A Well, it was initially pushed to Hotmail,
18  then later, once I got the iPhone, Hotmail didn't go
19  to the iPhone so it pushed to the Gmail account,
20  which then pushes to the iPhone. Which is all -- you
21  have now reached the limit of my technical
22  capabilities.

Page 91

1      Q You and I are about in the same place.
2      Let's just say for the course of your
3  marriage with Katherine, did you give her your
4  passwords to any of these e-mail accounts?
5      A Periodically.
6      Q You gave them to her?
7      A Uh-huh.
8      Q Did you ever change your passwords after
9  you had given them to her?
10      A I had changed passwords -- as a general
11  proposition, I would change a password after a case
12  if I was using the company computer. In some of our
13  clients, you can't use wireless, so I would -- they
14  would provide me with a laptop or PC, and if I wasn't
15  able to take the hard drive with me -- because
16  sometimes they just give you the hard drive, which
17  struck me as being a pretty complete remedy, but who
18  knows. Again, I'm not the most technical.
19      If I couldn't get the hard drive and that
20  computer was staying with the client, then I would
21  change my password afterwards. I mean, it's not a
22  hard-and-fast rule, but as a security -- you know, I

Page 92

1  was conscious of it.
2      Q Right.
3      And when you changed your passwords to
4  these various e-mail accounts, did you give your
5  password to Katherine?
6      A Whenever she needed it.
7      Q Why would she need it?
8      A A number of reasons. I mean, sometimes --
9  you know, we would share laptops when we traveled at
10  times. Her laptop was much more finicky than my
11  laptop, so -- and it wasn't -- well, I think the
12  laptops were finicky, too. Another show for a
13  different day. Her e-mail, for whatever reason, a
14  lot of times on trips would not work, and whether
15  that was an IT issue on the D.C. end or an IT issue
16  on the Tampa end, we could never really completely
17  reconcile.
18      Hageman and her guy, whose name I don't
19  remember, would always argue about what the cause of
20  that was. But we would be in Russia or in Romania or
21  in Vail or wherever, and the dang e-mail wouldn't
22  work for her. And she cannot be out of touch that

Page 93

1  long, and you can't do that much on the BlackBerry or
2  the phone, so she would use my laptop. At times that
3  would work in reverse. Now, my computer would always
4  work, but if you're getting charged $25 a day for
5  access in the hotel, you use the one -- the first
6  person to sign in gets the -- you know, it's their
7  laptop.
8      So, yeah, we would frequently use one
9  another's laptop and, if necessary, access -- that
10  would also go for printing things at our respective
11  houses. She kept her house in Virginia; I kept my
12  house in Tampa. We both had printers that at times
13  wouldn't work with one another's, you know, computer,
14  so I would print things on her computer.
15      I never could print at the GPP offices. I
16  could -- we'd tap into the wireless at the Caribou
17  Coffee, but we couldn't -- but I couldn't print. So
18  in order to print, I would have to e-mail it to her
19  computer, which was connected to the printer at GPP,
20  and then I could -- I'd logon to her e-mail, and then
21  I could print my document. So we would do that back
22  and forth. There weren't any secrets between us.

24  (Pages 90 to 93)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 98

1    A I -- yes.
2    Q Is this one of the documents -- are
3  these -- did you review these two documents in
4  advance of this deposition?
5    A I reviewed both these documents.
6    Q Good.
7      Can you explain to me why you have not
8  verified them subject to penalty of perjury?
9    A Yes. I have verified them. Matt, who
10  just walked out of the room, has the original of the
11  signed copy, which I hand-delivered to him today. I
12  have previously faxed it. I faxed it a couple of
13  times, and for whatever reason, it didn't go through.
14  I just got a busy signal here so --
15    Q So basically you have verified those
16  interrogatories --
17    A I have verified --
18    Q -- and at some point I'm going to get
19  them?
20    A Yeah, and Charles has -- Matt has the
21  original.
22    Q Why don't you turn to Exhibit 1,

Page 99

1  interrogatory response No. 1, please. Now, in this
2  interrogatory response you admit to accessing
3  Ms. Friess' Global Policy Group e-mail, her Hotmail
4  account, her Gmail account, and her GPPWashington.com
5  account, correct?
6    A Yes.
7    Q Now, in response to interrogatory No. 3, I
8  believe it's the supplement interrogatory No. 3, you
9  also admit to accessing for some period of time
10  Mr. Weiss' e-mail account, correct?
11    A That's not correct.
12    Q Okay.
13    A If I can clarify that.
14    Q Sure. Let's read it.
15    A At the time that Devinda was being brought
16  into the company, Katherine became concerned that
17  Devinda was sort of back-dooring her, end-running her
18  to Jeffrey. Jeffrey and Devinda had been friends for
19  a long time. I gathered they were neighbors. I may
20  be off on that. I think actually the embassy may be
21  next to Jeffrey's old house. So they were social
22  friends as well as business friends. Jeffrey brought

Page 100

1  Devinda in.
2      Devinda, Katherine felt like, did not show
3  her appropriate amount of respect. I think that
4  probably was true. She and he had a lot of problems,
5  back-and-forth e-mails, and I tried to sort of
6  mediate, and she used me to do that. I wasn't doing
7  that because she wasn't getting it done. It just
8  simply was she said, He's going to listen to you more
9  than he's going to listen to me, you deal with him.
10  I would draft responses for her at times.
11      So worked to try to keep Devinda onside
12  because he potentially brought a lot of business but
13  manage those relationships and ensure that he had the
14  appropriate amount of deference or respect to
15  Katherine, who we viewed as kind of the senior face
16  of the firm, which is not the pejorative --
17    Q I understand.
18    A I mean the most experienced person.
19    Q Right.
20    A And at that time I recall her being
21  curious as to whether -- or I guess concerned about
22  Devinda going around her to Jeffrey and whether

Page 101

1  Jeffrey was letting her know about all that. She
2  wanted to see if there was any record of that. My
3  answer to this was -- honestly, I remember her
4  wanting to get into that e-mail. I could not tell
5  you that we were able to do that. She had his
6  password, which was FUBAR.
7      I know she testified last week that, you
8  know, he changes his password every week. That's not
9  true. It was, as far as I know, according to her, it
10  has always been FUBAR. It was FUBAR for a long time.
11  We all know what that means. And he probably has
12  changed it since then. I have no idea. But at that
13  time she said, His password is FUBAR.
14      Now, I don't have any specific
15  recollection of actually getting into his e-mail, but
16  I remember that she wanted to access his e-mail in
17  order to see whether or not he was in communication
18  with Devinda in a way that showed her concern along
19  the same lines that I had concern later, which was
20  business usurpation. Would he try to take -- would
21  Jeffrey and Devinda split off, et cetera, because
22  Katherine had been paying Jeffrey's salary.

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 106

1    A They were -- they may have still been on
2    the Web site. They may have still been publically
3    identified with us, but the decision by then had been
4    made we weren't bringing them in.
5    Q So they were already in, and they had
6    e-mail accounts, but -- I'm missing something.
7    Did they have e-mail accounts?
8    A They had e-mail accounts.
9    Q Okay.
10   A They were not issued any interest. The
11   operating agreements were never approved, which would
12   have purported to give them an interest in the firm.
13   Devinda was going to be a manager; he was going to be
14   a shareholder, for want of a better term, a member.
15   Q Okay. I'm with you.
16   A And Frank I don't believe was. Frank was
17   going to be on kind of a retainer arrangement or a
18   fee splitting or origination --
19   Q Did you have any role in all this, or is
20   this something you just heard about?
21   A No, I had a role in the whole thing.
22   Q You had a role of forwarding e-mails to

Page 107

1    Katherine?
2    A No, no, no. I'm sorry. The forwarding of
3    e-mails I couldn't do if my life depended on it.
4    (Discussion off the record.)
5    BY MR. NEAL:
6    Q So now Peter McIllwain, M-C-I-L-L-W-A-I-N,
7    was he with GPP?
8    A Yes.
9    Q And for what period of time was he with
10   GPP?
11   A He joined for the India project
12   specifically because he had an expertise in the
13   region.
14   Q Did you -- since beginning of GPP to the
15   current date, did you ever access his e-mail account?
16   A No.
17   Q Is there -- other than the accounts that
18   you've identified in your interrogatory responses,
19   are there any other GPP e-mail accounts that you have
20   accessed?
21   A No.
22   Q Let's turn to Exhibit 1, interrogatory

Page 108

1    response No. 1. Starting with the first numbered
2    paragraph.
3    A Yes.
4    Q You refer to a Global Policy Group e-mail
5    account. What is that?
6    A That is the e-mail which Katherine had
7    with her previous firm, also confusingly called
8    Global Policy Group, but that was -- let's call that
9    the Trey Barnes firm. Trey cut off her access on
10   July 11th, I think, maybe July 10th. Her birthday
11   was the 12th. We arrived in Bermuda either on the
12   10th or the 11th. That's the day he cut it.
13   Q Okay.
14   A But she had the saved e-mails, obviously.
15   Q And so you say sometime before 2007 you
16   accessed the account.
17   Do you know when before 2007, roughly?
18   A It doesn't say before 2007. It says
19   before August of 2007.
20   Q I'm sorry, you're exactly correct.
21   Before August of 2007. Can you isolate
22   that a little better than before?

Page 109

1    A Not really because it was -- this happened
2    on July 11th and -- so sometime in July.
3    Q Okay.
4    A This may have -- I think I talked to Trey
5    Barnes and negotiated with him both for retrieval of
6    her e-mails and money and other things, stopping
7    defaming her would be one of the principal objectives
8    of that. And that was from the time the hatchet fell
9    on the 10th or 11th of July until sometime in mid to
10   late August. So I worked with her to look through
11   e-mails to see if there was anything there that would
12   advantage her claim against him.
13   So I certainly accessed her e-mail. I did
14   it with her permission. Clearly I saw, you know,
15   whatever was on the -- and I recall looking for
16   anything that would bolster her claim against Trey.
17   Q Now, you say that she -- that Katherine
18   provided you with her password.
19   Did she literally just tell you what it
20   was?
21   A Yes.
22   Q She said, This is my password -- and were

28 (Pages 106 to 109)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 110

1   you on your laptop computer at this time?
2       A   I wouldn't know.
3       Q   Well, if you weren't on your laptop, how
4   else would you do it?  Would it be her laptop, your
5   laptop, an iPhone?
6       A   It would have been -- well, we didn't have
7   iPhones yet.  We didn't get iPhones until Christmas.
8   So I would say it would have been one of our two
9   laptops.  Sadly, even when we take vacation, we
10  generally take the laptop.  So it could have been
11  either one.  I don't know.  And then we got back to
12  the -- back to the states, worked out of her house or
13  my house, initially had an office up on the Hill.  It
14  could have been in any of those places, although I
15  don't think we -- we may not even have had wireless.
16  We finally got wireless up on the Hill before we
17  moved to 1701.
18      So whenever it was that Katherine and I
19  were together.  I also may -- you know, may have done
20  it at night or whatever on my own.  Again, it's at
21  her request and at her instruction because I'm
22  looking for anything that might help her in her claim

Page 111

1   against Trey.  Whether it's wrongful discharge --
2   see, I'm acting like a lawyer.  I don't know.
3       Does that answer your question?
4       Q   I think you got it.
5       So it would either have been your laptop
6   computer or her laptop computer, right, that you
7   would have used to access this account?
8       A   Yes, I assume so.
9       Q   I guess the only other option I can think
10  of if you don't have an iPhone or remote access,
11  like, for instance, you're at a hotel, and you --
12      A   We may well have used -- I can't recall
13  where we accessed it specifically.  It may well have
14  been from one of our laptops.  It was, in any event,
15  in her interest and at her direction.
16      Q   Do you remember what that -- it was a
17  while ago, but do you remember what that password was
18  that she gave you for the Global Policy Group?
19      A   I do not.
20      Q   Now, when you accessed her computer, what
21  exactly were you viewing?  Just e-mails?
22      A   Yeah.

Page 112

1       Q   I'm still on the Global Policy Group
2   e-mail account.
3       So you were using her e-mail, and I'm
4   guessing you had documents that were attached to
5   those e-mails?
6       A   I don't remember if there were any
7   documents, but if there were documents attached to
8   e-mails, I certainly would have checked the
9   documents.  I would have been thorough in searching
10  it for anything that was helpful to her.
11      Q   Fair enough.
12      So you reviewed everything -- did you
13  review every e-mail that was in that account?
14      A   I have to imagine I used search terms
15  or -- I candidly don't specifically recall how I
16  searched.  I remember that she wanted me to look at
17  it and wanted me to find anything in there that might
18  be helpful to her against Trey to bolster her claim
19  either to get reimbursed by him, to file potentially
20  a claim against him, to show wrongful discharge,
21  improper motive, who owned the clients, you know, who
22  was doing work for the clients, all that sort of

Page 113

1   thing.
2       Q   Now, how many times did you access this
3   GPP -- Policy Group e-mail in July and August of
4   2007?
5       A   I don't know, and I don't recall whether
6   it was a very fruitful search or not.  I think the
7   discussions with Trey over, you know, reaching some
8   sort of compromise of claims, for want of a better
9   term, might have gone on a couple of months, but I
10  don't think the search of the e-mails did.  I mean,
11  it may have been -- I really -- I couldn't tell you.
12  I mean, it's been over two years, and I --
13      Q   Well, you certainly -- did you do it more
14  than once?  Did you access the account more than one
15  time, Mr. Yessin?
16      A   I don't know.  I would have no way of
17  knowing.  It would -- it could have been --
18      Q   There is one way of knowing.  If we had
19  your computer, we'd know.
20      A   Well, no, but it's -- but it's over two
21  years -- well, no.  I mean, that was years ago.  That
22  was before either one of us got Apples.  We got

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 114

1    Apples after we got iPhones.
2        Q So you may have accessed it more than
3    once, but as you sit here today, you just don't know?
4        A I couldn't tell you, yeah.
5        Q All right. So what exactly --
6        A I guess what I'd say is it doesn't matter.
7    She wanted me to do it, she asked me to do it, so I
8    did it.
9        Q I understand your position.
10       So you don't know how many times you did
11   it, you're looking at these e-mails.
12       What did you do with the e-mails you
13   looked at?
14       A Well, by then we had a new account because
15   simultaneous with her being cut -- virtually
16   simultaneous, within the same two- or three-day
17   period of her being cut off of the old e-mail, she
18   used, I guess, her Hotmail in the interim, which we
19   then set up -- we then set up the GPP account for
20   her. So anything that would have been of interest
21   that she'd want to retain, we would forward to the
22   GPP e-mail account.

Page 115

1        Q So you forwarded e-mails from the Global
2    Policy Group e-mail account to the
3    Katherine@GPPWashington.com account?
4        A I would have done that. I don't know that
5    we actually did that. We might have had to print
6    things down if things weren't -- because her access
7    had been cut. So if you could just read it, you
8    couldn't access the account. If she had something
9    that would have been stored, we would have perhaps
10   been able to read it, make notes from it, download
11   it, save it, e-mail it after that.
12       I don't think you could e-mail -- I
13   believe the way he did it, you couldn't e-mail
14   directly from her account. You would save it as a
15   file and e-mail it on your new account to yourself,
16   but you couldn't e-mail from whatever Trey's server
17   was or account was or whatever.
18       Q Okay. So did you print some of these
19   documents off; is that what I'm hearing?
20       A We may have.
21       Q I'm asking you, not -- not "we." I'm
22   asking what you did.

Page 116

1        A I don't have any recollection of printing
2    it, but I do believe we had -- we had some documents
3    from her old accounts that she and I printed for use
4    in any adverse matter with Trey Barnes.
5        Q And where are those documents now?
6        A I would think long gone probably. I'm
7    sure she probably kept some at the office. I don't
8    know. It was not my interest; it was her interest.
9    So I didn't -- I didn't schlep them back to Tampa.
10       Q Did you forward any of those e-mails to
11   any other account other than
12   Katherine@GPPWashington.com?
13       A I don't know why I would, and I don't
14   recall doing it. Perhaps to her Hotmail account.
15       Q How about to one of your accounts?
16       A No. I don't have any interest or use in
17   it --
18       Q Okay. I --
19       A -- other than -- apart from representing
20   her.
21       Q If the answer is no, you can just say
22   "no."

Page 117

1        Did you discuss any of that information --
2    other than -- well, I guess you took some of this
3    information, and you used it to discuss with
4    Mr. Barnes, right?
5        A Yes.
6        Q Did you share this information with anyone
7    other than Mr. Barnes?
8        A We might have discussed it with Jeffrey.
9    I don't specifically recall. I might have discussed
10   it with Cusack. I don't specifically recall that.
11   Jim's an employment lawyer also. If we had
12   employment claims, I very often will bounce ideas off
13   of him. That would probably be a pretty exhaustive
14   list of who we would have talked to. Jeffrey because
15   he was going to be involved in the new company. Jim
16   because he might have provided relevant professional
17   advice, but that -- again, over two years ago.
18       Q Anybody else? Share with anyone else
19   other than those people?
20       A Not that I can think of.
21       Q Let's turn to Mrs. Friess' Hotmail
22   account --

30 (Pages 114 to 117)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 118

1      A  Can I just go back and add something to
2  that?
3      Q  You may.
4      A  And I don't -- I just don't recall what
5  you asked me on that.  I may have shared them with
6  Trey Barnes to advance the bargaining position, and
7  I'll give you an example.
8          There were e-mails from him to her talking
9  about how great she -- what a fine job she was doing
10  and how good the business was or whatever.  They were
11  complimentary.
12      Q  Right.
13      A  And I used those in discussions with him.
14  He also sent me e-mails to the same effect about how
15  widely talented she was and what a great asset, et
16  cetera.  So I had my own e-mails from him.  I'd say
17  Barnes absolutely I shared as needed something -- if
18  it was advantageous to her which we found.
19  Obviously, if it wasn't advantageous, we didn't share
20  it.  And I might have shared things with Jim Cusack
21  for advice and Jeffrey Weiss potentially, and, again,
22  only with Katherine's acquiescence.

Page 119

1          I wouldn't have shared it beyond that, and
2  I regarded that as privileged.
3      Q  When you shared it, I mean, were you
4  sharing it verbally?  Were you forwarding it?  Were
5  you printing it and faxing it?  How were you sharing
6  this information?
7      A  I don't know.  Probably conversationally.
8  I -- with Trey, I don't -- I may well have -- if
9  there was something that I thought would be
10  beneficial for him to see that he had written, I
11  probably forwarded it to him or I would have showed
12  it to him.  Again, two years later, I couldn't tell
13  you with specificity.  I do remember having documents
14  that were advantageous to her.
15      Q  And where are those documents today?
16      A  I have no idea.  Probably GPP's office, I
17  would guess.
18      Q  Well, you -- I mean, you accessed them,
19  and you said you saw the documents so they had to be
20  printed off, right?
21      A  They would be at -- I would say the most
22  likely repository is Katherine's house or GPP's

Page 120

1  office.  Other than that, they would not exist.
2      Q  That's premised on your getting them to
3  Katherine, right?  Why would they be at Katherine's
4  house or the GPP office if you printed them off?
5      A  Because they were for her use.  I would
6  want her to review it, tell me what it was, get
7  them -- you know, elaborate on it.  I didn't maintain
8  a GPP file at my office in Tampa.  I think we
9  returned to D.C.; if not, I can tell you, this was a
10  D.C. issue.  I met with Trey here, you know.  I dealt
11  with it here.  I may have called him from somewhere
12  else in the country to try to set that up when he was
13  here, but he resided in London.
14          When he was here is when we met.  We met
15  at the Capital Hilton.  I remember that.  Beyond
16  that, all pretty sketchy.  Pretty sure you can't make
17  a claim for me helping my wife.
18      Q  The Hotmail account -- are you done with
19  this account now?
20      A  I am so done with this account.
21      Q  All right.  Katherine_Friess@hotmail.com,
22  so you admit to accessing that account as well,

Page 121

1  correct?
2      A  Yes.
3      Q  And when -- I guess I didn't read it
4  carefully.  2007 is when you say that Ms. Yessin gave
5  her password.
6          Is that when your access started?
7      A  Yes.
8      Q  And when in 2007?
9      A  Well, we didn't know each other very long.
10  We met in April, went to the UK in May or June or
11  maybe May and June.  I recall at some point in the
12  UK, you know, needing her laptop -- I think one of us
13  signed in, and she was there on business.  I was
14  there on sort of business development.  So in other
15  words, someone was actually paying her bill, so I
16  think she's the one that did the logging in the hotel
17  room.
18      Q  I think I heard you say May or June 2007
19  probably?
20      A  Or perhaps May and June.  I mean, I think
21  we stayed at the same place over in Knightsbridge.
22      Q  And so your access of this e-mail account

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 122

1   started in May or June 2007 and continued through
2   June of 2009; is that correct?
3       A  No.
4       Q  That's what it says.
5       A  No, it doesn't.  It says access to the
6   account ended on or about June 2009.  I would have no
7   access to it after the password was changed.  While
8   the password was the same, obviously I would have
9   access to it, though I virtually never accessed it.
10      Q  Okay.  That's where I'm heading.
11         So we agree when your access started,
12  right?
13      A  Yes.
14      Q  May, June 2007?
15      A  Yes.
16      Q  When did your access end?
17      A  June 2009, when she changed the password.
18      Q  Right.  I'm sorry, I thought that's what I
19  had said, but maybe I didn't.
20      A  No.  You said you accessed it.
21      Q  Fair enough.
22      A  And for clarity --

Page 123

1       Q  I wasn't lying.  I just made a mistake.
2   Let's --
3       A  No, no.  I know, but --
4       Q  Let me just ask another question.
5          So there's a two-year period where you had
6   access to this account if you wanted to, correct?
7       A  Yes, that's correct.
8       Q  And that period of time May or June 2007
9   to sometime in June 2009 when Katherine changed her
10  password, correct?
11      A  That's correct.
12      Q  All right.  We're on the same page.
13      A  Yes.
14      Q  Two years you had access to this account.
15         When did you -- first of all, how did you
16  access this account?  Did you use your own laptop?
17  Her laptop?  Remotely?  An iPhone?
18      A  I think just her laptop.
19      Q  You would have used her laptop to access
20  her e-mail account you're saying?
21      A  Yes.
22      Q  So you never would be down in Tampa on

Page 124

1   your computer accessing this account?
2       A  No.  Hotmail we just didn't use that much.
3   Neither one of us used it after -- you know, after we
4   got the iPhones, which would have been by December
5   of '07, Hotmail was an afterthought for both of us.
6       Q  Why that?
7       A  Because it doesn't pop through the damn
8   iPhone.  I don't know why.  It's just crazy.
9       Q  So I guess you're telling me is, with
10  respect to this Hotmail account for this two-year
11  period of time, you accessed it with her laptop
12  computer and not your own; is that your testimony?
13      A  That's -- that's my testimony.  That's the
14  best recollection I have.
15      Q  Okay.  And you would not have used an
16  iPhone to access this account because it wouldn't
17  work?
18      A  It is impossible.
19      Q  All right.
20      A  Seemingly impossible.
21      Q  So we are narrowing the issues.
22         Now, during this two-year period of time,

Page 125

1   how many times did you access this account?
2       A  I don't recall.  It would have been only
3   with her permission and -- once or twice.  I mean, it
4   wasn't -- it wasn't typically needed.  Most of our
5   travel occurred after we got Gmail, and we just -- by
6   then -- Gmail, much easier.  You know, I've used my
7   own laptop or I'd use her laptop to access my Gmail
8   or she'd use my laptop to access her Gmail or her GPP
9   account.
10         So we might exchange laptops, but we
11  didn't -- I didn't need to use her account.  The only
12  time I needed to use the account was to print, and so
13  that -- you're not going to get to that until No. 4.
14      Q  I bet you anything I get there.
15      A  I'll hold that.
16      Q  Let's stick with this account.
17      A  Okay.
18      Q  So as I understand your sworn testimony,
19  for this two-year period of time you only accessed
20  this account on one or two occasions; is that your
21  testimony?
22      A  Yes.

MERRILL L.A.D. REPORTING & DIGITAL VIDEOGRAPHY  301-762-8282
CONFIDENTIAL REDACTED

Page 126

1  Q And for what purpose were you accessing
2  this account?
3  A You know, initially, just the first time
4  in the UK, I think I accessed it to try to get into
5  my own e-mail or to send something, you know, to
6  myself or send a document which I needed to send and
7  didn't have access myself. The only other time that
8  I recall accessing Hotmail was in February maybe
9  of '08 when she had a laptop that was open and
10 connected in the hotel room, and I did not, and her
11 laptop was on.
12      She got some e-mail from a guy saying,
13 Let's meet at, you know, the Little Nell or
14 something. We had been married about three months,
15 and I thought that probably wasn't the best idea.
16 She was -- she had a touch too much to drink and
17 said, you know, Send him an e-mail, blow him off. I
18 don't care. I never need to see him again. At that
19 stage I did that, sent that e-mail from her account
20 at -- with her permission. Not her finest hour; not
21 this guy's finest hour; not my finest hour.
22      We sent an e-mail back to her friend in

Page 127

1  Australia that there would be no Little Nell
2  rendezvous. That's the little long and short of
3  that. If you want to go into more lurid detail --
4  Q I really don't.
5  A That's what I suspected --
6  Q I really --
7  A Can we just move on? That's the only --
8  Q I'm really --
9  A I'll tell you, that's the only access to
10 Hotmail that I can recall.
11 Q I'm going to drill down on a couple of
12 these things and not more salacious parts.
13     As to the second access, you said her
14 computer was up and running, correct?
15 A Yes.
16 Q And was she present in the room?
17 A Yes.
18 Q And your testimony is that with her
19 present, an e-mail pops up, and she said, Go ahead
20 and look at the e-mail; is that what you're saying to
21 me?
22 A Actually, I think it was a text -- it came

Page 128

1  through on the phone. In fairness, the phone was in
2  the bathroom because she was in the bathroom. I
3  don't want to elaborate on that, but suffice it to
4  say the message popped up onto the screen --
5  Q On the phone or on the computer?
6  A No, on the phone. And she said, Send him
7  an e-mail back, you know. Send him an e-mail back,
8  tell him I don't care. I don't want to see him again
9  or whatever, so I did. But the computer was up and
10 running, so I sent the e-mail --
11 Q And who had logged onto the computer?
12 A She had.
13 Q So then you sent an e-mail saying whatever
14 you said. I don't really care --
15 A Right. No need to go to the Little Nell.
16 She won't be there, champ, or something to that
17 effect.
18 Q That's more generous than I probably would
19 have done.
20     That's the second time that you claim you
21 accessed -- again, I'm just going with what you said
22 in your interrogatory response, so --

Page 129

1  A I recall that. Other than that, no reason
2  to be in Hotmail. I don't have any interest in --
3  you know.
4  Q Did you have your own Hotmail account?
5  A I have my own Hotmail account.
6  Q So tell me again about the first time that
7  you accessed this. You said -- well, I won't tell
8  you what you said. Tell me.
9  A I can't even tell you why I had to be --
10 you know, for whatever reason, I needed access.
11 Perhaps it was sending something from her laptop, you
12 know, sending a document. We were both working off
13 the same laptop. So I recall being in London and
14 needing to send something, and her laptop was the one
15 that was logged in and her account was the one that
16 was logged in.
17     I believe that was the time at which I
18 sent an e-mail from her account that needed to be
19 sent to whomever, one of my clients or whatever, and
20 I probably say -- or maybe it was back at the office.
21 It's Brent, you know, in the subject line, so --
22 Q So on that occasion you're telling me

33 (Pages 126 to 129)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 130

1    that -- again, the computer was already up and
2    running. You didn't need a password because it was
3    already up; is that what you're telling me?
4        A  Well, the computer being running and
5    access to the account are two different things. So
6    the computer would have been already running for
7    sure. I think that -- you know, I don't know. I
8    mean, it's been -- I don't want to speculate about
9    that. All I can tell you is that I couldn't have
10   gotten on to either the computer or the account
11   without her permission, and she was doing me a favor
12   by letting me send something.
13       Q  So by admission you're saying she gave you
14   the password?
15       A  Yes.
16       Q  Okay. Again, I'm just --
17       A  Yes.
18       Q  I'm not making this up. I'm looking at
19   your interrogatory responses, so --
20       A  Yes. She gave me the password.
21       Q  Okay. So then it wasn't up and running,
22   at least her e-mail account wasn't because she would

Page 131

1    have had to enter her password, right?
2        A  You asked me about the computer. I think
3    the computer was up and running, but the e-mail may
4    not have been.
5        Q  So in order to get into the e-mail
6    account, you would have had to have put in the
7    password, correct?
8        A  That's correct.
9        Q  And she gave you the password; that's your
10   testimony?
11       A  That's correct.
12       Q  All right. So these are two occasions,
13   and the only two.
14           Now, you said you needed to access your
15   e-mail account, so you were going into her e-mail
16   account to do what?
17       A  No. I needed to send an e-mail.
18       Q  Okay. That's different.
19       A  I need to send a document or something
20   that we had done -- I had done there. She was
21   working largely. I was there on a business
22   development thing, so I was stuck in the room. So I

Page 132

1    was working. That may have been -- I think I
2    actually was the one that did the shopping. I went
3    to Harrods, got her a couple pair of shoes. It was
4    sort of a role reversal. I sent out -- you know, I
5    worked from the room, and she went to the client
6    meetings. Not a bad life.
7        Q  Let's move on to the Gmail account. This
8    is the Katherine -- this is paragraph 3,
9    interrogatory No. 1.
10           You say that Katherine provided -- I'm
11   sorry, you provided Katherine with a password to the
12   Gmail account in December 2007 when you set it up for
13   her iPhone; is that right?
14       A  Yes.
15       Q  Just tell me about that. How did that
16   come to be?
17       A  We bought the iPhones because her friend
18   said it's the greatest thing since sliced bread.
19   He's an IT genius at Microsoft. As soon as we got
20   them, we both found we were incapable of receiving
21   our e-mails on them. So after much back and forth
22   with Kent, his solution was just push everything to a

Page 133

1    Gmail account because Gmail or Google or whoever runs
2    Gmail has a deal with Apple. It's much easier, and
3    the server is much easier.
4        For whatever reason she either had a
5    frustration or whatever and said, I'm done with the
6    damn thing, you set it up. So I did. I got mine
7    working and said, Gee whiz, shazam, it does work, and
8    I took hers. She said, Please set it up for me, I
9    can't make it work, so I did. I assigned both of us
10   passwords. Mine was, you know, LOML1967; hers was
11   LOML1963, our respective years of birth.
12       Q  L-O-M-L? I've seen that --
13       A  L-O-M-L. It's a term of endearment that
14   appears on various e-mails and so on.
15       Q  I'm sorry, what were those e-mail accounts
16   again -- I'm sorry, those passwords again?
17       A  LOML1967 and LOML1963. Mine was her birth
18   date; hers was my birth date. And she'd periodically
19   call and say LOML, God dangit, I forgot my password,
20   what is my password. I would say, It's my birth
21   year.
22       Q  All right. So according to you, you set

34  (Pages 130 to 133)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 134

1  it up, and you gave her the password, right?
2      A  Yes.
3      Q  Now -- and you had your own Gmail account,
4  obviously?
5      A  I set them both up at the same time in the
6  master bathroom of the home in Tampa.
7      Q  So you both have an e-mail account?
8      A  Yes.
9      Q  You both have your own password, right?
10     A  Yes.
11     Q  They're different passwords; it's not the
12  same account?
13     A  Right.
14     Q  Different accounts?  Different passwords?
15     A  Yes.
16     Q  So according to your interrogatory
17  responses, your access to this -- your ability to
18  access this account commenced in December 2007 and
19  ended in June 2009 when she changed her password,
20  right?
21     A  Yes.
22     Q  So here we are again, let's call it -- 12

Page 135

1  and 7 is 19 months roughly, right?
2      A  18 months.
3      Q  We'll go with 18.
4         So you had access to this account for up
5  to 18 months?
6      A  Yes.
7      Q  Her account?
8      A  Yes.
9      Q  Now, did you access this account during
10  that 18 -- her account, not yours -- her account
11  during this 18-month time period?
12     A  Gmail absolutely at the very beginning to
13  ensure it was working.  So the answer is yes.
14     Q  Okay.
15     A  I'll leave it at that.
16     Q  Well, no --
17     A  I'll leave it at that and wait for a
18  response.
19     Q  I'll bet you're wrong.
20        So initially for a period of time you did
21  access the account using her password in order to
22  ensure that it was working correctly; that's your --

Page 136

1      A  I sent and received e-mails to ensure,
2  shazam, it really does work.
3      Q  For what period of time were you doing
4  this, roughly?
5      A  You know, a day.
6      Q  So after that day, sometime in
7  December 2007, did you access Ms. Friess' Gmail
8  account using her password?
9      A  I don't recall a specific time.  I may
10  well have, but I don't remember a specific incident.
11  Gmail pushed to the GPP account.  There's no reason
12  to access one.  The only thing -- again, I have sort
13  of a vague recollection of at one point not being
14  able to get into GPP, and I could print off of her
15  laptop at the office -- at our office in D.C.  I
16  could not print off of my laptop.  I could send and
17  receive, but I couldn't print.
18     Q  Right.
19     A  So I would use her laptop to do that.  For
20  whatever reason GPP was a little squirrely from time
21  to time, that account -- so it's the laptop that
22  makes the printer work, not the e-mail account.  So I

Page 137

1  believe I used Gmail on at least one occasion to
2  print, whether it was boarding passes or documents or
3  whatever I needed to print at the office in D.C.
4  because her laptop worked with the printer and mine
5  did not.  I believe that I went through the Gmail
6  account to do that because the GPP account, for
7  whatever reason, I couldn't get into.
8      Q  So your testimony is over a two-year --
9  over an 18-month period of time, roughly, you only
10  accessed this account on two occasions?
11     A  On a couple of occasions.
12     Q  And is it your contention that Ms. Friess
13  had knowledge that you were doing this?
14     A  Absolutely.
15     Q  Why?  Why would she know?
16     A  Because, one, she couldn't set the account
17  up on her own, by which I don't mean she didn't have
18  the technical expertise.  She was frustrated and had
19  me set the account up.  So quite obviously she knew
20  that I set it up and that I assigned her the
21  password, she never changed the password.
22        Also, she would go to meetings or she

35 (Pages 134 to 137)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 138

1  would be in a meeting or what have you, and it was an
2  understanding between the two of us that we
3  absolutely could use either computer. She knew mine
4  didn't work, and she'd say, Just use mine to print.
5  Well, obviously, I can't use hers to print unless I
6  get the document off my laptop and go into her
7  computer to access my own e-mail to then print on her
8  laptop. She was aware -- it's the only way to print
9  there. So, yes, we certainly were aware --
10      Q  Well, let's take the second incident you
11  talked about, and that is when you went on her --
12  went into her e-mail account using her password.
13      How would she have knowledge that you were
14  doing that?
15      MR. SIMS: You're talking about the Gmail
16  account?
17      MR. NEAL: I'm sorry. Yes, I am.
18      A  I had blanket permission to use it as
19  needed. There was no restriction on access to one
20  another's accounts at all. She knew my account name,
21  password was LOML1967, and I knew hers was 1963. Of
22  course, if we wanted to, we could certainly check.

Page 139

1  There was no reason to check, as a general
2  proposition, but I certainly -- I couldn't in any
3  other way be completely productive at the D.C.
4  office.
5      I mean, it's hard enough to be here a
6  couple days a week when I've got business elsewhere,
7  a daughter in Tampa, without, you know, being
8  paralyzed at the office unable to print. So it
9  was -- we didn't have secrets, and we didn't restrict
10  one another's use.
11      BY MR. NEAL:
12      Q  The second time you accessed this account,
13  was she present?
14      A  No. If she had been present, she would
15  have just done it.
16      Q  Then the answer is "no."
17      All right. So she wasn't present. You
18  claimed that you had authorization because you had
19  blanket authorization to do whatever you wanted with
20  her accounts; is that what you're saying?
21      A  Well, I don't think I had authorization to
22  do whatever I wanted with her accounts. I wouldn't

Page 140

1  have sent, you know, squirrely e-mails to people,
2  apart from the one incident at the Venetian. Other
3  than that there wasn't any -- but no. In order to
4  access it for business purposes, sure.
5      Q  Now, the Gmail account, how did you access
6  this account? Were you using your iPhone? Your
7  laptop? Both? Remotely? How did you do it?
8      A  Well, initially -- initially her iPhone,
9  and then her computer. I don't think I ever accessed
10  her Gmail from my computer.
11      Q  And just so we're clear, you're talking
12  about accessing this account two times?
13      A  There may have been other times when I
14  needed -- you know, it would be at the office. It
15  would be business related. I don't -- I couldn't
16  tell you for sure it's twice, but I -- it wasn't very
17  often, and it wasn't for any purpose other than to do
18  whatever needed to be done for our business. Maybe
19  to get an e-mail address as I --
20      Q  How about --
21      A  Let me --
22      Q  Yes, sir. Go ahead.

Page 141

1      A  Let me add to that because I'm just
2  thinking. She had e-mail addresses -- you know, in
3  Gmail, once you type an e-mail address in, you got
4  it. It saves somehow. It's magic. So I think there
5  may well have been times where one or another of us
6  would need an address from the other. So that's
7  possible.
8      Q  That you would access her e-mail account
9  using her password with the intent of obtaining an
10  e-mail address?
11      A  An e-mail address that I needed and didn't
12  have in my own repertoire.
13      Q  Was she present when you did that?
14      A  She may have been. I don't know.
15      Q  I guess what I'm getting to is, how do you
16  know that she would know that you're doing this?
17      A  Because we talked about it.
18      Q  You would have told her?
19      A  Sure.
20      Q  I mean --
21      A  She would have said, I've got that
22  address, get it off my account.

36 (Pages 138 to 141)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 142

1    Q Did you always tell Ms. Friess when you
2  were accessing her various e-mail accounts?
3    A No.
4    Q I take it the "no" applies to the GPP
5  Washington account; is that right?
6    A Yes.
7    Q Did you ever use her Global Policy Group
8  e-mail account, Hotmail account, or Gmail account
9  without telling her you were doing it?
10   A In regards to Gmail, as I discussed
11 earlier, if she was not present and I needed to
12 print, then I would -- I don't think I would have
13 seen the need when she came back to say, By the way,
14 I used your Gmail. I think that would just have been
15 expected. So, you know, I didn't leave a "your yard
16 has been fertilized" hanger on the computer --
17   Q As I understand your testimony with
18 respect to the Gmail account, you're telling me that
19 on the one or two days when you first set it up, you
20 may have accessed it a number of times to make sure
21 it's working, there may have been one other time when
22 you accessed this account, and then there may have

Page 143

1  been occasions where you would access it without her
2  necessarily knowing in order to obtain e-mail
3  addresses.
4      Does that summarize your testimony as
5  to --
6    A No. I think for e-mail addresses she
7  would have said -- and she say, I've got that
8  address, go on my contacts and get that. But for
9  printing and things like that that were just, you
10 know, use my laptop, no, I would have just used it,
11 and I wouldn't have -- she just would have expected I
12 used it.
13   Q How many times do you think that happened?
14   A It happened a few times.
15   Q Ten? Twenty?
16   A No. I don't know.
17   Q Seven?
18   A Five -- yeah, something like that, four or
19 five. I don't know.
20   MR. NEAL: Let's go off the record.
21   (Off the record.)
22

Page 144

1      (Whereupon, at 12:52 p.m., the deposition
2  was recessed to reconvene at 1:37 p.m. that same
3  day.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 145

1      AFTERNOON SESSION
2        (1:37 p.m.)
3  Whereupon,
4      BRENT W. YESSIN
5  having been previously duly sworn, was further
6  examined and testified as follows:
7      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
8      BY MR. NEAL:
9    Q Going back to sub Nos. 1, 2, and 2 in
10 response to interrogatory No. 1. You mentioned at
11 times, with respect to some of those, that you may
12 have used Katherine's computer.
13     Am I right on that?
14   A Yes.
15   Q Doesn't her computer have a fingerprint --
16 an infrared fingerprint device that you would have to
17 use in order to use that computer?
18   A Her new computer does; her old computer
19 did not.
20   Q And when was the transition, as far as you
21 understand it, between the old computer and the new
22 computer?

37 (Pages 142 to 145)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 146

1    A That I couldn't tell you. During the
2  marriage. Maybe this year.
3    Q For all the times that you used her
4  computer, is it your testimony that the computer you
5  used is the one without the fingerprint imaging
6  device or infrared device?
7    A Well, I don't have her fingerprint, so if
8  I used it and she's not there --
9    Q That's where I was heading.
10   A Yeah.
11   Q The answer is "yes"?
12   A Yes.
13   Q Let's turn to paragraph 4, interrogatory
14 No. 1, Exhibit 1. This is Katherine's
15 GPPWashington.com account. You say you had access to
16 it on or about July 2007 through sometime in June
17 2009; is that correct?
18   A Yes.
19   Q Approximately two years that you had
20 access to this account, correct?
21   A Yes.
22   Q Did you access this account during that

Page 147

1  time period?
2    A Yes.
3    Q On how many occasions -- withdrawn.
4      What computer or device did you use to
5  access this account?
6    A I know that I used my computer to access
7  it. I may have used her computer to access it at
8  some point. I have to imagine that I did because,
9  again, that's how you print here in Washington, at
10 her house and here -- I'm sorry, at our office and at
11 her house. So I may have -- I may have accessed her
12 computer, but it would have been one of the two
13 laptops.
14   Q You wouldn't have used your iPhone, sir?
15   A I don't think I could -- the answer is I
16 don't think so.
17   Q How about remotely? For instance, you
18 travel a lot?
19   A Uh-huh.
20   Q You're very busy with a lot of companies.
21     When you're on the road, did you use a
22 hotel computer or some other computer remotely in

Page 148

1  order to access this account?
2    A Doubtful. I don't think so. I think --
3  it's on my laptop. These days there were -- you
4  know, there's wireless more commonly. Early days you
5  used hotel computers. That would have -- you know,
6  '07 would have been about the end of that, I think.
7  If her account was accessed -- well, I should say --
8  if my account or Katherine@GPP.com was accessed, I
9  would have accessed it on my own laptop in all
10 likelihood.
11   Q Okay. And --
12   A Or on her computer for the aforementioned
13 purposes.
14   Q When did you first start reviewing her
15 e-mail account?
16   A When did --
17   Q By the way, this e-mail account. My
18 questions now are really directed to this GPP
19 Washington account.
20     When did you first start accessing that
21 account?
22   A Well, I first started accessing it when I

Page 149

1  created it.
2    Q Okay.
3    A And I did not access it anymore when she
4  changed the password that I assigned.
5    Q I understand that. We've established
6  that.
7    A So that's the period.
8    Q I understand. We've established the
9  period. I'm asking when you first started doing it.
10     So July 2007, were you accessing the
11 account in July 2007?
12   A Yes. Again, in the offices. That's the
13 only way I can print.
14   Q Well, you could access the account without
15 printing, couldn't you?
16   A Yes, but I couldn't print without
17 accessing them.
18   Q I understand.
19     You could, for instance, go in online and
20 look at these e-mails without printing them off,
21 correct?
22   A I could.

38 (Pages 146 to 149)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 150

1     Q All right. Did you in July 2007?
2     A No.
3     Q Okay. So you started accessing 2007.
4         How frequently did you access this account
5  after that period of time?
6     A After what period?
7     Q July 2007.
8     A Well, it didn't exist prior to that.
9     Q I understand.
10    A So we're always talking about July then to
11 June. July '07 to June '09.
12    Q Right.
13    A How frequently?
14    Q Right. That's my question.
15    A Infrequently.
16    Q Okay. Once a week? Once a month? Once a
17 day?
18    A I think that would depend on how often I
19 was up here. In '09 I have not been up here hardly
20 at all. So '08 I was here with more frequency, and
21 at that time I probably would have accessed it for
22 the purpose of printing, use at either one -- use at

Page 151

1  her house here. We moved into GPP late '07, so that
2  would have -- I probably would have used it some in
3  late '07.
4     Q Okay. I think -- I'm trying to understand
5  your testimony.
6         Is your testimony that you would only
7  access this e-mail account when you were in
8  Washington, D.C.?
9     A I can't think of another time I would need
10 access to that account unless I needed to print at
11 Katherine's house or at our office.
12    Q That's your testimony? That's the only
13 time you would access this account is when you needed
14 to in order to print?
15    A That's my recollection, yes.
16    Q So back to frequency.
17        Over this two-year period of time, how
18 many times do you think you accessed this e-mail
19 account?
20        MR. SIMS: I'm going on object, asked and
21 answered.
22    A Let's take it year by year. Okay?

Page 152

1     BY MR. NEAL:
2     Q Sure. Fair enough.
3        2007?
4     A 2007, moved into the office of Preferred.
5  I was out of town a lot. We were on honeymoon, so I
6  wasn't here much. So to the extent I would have
7  needed it, it would have probably been in December.
8  It might have been a couple times in October. We
9  were out of the country in October. We got married
10 in November. So very few instances in '07 because
11 the need arose when we moved into Preferred offices
12 on Pennsylvania. That, I think, was around October.
13    Q 2007?
14    A 2007. So I was busy with cases. I can't
15 -- I don't know. Two, three -- I don't know how many
16 times I would have been here. It wouldn't have been
17 very much. In 2008 I was here much more frequently.
18 I needed to print more obviously because I can't be
19 here a day or two a week and not have access to a
20 printer. So I would have accessed it more frequently
21 while I was here, and I was here most in 2008.
22        In 2009 I just haven't been here much for

Page 153

1  whatever reason. That was the source of some
2  complaint, and I wasn't here.
3     Q So you weren't here in 2009, so you didn't
4  access this account at all in 2009; is that your
5  testimony?
6     A I was probably in D.C., I think by
7  Katherine's count, three times between January and
8  May. So -- and I don't know that I needed it every
9  one of those times.
10    Q You're using the word "need," and I'm
11 asking you when you did it. Maybe they're
12 synonymous; maybe they're not.
13        I'm asking you, in 2009 did you ever
14 access this account?
15    A Yes.
16    Q Okay. How many occasions?
17    A I don't know how many occasions. When I
18 was in D.C., I would need to print. If I needed to
19 print, I would use her account to print.
20    Q Why did you need her account to print?
21    A Because my laptop didn't work with our
22 printer at GPP's offices. I never had my -- it took

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 154

1  a long time for the IT person to come down, hook it
2  up, et cetera, apparently.  So for whatever reason my
3  laptop was never synced to their printer at Preferred
4  offices.  Jeffrey's was; Katherine's was; mine
5  wasn't.  I wasn't here frequently enough to really
6  make that an issue.  So when I needed to use it, I
7  used it.
8      Q  You used the account, that's the --
9      A  I used the account.
10     Q  And when you accessed this account, I
11  think what you're saying is you're using Katherine's
12  computer?
13     A  Yes.
14     Q  Did you ever access the account not using
15  Katherine's computer?
16     A  Yes.
17     Q  When?
18     A  In May -- late May to mid-May of this year
19  to mid-June for about a four- or five-week period.
20     Q  And what computer did you use then?
21     A  I used my computer.
22     Q  I guess you didn't need to print; is

Page 155

1  that --
2      A  I wasn't here.
3      Q  But -- the way I understood your testimony
4  before was that I only accessed this account when I
5  needed to print, and so therefore I only needed to
6  print when I was in D.C., so the only time I accessed
7  the computer was when I was in D.C.
8         So I got that right, right?
9      A  I'd rather characterize that myself.
10     Q  Please.  Go ahead.
11     A  When I was in D.C., there was no way for
12  me to print at our office apart from --
13     Q  On your computer?
14     A  On my laptop, period.
15     Q  Got you.
16     A  So if I was going to print, I had to
17  e-mail myself or e-mail Katherine.  Actually, it
18  wouldn't work e-mail to myself because I still
19  wasn't --
20     Q  Still can't print.
21     A  So I had to e-mail her, I'd print boarding
22  passes, documents, anything I needed to print and

Page 156

1  read.
2      Q  So just so I get this right.  You're in
3  Washington --
4      A  Yes.
5      Q  -- you would e-mail something from your
6  laptop, your Mac, to her e-mail account?
7      A  Yes.
8      Q  Then you would use her computer using her
9  password to go into that e-mail account in order to
10  print off that which you had just sent to her
11  computer?
12     A  That's correct.
13     Q  Okay.  Now, when you did this, did you
14  also look at other e-mails that might be on her
15  e-mail account?
16     A  Not -- certainly not intentionally.  I
17  mean, if there's e-mails there --
18     Q  What does that mean?
19     A  Well, if there's e-mails there, you can
20  see there's an e-mail there.
21     Q  Uh-huh.
22     A  But the way their account was, you

Page 157

1  couldn't see more than a line of it, and I'm
2  interested in the content of it.  I'm interested in
3  printing what I need to print.  Find mine, print
4  mine, move on.
5      Q  So you never looked at any of these other
6  e-mails that were on her system?  You never opened
7  them up and looked at them?
8      A  I don't recall opening them up.  I
9  wouldn't have any reason to open them.
10     Q  I know you don't have a reason to.  I'm
11  asking if you did it anyway.
12     A  I don't recall ever opening up an e-mail
13  that I wasn't entitled to while I was sitting in her
14  office in order to print my documents.
15     Q  So I think what you're saying is up until
16  May 2009 this was your practice:  That if you were in
17  Washington, you would access her account using her
18  password in order to print documents that you had
19  sent her, and that's all you did?  That's the only
20  time you accessed her account up until May 2009?
21     A  That would be the purpose of accessing her
22  account, yes.

40 (Pages 154 to 157)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 158

1    Q I'm not saying the purpose.
2        I'm saying, is it so that's the only time
3    you accessed the account?
4    A That's the only time I recall accessing
5    her account.
6    Q Now, what happened in May 2009 that made
7    that change?
8    A In late May, maybe May 17th, May 24th,
9    something like that, Katherine and I separated, and
10   at that time -- initially it looked like it might be
11   a cordial, you know, it's too bad it didn't work.
12   You live in D.C.; I live in Tampa. I've got a
13   nine-year-old, I can't come. And I can't move up
14   here; you're not willing to give up D.C. and move to
15   Tampa. We remained involved in each other's
16   business, supportive of one another's efforts.
17       I was a little concerned about the
18   disposition of GPP and the integrity of my investment
19   and loan there, whether or not I'd be able to recover
20   that. When I talked to her about India, which was
21   her principal focus -- in June she got notice from
22   ICSC that they were canceling the contract. That was

Page 159

1    the last paying contract. Nomadio had not paid us
2    for quite some time. So the last paycheck was ending
3    in June or July from a regular retainer client. They
4    were betting everything on India.
5        India was a big-ticket item. The only way
6    I was going to recover my investment, my loan, was
7    out of the success of India. So I was interested in
8    India being successful, and she was interested in
9    India being successful. But when I asked her about
10   it, I began to get disingenuous answers. I knew from
11   the India side of the deal -- I heard from the India
12   side of the deal that it was imminent that the deal
13   close. The India project was going to be successful.
14   GPP was going to get funded.
15       At that time she was telling me it's
16   nowhere close. Can't get any response from them.
17   Not going to happen. We don't have any money. I
18   can't afford it. So those two representations were
19   discordant. When I confronted her with that, she
20   said, Well, your source is just trying to pick up a
21   fee, don't believe what you hear, and I became
22   suspicious.

Page 160

1    So I did access the account in order to
2    safeguard my own investment and to see are they
3    trying to usurp this business opportunity. And, in
4    fact, the answer is yes. That was in late May of
5    this year.
6    Q Where were you when you were accessing
7    Katherine's e-mail account?
8    A I think that would vary. I was in various
9    locations.
10   Q Enlighten me.
11     Tampa?
12   A Tampa.
13   Q Las Vegas?
14   A I don't think so. Maybe Las Vegas had
15   started. I had a case in Kansas City. I had a case
16   in Las Vegas. I have business in Los Angeles. It
17   could have been any of those locations.
18   Q Okay.
19   A So it was wherever I -- you know,
20   obviously, it was where I was.
21   Q That's what I'm getting at, though.
22       You were using your laptop every time?

Page 161

1    A I was using my laptop.
2    Q Every time?
3    A I believe so, yes. I don't remember using
4    any other computer to access it.
5    Q Or your iPhone?
6    A I don't think -- I don't know how to
7    access it from the iPhone --
8    Q So the answer is "no"?
9    A So the answer is I believe it was the
10   laptop, yeah.
11   Q Well, if you don't know how to do it, then
12   you didn't do it, right?
13   A Right. Exactly.
14   Q All right. So we really are just talking
15   about this laptop computer?
16   A Yes.
17   Q When did you purchase this laptop
18   computer, the one you used to access during May or
19   June 2009?
20   A I don't remember exactly. It was after
21   the iPhones. We got the iPhones -- once we got the
22   iPhones, they work much better with Apples. So we

41 (Pages 158 to 161)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 162

1   got the iPhones in December of '07. Let's say the
2   middle of '08.
3       Q  And that's the same computer you've been
4   using ever since and to the present date?
5       A  Yes.
6       Q  And that's the computer that had its hard
7   drive imaged?
8       A  Yes.
9       Q  And you wouldn't have used any other
10  computer during that time period to do this?
11      A  No, because the memory -- the password was
12  saved on the Mac.
13      Q  Whose password?
14      A  Her password.
15      Q  Katherine's password?
16      A  Yeah, because she used my Mac because -- I
17  point out my Mac is more reliable than her Linux or
18  whatever it is that she's using. So when we were on
19  vacation, she'd use it. Firefox remembers the
20  passwords, so when you pull up the account, when you
21  go to the Web mail address or whatever it is, it's
22  already loaded in, and it just pops up.

Page 163

1       Q  And that's where you got her password?
2       A  Yeah. It's already on the computer. So
3   when she changed it, obviously --
4       Q  You still had it?
5       A  Well, no. It didn't work anymore. When
6   you change the password, it doesn't work.
7       Q  Now, when you were accessing her e-mail
8   account in May towards the end of June, do you
9   contend that Ms. Friess knew about this?
10      A  From May to the end of June?
11      Q  Yes.
12      A  No.
13      Q  She didn't know -- you didn't tell her you
14  were doing this, right?
15      A  I did not tell her I was doing it. She
16  was aware that I had the password. She was aware
17  that I had access to the account in the past. I
18  would say reasonably, you know, she could have had
19  notice in that I've regularly done it. She knows
20  that I have the password, and you might assume --
21  you're certainly not going to stop access when you
22  lose trust in the other individual. But I did not

Page 164

1   call her and say, I'm going to access your e-mail.
2       Q  Right. And after you had accessed these
3   e-mails from wherever you were, you certainly didn't
4   tell Ms. Friess that you had accessed her e-mail
5   account, correct?
6       A  I did not.
7       Q  And you didn't seek her authorization to
8   do that, did you?
9       A  I didn't believe that I needed her
10  authorization to do that.
11      Q  That's a different question, and we're
12  going to address your belief later on, I promise.
13  We'll come back to it.
14      A  Right.
15      Q  What I'm asking you right now -- let's
16  just take this May to June time period.
17      At a time when you're separated, did you
18  seek her authorization to access her e-mail account?
19      A  I did not seek Katherine's authorization
20  to access that account because I believe that account
21  was my account.
22      Q  I understand your belief. I promise you

Page 165

1   we're going to get to it. If we don't, Charlie's
2   going to come back to it.
3       A  I understand.
4       Q  We're going to get to your belief. I'm
5   just asking a very simple question. We're going to
6   go back before May in a second.
7       May, end of June when she changed her
8   password again, did you seek her authorization to
9   access this e-mail account?
10      A  Well, it wouldn't have been May 2rd.
11      Q  I said May through June.
12      A  Oh, I'm sorry.
13      No, from May 17th or whatever through
14  June 24th or so, whenever she changed the password, I
15  did not seek authorization.
16      Q  Now, during this May to June -- let's call
17  it 25th because I think that's the day she changed
18  her password, 24th, 25th, whatever it is, it is.
19  That's a matter of record.
20      During that time period, how often did you
21  access this e-mail account?
22      A  I don't recall precisely. It wasn't -- it

MERRILL L.A.D. REPORTING & DIGITAL VIDEOGRAPHY  301-762-8282
CONFIDENTIAL REDACTED

DEPOSITION OF BRENT W. YESSIN – 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 166

1    certainly wasn't every day.  On more than one
2    occasion, but not terribly frequently.
3          Q  You were concerned about what was going
4    on, right?
5          A  Yes.
6          Q  So based on that concern, didn't you check
7    it about daily, sir?
8          A  No, because I was also busy at that time.
9    I was concerned, but I didn't pick up a lot of
10   disingenuous behavior activity until later in the
11   month in May.  And when I did check, you know, if
12   there wasn't anything in there substantive about
13   India, it wasn't of that much interest to me.
14          I mean, there were -- clearly when you log
15   on, there's personal -- there's girlfriends setting
16   dates to go have drinks.  I don't care.  Have as many
17   drinks as you want.  See as many girlfriends as you
18   want.  What I'm interested in is if you're trying to
19   usurp the business opportunity.
20          Q  So, again, let's stick with this May time
21   period.  So you would log in to -- from -- not from
22   the GPP office, obviously, from wherever you are,

Page 167

1    Tampa, LA --
2          A  On my Mac.
3          Q  You're on your Mac, you're accessing the
4    account.  You go in there, and you use her password.
5          What pops in when you go into her
6    password?  Her e-mail account?
7          A  There was a screen that says Web mail, has
8    the password entered in -- but screened so you can't
9    see it, but it's in there.  I think little stars or
10   something.
11          Q  Right.
12          A  And you hit, you know, enter or go or
13   whatever, and you get the inbox.
14          Q  And there's all these e-mails; some with
15   documents, some without documents, right?
16          A  Yes.
17          Q  Okay.  And so you went through these --
18   well, tell me.  I don't want to lead you.
19          So which e-mails did you go into?  Did you
20   go through all of them?
21          A  No.  You get a sort of summary.  You can
22   see the first, you know, few lines.  So if it's --

Page 168

1    you know, if it's somebody I know is a girlfriend,
2    they're not going to be talking about India.  If it's
3    a business acquaintance or it's Lalit or it's, you
4    know, Jeffrey or whoever -- frankly, I don't know
5    whether she got e-mails from those folks or not.  But
6    if it looks like it might have business details on
7    GPP, then I would look at it.
8          Q  So you wouldn't look at any of her
9    personal e-mails; is that your testimony?
10          A  Not interested in the personal e-mails.  I
11   see them, am aware of them, not my interest.
12          Q  I hear you.
13          A  In the sense that you look at commercials
14   during a TV show.  They're there --
15          Q  I know -- you say that you're not
16   interested in them, which is an answer, but it's not
17   the answer to my question.
18          I'm asking you, whether you're interested
19   or not, did you open them up and read them?
20          A  I don't think I'd open them.
21          Q  But you might have read the summary?
22          A  I'd read the summary.  If there was

Page 169

1    something in there that was of interest that looked
2    like it was leading towards a business summary,
3    because, in fact, some friends are business friends,
4    too.  She would, in fact, say, you know, Things going
5    well or whatever and have some summary of her --
6    summation of whatever her business -- GPP's business
7    was doing.
8          Q  So according to you, you did this for the
9    purpose of solely determining whether or not they
10   were usurping a business opportunity; is that your
11   testimony?
12          A  I accessed that account for the sole
13   purpose of determining whether or not they were going
14   to usurp a business opportunity, and I concluded that
15   they were.
16          Q  How did you conclude that?
17          A  Because they were telling me one thing,
18   that was a very remote possibility, and telling
19   others that it was imminent, and, in fact, hearing
20   back from India that it was imminent.  So I --
21          Q  And you --
22          A  -- don't know how you reconcile those two.

43 (Pages 166 to 169)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 170

1  Q So you would read -- for instance, the
2  ones from India, who were the authors of those
3  e-mails and the recipients of those e-mails?
4  A I remember Lalit e-mailing her that -- you
5  know, something like success is imminent, you know,
6  right across the line or some colloquial that
7  indicated it was just around the corner. Whether
8  that was two weeks, four weeks, six weeks, I can't
9  tell you. But imminent, to me, is in the next four
10 weeks or so. In fact, I think that the e-mail that I
11 saw of yours, she said in the next six weeks.
12    Q We'll get to mine a little bit later.
13    A Well, she --
14       (Simultaneous conversation.)
15    A She sent you an e-mail saying something to
16 the effect of, I expect India to close in the next
17 six weeks or something.
18       BY MR. NEAL:
19    Q Yeah. And when you saw that e-mail, you
20 knew I was a lawyer, right?
21    A I knew you were a lawyer. I didn't know
22 that you were representing her in the divorce,

Page 171

1  obviously, since you were in Virginia and the divorce
2  was in Florida. I understand you have an expansive
3  practice.
4     Q I do.
5     A To be honest, it never occurred to me that
6  you would try to give her advice on a Florida
7  divorce.
8     Q Okay. You also say in your
9  answer -- supplemental answer to interrogatory No. 2
10 that you reviewed e-mails between Ms. Yessin and her
11 acquaintances related to her social activities.
12    A Yes.
13       MR. SIMS: Where are you reading?
14       MR. NEAL: It's supplemental answer to
15 No. 2. It should be Exhibit 2, Charles.
16       BY MR. NEAL:
17    Q So you did read those e-mails?
18    A No. I saw them.
19    Q You saw them?
20    A Did I take note of them, yes, I did. Did
21 I go in with any interest and read them to say who is
22 she having dinner with, no, I didn't. But I could

Page 172

1  tell that it's a social e-mail versus a business
2  e-mail.
3     Q But you read the business e-mails?
4     A I was interested in the business e-mails.
5  I read the business e-mails intently to see whether
6  or not the business interests are being usurped.
7  Social e-mails not so interesting.
8     Q Did you print any of these e-mails off?
9     A I may have printed the e-mails -- the
10 e-mails that we have produced to you, are the e-mails
11 that I would have printed.
12    Q And none others? That's it?
13    A I believe so.
14    Q I'm sorry?
15    A I believe so. I don't know what else I
16 would have printed --
17    Q Did you save any of these e-mails?
18       I'm talking about any e-mail you reviewed.
19       Did you save any of them on the computer
20 system, your computer?
21    A I don't think so.
22    Q Did you forward any of the e-mails that

Page 173

1  you accessed or reviewed to anybody?
2     A Yes.
3     Q Who?
4     A I forwarded -- again, this is what I've
5  produced to you already. I forwarded the one e-mail
6  in particular where she says the $10,000 would be a
7  nonstarter. Apparently that's something you talked
8  about. Therefore what I want is $15,000 and, you
9  know, repayment for MODUS and -- et cetera. So
10 that --
11    Q The one you sent to Mr. Cusack?
12    A Exactly. The one I produced is the one
13 that I forwarded. Other than that, I didn't forward
14 anything.
15    Q So during this whole time period, did you
16 take any information off of her e-mail account and
17 then forward it to anyone else by cutting and pasting
18 or by deriving information from that e-mail and then
19 sending it to anyone or the like?
20    A I think that's how I saved that e-mail. I
21 think I saved -- I probably did a file print and then
22 forwarded that because I don't -- I wouldn't have

44 (Pages 170 to 173)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 174

1    forwarded it directly from the GPP account. I think
2    I file printed and then forwarded, is my
3    recollection, but I -- not being a tacky --
4        Q  That's one e-mail --
5            (Simultaneous conversation.)
6        BY MR. NEAL:
7        Q  I'm talking about any other e-mail.
8        A  No. That's the only one that I recall
9    forwarded at all because it was the only one that
10   really was directly relevant, you know. The rest of
11   the stuff I -- when I look at it, I know, okay,
12   they're not being honest with me, and, yes, they are
13   trying to usurp the business opportunity. We are at
14   some risk here, and we need to take some action.
15   That's the one that I forwarded because it, in sum
16   and substance, captured the whole essence of it.
17       Q  And you didn't forward any other e-mails
18   to Mr. Cusack or any other counsel?
19       A  I don't think so. That's the only one
20   that I recall forwarding, and that's the only one
21   that I can find.
22       Q  Have you shared any of this information

Page 175

1    that you derived from any of these e-mails from the
2    May/June time period with Mr. Maney?
3        MR. SIMS: I'm going to object. I think
4    that's getting into the attorney-client privilege.
5        MR. NEAL: Well, whether he shared the
6    information is not privileged. Any conversation he
7    had arguably could be.
8        BY MR. NEAL:
9        Q  But right now I'm just saying, did you
10   share that information with him?
11       MR. SIMS: I think what's not privileged
12   is if he transmitted that document. I think if
13   you're sharing, you're communicating, and he may be
14   asking for legal advice.
15       What I want to say is you can answer the
16   question to the extent that if you were sharing the
17   information, your purpose in sharing the information
18   was not to obtain legal advice. If you were just
19   sharing it with him, then you can answer the
20   question.
21       A  I didn't forward it to anybody else. At
22   about the time I discussed any of this with

Page 176

1    Mr. Maney, Mr. Knox had already made a demand to him,
2    I believe. So I think Mr. Maney's discussion and
3    mine over nature of the settlement would have been
4    responsive to Mr. Knox rather than in any way
5    related --
6        BY MR. NEAL:
7        Q  That's not the question I asked.
8            I'm asking -- let's just take the Cusack
9    e-mail. The information that was in that e-mail
10   which you took from Katherine's e-mail account and
11   then forwarded to Mr. Cusack, you told me you didn't
12   forward that to Mr. Maney?
13       A  That's correct.
14       Q  Now, I'm asking you whether you took that
15   information that was in that e-mail and shared it
16   with Mr. Maney without forwarding the e-mail itself?
17       MR. SIMS: Again, to the extent that you
18   shared it with him separate from seeking any legal
19   advice, you can answer the question.
20       A  I did not share the information apart from
21   any legal discussions that I might have had regarding
22   potential settlements.

Page 177

1        BY MR. NEAL:
2        Q  So, in essence, you're saying -- and I'm
3    really not trying to argue with you.
4            You're saying, yes, I shared it with him,
5    but it's privileged, right?
6        A  No. I'm saying I didn't forward it.
7        Q  We've established that.
8        A  And I think anything other than that is
9    going to involve my discussion with Mr. Maney of my
10   settlement position or objectives, which I can assure
11   you were not in the same galaxy as the ones in that
12   e-mail.
13       Q  Yeah. I'm not asking -- and I'm not going
14   to today ask for your settlement position or your
15   strategy. Apparently only my strategy is subject to
16   discovery.
17          What I'm really asking you is, did you
18   share the information that you gave to Mr. Cusack,
19   who apparently you were also seeking legal advice
20   regarding divorce, did you share the same information
21   with the guy who's handling the divorce?
22       MR. SIMS: I'm going to object. It's been

45  (Pages 174 to 177)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 178

1  asked and answered.
2        MR. NEAL: Well, he hasn't answered the
3  question yet.
4        THE WITNESS: I think I have --
5        MR. SIMS: Again, you're interrupted me.
6        I object, asked and answered. Also,
7  object to the extent that it calls for disclosure of
8  attorney-client information.
9        I will instruct the witness not to answer
10 to the extent that the answer involves revealing
11 communications with his client for the purpose of
12 obtaining legal advice.
13       BY MR. NEAL:
14       Q When you sent the information -- my
15 attorney-client privileged information, by the
16 way --
17       MR. SIMS: I'm going to object to the form
18 of your question.
19       MR. NEAL: I haven't even asked the
20 question yet.
21       MR. SIMS: I'm going to object --
22       MR. NEAL: Now who's interrupting who?

Page 179

1        MR. SIMS: I'm going to keep objecting to
2  your preambles in your question.
3        MR. NEAL: No, you're not.
4        BY MR. NEAL:
5        Q When you took my attorney-client
6  communications with my client and sent them to
7  Mr. Cusack, I take it you don't believe that was
8  privileged --
9        MR. SIMS: I object to the form of your
10 question. It calls for a legal conclusion.
11       BY MR. NEAL:
12       Q -- right?
13       See where I'm going?
14       A Well, let me answer your question --
15       MR. SIMS: I'm going to object to the
16 preamble and the statement made by counsel.
17       There's no question pending.
18       MR. NEAL: Yeah, there is.
19       Read it back.
20       MR. SIMS: No, there isn't. You just
21 said, See where I'm going. That's not a question.
22       MR. NEAL: Yeah, it is.

Page 180

1        A The answer is yes, I see where you're
2  going.
3        BY MR. NEAL:
4        Q Let me lay it out for Mr. Sims because he
5  doesn't see where I'm going.
6        MR. SIMS: I object to the preamble.
7        BY MR. NEAL:
8        Q If you send my attorney-client
9  communications to a lawyer, which you did,
10 Mr. Cusack, who is providing legal advice, and didn't
11 assert a privilege as to that, why would it be
12 privileged when you send the exact same information
13 to Mr. Maney?
14       MR. SIMS: I'm going to object, calls for
15 a legal conclusion, lack of foundation, and I object
16 to the statements being made by counsel in his
17 question.
18       A The e-mail that I sent to Jim contained
19 Katherine's sense of what she wanted out of a divorce
20 settlement. It did not, in my opinion, at that time
21 and as I sit here, involve anything to do with your
22 legal strategy. It certainly had to do with what she

Page 181

1  thought she wanted out of this settlement. That
2  demand was so out of the realm of reality that it
3  wasn't something that we would have considered
4  anyway.
5        So if you're talking about what -- you
6  know, why I would send that to Jim, it was by way of
7  saying --
8        MR. SIMS: Let me object. Don't -- I'm
9  going to instruct you not to answer to the extent
10 you're revealing your communications with Mr. Cusack,
11 if those communications were made for the purposes of
12 obtaining legal advice.
13       THE WITNESS: They were.
14       BY MR. NEAL:
15       Q You're answering a different question than
16 I asked.
17       My question is, if it's not privileged
18 when you shared this settlement offer with
19 Mr. Cusack, why is it privileged when you're sharing
20 the exact same information with Mr. Maney?
21       MR. SIMS: Are you asking for his legal
22 opinion?

46 (Pages 178 to 181)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 182

1    MR. NEAL: No. I'm just asking that he
2  answer the question.
3    A  Are you asking about whether my
4  communication with Mr. Cusack is privileged?
5    BY MR. NEAL:
6    Q  No.
7    Look, the foundation for all this is I'm
8  simply asking -- okay. The e-mail to Mr. Cusack
9  provided Katherine's settlement number or what she
10  would like to have, correct?
11    A  I would call it a wish list.
12    Q  A wish list.
13    And you shared that with Mr. Cusack,
14  right?
15    A  Yes.
16    Q  And you produced that e-mail in this
17  litigation, correct?
18    A  Yes.
19    Q  So my question is, without giving me any
20  legal advice to or from you, did you take the same
21  information that was in the e-mail that you sent to
22  Mr. Cusack and did you share that same information

Page 183

1  with Mr. Maney?
2    A  I don't believe so.
3    Q  All right. May/June time frame, so you
4  can't tell me how often you accessed Ms. Friess'
5  e-mail account?
6    A  Occasionally. Infrequently, occasionally.
7    Q  We've got roughly 30 days during this time
8  period, right? So during those 30 days, how many
9  days do you think you looked at her account?
10    A  Five.
11    Q  Only five times?
12    A  I think probably two or three. If you
13  had -- if I had to pick a number, I'd say probably
14  five. That's about -- it's once a week.
15    Q  And each time that you looked at that
16  e-mail account, did you go through all the e-mails
17  that were in her inbox or just --
18    A  There wasn't a pattern to that.
19    Q  But you looked at more than one e-mail? I
20  mean, you weren't going there to -- you were looking
21  for all the ones that were "business related," right?
22    A  It would depend on what time I had.

Page 184

1    Q  Let's go back to the time period before
2  then, so the July 2007 up to May 2009.
3    How many times did you access the account
4  during that time period?
5    A  I don't know, but I didn't access the
6  account without her knowledge or permission any
7  times.
8    Q  So during that time period, was she always
9  present when you were doing this?
10    A  She wasn't always present.
11    Q  And you said you had her permission.
12    How did you get her permission?
13    A  The same way we'd give each other
14  permission every time, which is say you can use my
15  computer, log on; if you need to print, print off
16  this. We had authority or agency or whatever to use
17  one another's computer, e-mail to do what we needed
18  to do.
19    Q  So unlike -- I guess what you're saying is
20  unlike the May/June time period, she knew you were
21  doing this; is that your testimony?
22    A  I didn't discuss every time I had printed

Page 185

1  with her. That would seem burdensome. She was aware
2  that I did it. I think -- if you're asking me would
3  it be a surprise to her that I used her account while
4  she was at a meeting and I was in her office, I would
5  say that is not a surprise to her.
6    Q  And did she give you the password to that
7  account?
8    A  No. I gave her the password.
9    Q  And that's the global1 password?
10    A  And then global2.
11    Q  You gave her both passwords?
12    A  I gave her both passwords.
13    Q  How did you give her global2?
14    A  We changed from global1 to global2 six
15  months maybe after we set up global1. We changed
16  servers. She was having trouble when we traveled,
17  and we changed servers. I have no idea what that
18  means, but I know that's a term of art, and that's
19  what happened, and that somehow set a new password.
20    Q  Do you know when she changed from global2
21  to a new password? Is that the June 25th --
22    A  June 24th, 25th.

47  (Pages 182 to 185)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 186

1      Q In your interrogatory responses, No. 1,
2  you say that Mr. Hageman provided you with the
3  password, and you provided it to Ms. Yessin, now
4  Ms. Friess, I guess.
5          How did Mr. Hageman provide you with the
6  password?
7      A By e-mail.
8      Q It was directed to you?
9      A I believe so, yeah. It may have been
10  direct to Dawn and forwarded to me. Dawn was my
11  assistant and working at my direction.
12      Q I'll just tell you --
13      A And I sent them out.
14      Q And you sent it out to -- you personally
15  sent the global1 password to Katherine; is that your
16  testimony?
17      A I directed it be sent out. Whether or not
18  I pushed send or whether I had Dawn push send, I had
19  them sent out.
20      Q You didn't personally do it; you're saying
21  you directed someone to do it?
22      A I may have done it myself. If I didn't do

Page 187

1  it myself, I directed it to be done. I'm not looking
2  at the documents. I recall the conversation at that
3  time. I'm on the phone with Dawn. We've got the
4  password from John. We sent it out to the people who
5  needed it, to wit, Jeffrey and Katherine. And beyond
6  that, we didn't any other -- we didn't need any
7  accounts at that time.
8          I think we were going to set one up for
9  Bobby Juleano, and I don't know that we ever did.
10      Q I'll just represent to you that I've look
11  at -- and I know Charlie has, too. I've looked at
12  the Hageman documents and the McRae documents and our
13  documents and your documents, and I've never seen an
14  e-mail from you to Katherine with a password. I've
15  never seen that document.
16      A If there is no such document and it is, in
17  fact, Dawn that sent it out, it's at my direction. I
18  was on the phone with Dawn. We were in constant
19  contact about setting the accounts up. I directed
20  that the accounts be set up and sent out. I think we
21  changed the password to global2 also as a result of
22  the guys who were once --

Page 188

1          (Simultaneous conversation.)
2      A -- of the business, Devinda, James, Frank
3  Sensenbrenner because they knew the passwords.
4  Everybody's passwords were the same --
5      BY MR. NEAL:
6      Q Until they changed them, right?
7      A If they changed them. I don't think
8  anybody -- well, I don't know that anybody changed
9  them.
10      Q There came a time when you no longer had
11  access to this account, correct? I'm talking about
12  the GPP Washington account.
13          June 25, you no longer had access to that
14  account, right?
15      A Yes.
16      Q Did you know why that was?
17      A Yeah. I knew she changed the password
18  because when I hit open, it didn't open. Again,
19  we've now reached the limit of my technical
20  expertise.
21      MR. NEAL: We'll pick up the pace here a
22  little bit.

Page 189

1          (Yessin Exhibit 3 was marked for
2  identification and attached to the deposition
3  transcript.)
4      BY MR. NEAL:
5      Q Mr. Yessin, I've shown you an e-mail chain
6  between you and Jon Hageman. It goes along for three
7  pages, so why don't you just read them and tell me
8  when you're done.
9      A I'm done.
10      Q All right. You're good.
11          Let's start with the last e-mail. So
12  June 25 -- I take it on June 25 you tried to access
13  her account, correct?
14      A Must have.
15      Q And you couldn't get in, so what did you
16  do?
17      A This says June 26.
18      Q When you realized that you couldn't get
19  in, did you call Mr. Hageman?
20      A No.
21      Q Did you e-mail Mr. Hageman?

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 190

1    A Yes.
2    Q What was the purpose of the e-mail?
3    A The purpose of the e-mail was to say I've
4 been shut out of my -- the purpose of the e-mail
5 speaks for itself, first of all. The intent was to
6 have Jon reopen the e-mail account to me and, if
7 necessary, cut them out of the -- out of the account.
8    Q Let me show you another e-mail because I
9 may have inadvertently confused the record.
10    (Yessin Exhibit 4 was marked for
11 identification and attached to the deposition
12 transcript.)
13    BY MR. NEAL:
14    Q This is Exhibit 4. Why don't you take a
15 look at it, Mr. Yessin.
16    A Okay.
17    Q So another e-mail between you and
18 Mr. Hageman. There's three e-mails. The middle
19 e-mail is from you dated June 25, 2009. Jon, is GPP
20 paying this directly, or are we paying on our account
21 with Yessin?
22    Do you see that? Middle e-mail.

Page 191

1    A No. It's not on here.
2    (Yessin Exhibit 5 was marked for
3 identification and attached to the deposition
4 transcript.)
5    BY MR. NEAL:
6    Q This is Exhibit 5.
7    A I'm looking at Exhibit 5. I've read
8 Exhibit 5.
9    Q Middle e-mail, June 25, 2009, 12:04. You
10 write, Jon, is GPP paying this directly, or are we
11 paying on our account with Yessin?
12    Do you see that?
13    A Yes.
14    Q What are you referring to?
15    A I'm referring to GPPWashington.com.
16    Q Right.
17    Why were you asking Mr. Hageman on
18 June 25th that question?
19    A Because if we were paying on Yessin, it
20 was going to be very simple, and I was going to pull
21 the plug on it.
22    Q Mr. Hageman responds above one minute

Page 192

1 later, They pay me directly.
2    Do you see that?
3    A Yes.
4    Q And that's why you didn't pull the plug?
5    A That's why I pulled the plug?
6    Q You did not pull the plug?
7    A I did not pull the plug.
8    Q So I guess -- the reason I really showed
9 you this exhibit is to show you that June 25 is
10 probably the date when you first contacted
11 Mr. Hageman; is that right?
12    A I knew there had to be a threat in there
13 somewhere.
14    Yes, that's the first day I contacted him.
15    Q All right. I'm sorry, back to Exhibit 3.
16 My memory is different than your memory.
17    Exhibit 3, the last e-mail.
18    A Yes.
19    Q This is the June 26th, 9:27 p.m., from you
20 to Mr. Hageman?
21    A Yes.
22    Q First one, Jon, I would appreciate if you

Page 193

1 would keep this confidential.
2    A That's actually the first e-mail, not the
3 last e-mail.
4    Q First e-mail.
5    A Right.
6    Q Why did you and Mr. Hageman keep this
7 confidential?
8    A Because it's not good for business that
9 you lose control of your business.
10    Q So in other words, you were --
11    A It's like dirty laundry -- you know, it's
12 airing dirty laundry.
13    Q So you were specifically intending to make
14 sure that Ms. Friess did not know what you were doing
15 with Mr. Hageman, correct?
16    A No. I was ensuring that -- I didn't want
17 anybody to know we were having problems with the
18 company. At that stage nobody, outside of a very
19 close circle, knew that Katherine and I were
20 separated. Our business interests were intertwined,
21 and I did not want to rock the boat. So until I knew
22 what the public story on this was going to be and how

49 (Pages 190 to 193)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 194

1 to handle it, I didn't want to -- I didn't want a lot
2 of public discussion about their business is falling
3 apart, their company is falling apart, you know.
4 They're getting divorced, what have you. I wanted
5 every conversation about this to be confidential,
6 which is why I wanted to file in Osceola and have the
7 record sealed so that it wasn't a public record for
8 everybody to see.
9     Q You go on to ask -- I guess, though, you
10 also -- you wanted to keep it confidential for
11 everybody, but you also wanted to keep it
12 confidential from Katherine, right?
13     MR. SIMS: Objection, asked and answered.
14     A I think Katherine would be included in
15 everybody. I wanted to keep it confidential from
16 everybody.
17     BY MR. NEAL:
18     Q The same e-mail towards the end. It looks
19 like the first paragraph. It says, I know we can
20 push future e-mail to me, but I wonder if there's a
21 way I can get access to existing e-mail still in the
22 inbox.

Page 195

1     Do you see that?
2     A Yes.
3     Q Why were you requesting that, Mr. Yessin?
4     A Because if there was e-mail that was still
5 in the inboxes that had material information, I
6 wanted to see it.
7     Q And you also wanted to have Ms. Friess'
8 e-mails pushed to you, future e-mails, correct?
9     A No. I said I know that we could push
10 future e-mail to me because we had -- because
11 Katherine had instructed him to do that on other
12 accounts. So I knew it was possible to forward or
13 create a mirror or something like that.
14     Q But you didn't want him to do that,
15 though?
16     A I was not at this time asking him to do
17 that, no. I --
18     Q Did you ever ask him to do that?
19     A I asked him about the feasibility of it.
20 I don't believe I ever asked him to do it.
21     Q You ask at the bottom, Keep it under
22 wraps, please. They have no idea that I know how

Page 196

1 close they are. Ridiculous situation, but it is what
2 it is.
3     Who is the "they" in that sentence?
4     A Jeffrey and Katherine.
5     Q So, again, right here you're trying to say
6 don't tell them what I'm doing, right?
7     A What I'm saying here is they don't know
8 how close -- they have no idea I know how close they
9 are. If they -- because if they do, then they will
10 move now and usurp the opportunity, and I'm out of
11 the game is the point of that.
12     Had they changed the business and set up
13 another GPP in Texas, you know, whatever, it would
14 have been seamless to the Indians, I think, and I
15 would have never seen any money come into that
16 account, and I would not have been repaid on my loan
17 or investment, and my secured interest would have
18 been worthless. So keeping, you know, some element
19 of surprise until I knew whether they were going to
20 usurp the opportunity or not was essential to
21 preserving the business.
22     Q Okay. Turn to the first page of this

Page 197

1 exhibit. The June 26th, 2009 e-mail, 11:18, from you
2 to Jon. Again, you talk about having e-mails pushed
3 to you.
4     Do you see that?
5     A Where are you? Page 1?
6     Q Uh-huh.
7     A Page 1 of Exhibit 3?
8     Q Yes.
9     They do use Outlook -- rats. Do you see
10 that?
11     A Yes. He says if they use Outlook, it's
12 gone. And I said I think -- at that time I thought
13 they did use Outlook, but that's how much I know. I
14 said, And if you set me up on GPP, and I may already
15 be, you couldn't have their e-mails go to me as well,
16 could you? So not push them to me, just coming to me
17 and them.
18     He responded to me, and it must not have
19 been by e-mail. It must have been a verbal
20 conversation, that he could create a mirror account,
21 that is where -- I think he called it a mirror
22 account. Maybe it's a ghost account. Anyway, that

50 (Pages 194 to 197)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 198

1  is when it goes into their e-mail, it also goes into
2  yours. I asked him to look into that. That's when
3  he came back on the 28th with, After more thought, I
4  prefer to ask my own lawyer what I should do.
5      Q Right.
6      A And I said I totally understand that. You
7  can tell her I'm the only officer of the company.
8  It's a manager in an LLC, like a board of directors
9  in a C corp.
10     Q Do you recall speaking to Mr. Hageman
11 during this time frame, June 25th to basically
12 July 22nd?
13     A I may not have spoken to him. We may have
14 exchanged voice mails, but I have a recollection of
15 verbal discussions. I remember him discussing what I
16 believe is a mirror account or a ghost account or
17 something like that. That doesn't appear in any of
18 the e-mails that I've read, you know. I've read all,
19 I think, of these e-mails, and I don't see -- I don't
20 see that term used. I know the term came from him,
21 so I -- I kind of have a vague recollection of either
22 talking to him or exchanging voice mails.

Page 199

1      (Yessin Exhibit 6 was marked for
2  identification and attached to the deposition
3  transcript .)
4      THE WITNESS: Okay.
5      BY MR. NEAL:
6      Q I know you've read these, and I know
7  you've seen them before, so I'm going to try to move
8  through them quickly.
9      A Yeah.
10     Q On the second page of the exhibit there's
11 a June 29 e-mail from you to Jon Hageman again.
12     A Yes.
13     Q You send him a copy of an operating
14 agreement. Do you see that?
15     A Yes.
16     Q What was the purpose of sending the
17 operating agreement?
18     A To demonstrate that I was the only manager
19 to -- it's a manager-managed LLC, and that I was the
20 only one who had the authority to act on behalf of
21 the company in any event.
22     Q And did you, in fact, send that to

Page 200

1  Mr. Hageman, the operating agreement?
2      A I don't see it attached here.
3      Q Okay. But you think you did.
4      There's also a reference in here. You
5  refer to Jim Cusack as your general counsel.
6      Do you see that?
7      A Yes.
8      Q You mean GPP's general counsel?
9      A Yes.
10     Q I thought you were the general counsel?
11     A Well, I was initially.
12     Q I asked you earlier on if that position
13 ever changed or whether your roles changed over time,
14 and you said, no, not really?
15     A My role didn't really change. We -- GPP
16 asked Jim to represent it in a couple of matters.
17 Jim also gave legal advice to GPP, you know, Phil
18 clearly as corporate counsel. I take legal advice
19 from Jim. They took legal advice from me. I
20 don't -- we didn't have a strict organizational
21 chart.
22     Q Fair enough.

Page 201

1      When did Mr. Cusack become the general
2  counsel?
3      A I don't think we ever bestowed a title on
4  Jim. We used Jim for legal advice. We asked Jim to
5  send letters. We asked him to review things. I
6  farmed that work out as I could get people to do it,
7  generally as cheaply as possible.
8      Q So you asked in a number of e-mails to
9  Mr. Hageman, he basically said, look, I need to talk
10 to my lawyer?
11     A Yes.
12     Q And there came a time when you started
13 speaking to his lawyer, Ms. McRae, correct?
14     A Yes.
15     (Yessin Exhibit 7 was marked for
16 identification and attached to the deposition
17 transcript.)
18     BY MR. NEAL:
19     Q The court reporter is giving you
20 Exhibit 7. Let me know when you're through it.
21     A Yes.
22     Q So did you have any oral conversations

51 (Pages 198 to 201)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 202

1  with Ms. McRae, or were they all written?
2      A I don't remember any oral conversations.
3  We may have.
4      Q You don't remember?
5      A I don't remember.
6      Q So let me direct your attention as to,
7  again, a set of e-mails between you and Ms. McRae.
8  I'd like you to turn to the second page of the
9  exhibit, a June 29, 2009 e-mail, 11:13 a.m.
10     A Right.
11     Q Actually, back up. Let me go to the last
12  page. Let's start this right.
13         There's a June 29, 10:14 a.m. e-mail from
14  her where she introduces herself. She says, I
15  represent the Logical Web Company. Talk to me
16  instead of Jon. You have also requested that my
17  client shut down GPP's Web site.
18         Did you request that Mr. Hageman shut down
19  the GPP Web site?
20     A No.
21     Q So she got that wrong?
22     A I believe so, yes.

Page 203

1      Q She asked for the operating agreement and
2  any amendments thereto reflecting who has authority.
3      Do see that?
4      A I had said to him, I think we just pulled
5  a plug then, right. So she's interpreting that
6  evidently as I'm asking him to do that. What I'm
7  really asking him for is give me some guidance here.
8  What do you do when someone steals your company?
9      Q So -- all right. So she read too much
10  into that, I take it?
11     A I think so, yes.
12     Q So she asked for the operating agreement,
13  correct?
14     A Yes.
15     Q Did you send her the operating agreement?
16     A No. I sent her a version of it that I
17  had. I didn't have the actual hard copy with me, and
18  I believe I was on the road when I did this.
19     Q Okay. Did you --
20     A I had to track down the original version
21  of this in a box.
22     Q You know, we're going to go through a

Page 204

1  bunch of operating agreements.
2      A Right. So the answer is I sent her the
3  text of the operating agreement, but I didn't send
4  her the actual operating agreement because I didn't
5  have access to it.
6      Q You say in your June 29, 11:13 a.m.
7  e-mail, Certainly -- in response to when you sent the
8  operating agreement, you go on to say, The members
9  are without any rights here. I am the manager.
10     A Yes.
11     Q The only officer of an LLC.
12     A Yes.
13     Q Did you contend that you were the only
14  manager as of June 29, 2009?
15     A I was the only manager.
16     Q Is it your contention that you were always
17  the only manager of this LLC?
18     A You know, I'm not here as a corporate rep.
19  I'm not going to offer you legal opinion. We never
20  had -- we never had an executed operating agreement
21  until the one that made me the only manager. So
22  you'd have to ask Phil, who's an expert at this, does

Page 205

1  that mean that once there were three managers by oral
2  agreement and you reduced it to one when you either
3  verbally amended that or when you physically enacted
4  it, and the answer to that is I don't know what time
5  frame. Whether initially we had three and went down
6  to one or whether there was always one, and the final
7  signed executed operating agreement reflected that
8  status.
9          I can tell you that as I wrote this, I was
10  the only manager of GPP and still am.
11     Q Am I correct that -- I think you testified
12  earlier the articles of organization actually
13  identified three managers, right?
14     A The articles of organization identified
15  three managers.
16     Q We'll get to it.
17     A I think this pretty simply states the
18  status.
19     Q There's no question pending.
20     (Yessin Exhibit 8 was marked for
21  identification and attached to the deposition
22  transcript.)

52 (Pages 202 to 205)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 206

1     BY MR. NEAL:
2     Q Please take a look at Exhibit 8.
3     A The first page of that is the same e-mail
4   we had been reading from in the last exhibit.
5     Q Right.
6       It looks like there's an attachment of an
7   operating agreement and a filing reflecting an annual
8   report, correct?
9     A Yes. That's correct.
10    Q Now, this is your -- she asked that you
11  send an operating agreement, and apparently you did.
12      Is this the operating agreement that you
13  contend binds GPP?
14    A No.
15    Q No? Why not?
16    A It's not the executed version.
17    Q Okay. Is it an identical copy of the
18  executed version?
19    A I don't know that it's identical. It was
20  the closest that I could find in soft copy.
21    Q All right.
22    A I may have printed the actual signed

Page 207

1   version off of Katherine's computer. I had to go
2   back in e-mails, I think, to even find this.
3     Q So you don't know if this is the actual
4   version or not?
5     A It's -- at first glance, as I read it, it
6   looks like it's the same nomenclature. I mean, with
7   the -- with most of the material terms, it appears to
8   be, but I haven't compared it line by line. I don't
9   want to represent to you it's the final.
10    Q All right.
11    A If the material elements of it are that
12  I'm the only manager and that I convey interest to
13  them upon payment of the note, those, I believe,
14  represent the final agreement.
15      (Yessin Exhibit 9 was marked for
16  identification and attached to the deposition
17  transcript.)
18    BY MR. NEAL:
19    Q Please take a look at Exhibit 9,
20  Mr. Yessin.
21    A Yes, I remember this. It begins on the
22  back page --

Page 208

1     MR. SIMS: He didn't ask you a question.
2     BY MR. NEAL:
3     Q It begins the last page --
4     A Picking up where we last were.
5     Q Exactly. That's what I'm trying to do
6   here.
7     A I'll just give you the answers, then you
8   ask the question. It will be like Jeopardy.
9     Q Go ahead. See what you got.
10      Let's take a look at the -- let's go by
11  Bates number, 00060, bottom right.
12    A That's getting easier. Thank you.
13      Got it.
14    Q The e-mail in the middle of the page,
15  June 30, from you to her -- Ms. McRae. Can you fax
16  me the signed operating agreement, right? So she's
17  actually now asking you for the one that governs.
18    A Yes.
19    Q She said her concern was the Stored
20  Communications Act, which appears to contain a cause
21  of action for damages where a company, such as the
22  Logical Web, discloses e-mail communications to

Page 209

1   subscriber, GPP, without consent of the sender or
2   receiver of the e-mail. She's going to ask someone
3   to finalize the research for her.
4       So she points out to you that, you know,
5   this could be a problem, right? Did you take that
6   concern to heart at all?
7     A I did enough to ask questions of some
8   employment lawyers and do my own research, and I
9   concluded that it wasn't an issue at all, and that
10  there was actually more liability for Jon by not
11  producing it to the legitimate owner of the business
12  than he had from producing it. And if he had a good
13  faith belief that he was producing it to the correct
14  party, then he is protected from liability, it's my
15  understanding after review of that statute.
16    Q And you looked at the statute, I think you
17  also said you --
18    A I talked to some employment lawyers.
19    Q Do you know what lawyers were those?
20    A That, I couldn't tell you because I was
21  clearly out of town, you know. I talk to five or six
22  different employment lawyers every day, and whoever I

53 (Pages 206 to 209)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 210

1 was talking to at that time, I bounced that idea off
2 of them, and I said, Hey, is there something that's
3 happened since I was -- you know, obviously, the
4 Internet happened since I was in law school. So just
5 to make sure I've got the update, the employee is not
6 entitled to an expectation of privacy on the
7 employee's account at work, right?  Right.
8       So if an employer thinks that they're
9 being usurped in a business opportunity, then I have
10 a right to look at that employee's e-mail, right?
11 Right.  Okay.  What about this Stored Communications
12 Act?  Does a guy have any liability to me if I ask
13 him to give me the damn e-mail that belongs to me to
14 see whether or not they're stealing my business, and
15 everyone that I talked to said, Of course not.
16      Q  You mentioned in the July 1 e-mail two
17 leading law firms.
18         Does that help you remember what lawyers
19 you talked to?
20      A  No.  I don't want to be a smart aleck, but
21 I only -- you know, that's who I deal with, you know.
22 Smaller firms -- not that the smaller firms aren't

Page 211

1 perfectly good firms -- don't hire, you know -- they
2 don't subcontract lower-end work.  They keep it
3 themselves.
4      Q  Bates 58.
5      A  Yes.
6      Q  You guys are discussing the Storage Act
7 again.
8      A  Yes.
9      Q  She again asks you to point -- provide me
10 with the signed operating agreement.
11         Did you ever give her a signed operating
12 agreement, Ms. McRae?
13      A  I don't believe so.  I was -- this all
14 transpired before I could get back and get my -- and
15 get my documents is my -- is my recollection.  By
16 then it was to the point where it wouldn't make any
17 difference whether or not I gave her a signed
18 agreement or a chiseled-in-stone agreement or a
19 notarized agreement.  She wasn't going to release
20 this to me in any event.
21      Q  And so basically you say in the first page
22 of this Exhibit 9, you know, she's not cooperating,

Page 212

1 I'm just going to shut down the accounts, right?
2      A  I say --
3      Q  Perhaps I should close my accounts with
4 your client.
5      A  Yes.
6         MR. SIMS:  Hold on, hold on, hold on.
7         I object to the form of your question.
8      A  Let me catch up with you.
9         MR. SIMS:  You asked two questions there.
10        MR. NEAL:  I'll withdraw them both.
11        MR. SIMS:  Thank you.
12        BY MR. NEAL:
13      Q  Do you see where it says, Perhaps I should
14 close my accounts with your client?  Do you see that?
15      A  Yes.
16      Q  What did you mean by that?
17      A  That if I couldn't expect access to my own
18 accounts, perhaps I should close my --
19      Q  And ultimately, you did.
20        Because they would not cooperate with you,
21 you shut down all the accounts of Mr. Hageman,
22 correct?

Page 213

1      A  Eventually the end of July, yes.  I
2 believe it was the end of July.
3      Q  And how many different accounts did you
4 have with Mr. Hageman's firm?
5      A  Well, let me back up.  I didn't shut down
6 every account because I didn't shut down GPP.  I did
7 shut down the biggest account I had with him, which
8 was Yessin, which was Better Employee Relations and
9 all the consulting entities under that, RMI and VA
10 and -- I shut those down.  I didn't shut down GPP in
11 the end.  I did not set MODUS up with him.  I say,
12 Let's plan on migrating our accounts end of July.
13 That's Bates 56.
14        (Yessin Exhibit 10 was marked for
15 identification and attached to the deposition
16 transcript.)
17        BY MR. NEAL:
18      Q  Do you know what DEFCON 3 means?
19      A  From War Games.
20      Q  What's it mean?
21      A  It is a nuclear --
22      Q  A state of readiness?

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 214

1      A  A state of readiness.  Thank you.
2      Q  Is that a word that you use in your
3  everyday conversation?
4      A  It's something Katherine and I use from
5  time to time.  It's something -- it's not unusual.  I
6  don't normally throw nuclear bombs, but I -- it's not
7  unusual to use the terminology.
8      Q  It's hard to read.  Do the best you can or
9  I'll try to read it to you.
10     A  I can -- I can pretty much make it out.
11     Q  Okay.  You see where it refers to DEFCON 3
12  and pain points?
13     A  Yes.
14     Q  Did you derive that language from
15  something you read in Ms. Friess' e-mail account?
16     A  Yes.
17     Q  Do you remember sending this text message?
18     A  Yeah.  Not specifically, but it refreshes
19  my recollection to see it.  I did send that text
20  message.
21        MR. NEAL:  We're going to take five
22  minutes.

Page 215

1        (Off the record.)
2        (THE FOLLOWING PORTION WAS DESIGNATED AS
3   CONFIDENTIAL AND IS BOUND SEPARATELY.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 216

1   (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2              LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 217

1   (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2              LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

MERRILL L.A.D. REPORTING & DIGITAL VIDEOGRAPHY  301-762-8282
CONFIDENTIAL REDACTED

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 218

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2         LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 220

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2         LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 219

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2         LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 221

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2         LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

56 (Pages 218 to 221)

DEPOSITION OF BRENT W. YESSIN – 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 222

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2            LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 224

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2            LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 223

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2            LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 225

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2            LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

57 (Pages 222 to 225)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 226

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2          LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 228

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2          LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 227

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2          LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 229

1    (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2          LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

58  (Pages 226 to 229)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 230

1   (THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY
2                     LEFT BLANK.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 231

1
2
3
4
5
6
7
8
9
10
11
12
13   (THIS CONCLUDES THE CONFIDENTIAL PORTION AND THE
14   FOLLOWING PORTION IS NO LONGER MARKED CONFIDENTIAL.)
15      (Yessin Exhibits 12 - 13 were marked for
16   identification and attached to the deposition
17   transcript.)
18      BY MR. NEAL:
19      Q  You've read them already?
20      A  Yes.
21      Q  It's part of that photographic memory,
22   right?

Page 232

1         Let's clear up something first, and I'm
2   not sure if I can.  Take a look at Exhibits 12
3   and 13, Mr. Yessin.  Exhibit 12 at the top says Brent
4   Yessin to LMattu and Rohini K. Mattu.  It's dated
5   September 8th, 2009 at 6:23.
6         Do you see that?
7         A  Yes.
8         Q  And then it says "Jolly."
9         A  Yes.
10        Q  And look at Exhibit 13.
11        A  Okay.  Yeah.
12        Q  If you look at -- looks like Bates 1299.
13        Do you see that at the top?  There's a
14   "from" you again --
15        A  I don't see 1299 -- okay, 1298 and 1299,
16   okay.
17        Q  And it's September 9th, 2009, 3:54 a.m. --
18   I'm just trying to figure out -- I'm not a computer
19   expert -- why there appear to be different -- same
20   e-mail, but there seem to be different dates and send
21   times.
22        MR. SIMS:  I think what happened here --

Page 233

1         A  Because one was in India and one was --
2   one is probably Indian time, and one is probably U.S.
3   time because she forwarded this -- apparently -- if
4   I'm reading this correctly, she takes my e-mail to
5   Jolly -- I'm sorry, he takes my e-mail -- he, Jolly,
6   takes the e-mails and forwards it to Katherine.  So
7   his time stamp is 3:54 a.m. --
8         BY MR. NEAL:
9         Q  There you go.
10        Why don't we start with -- let's go with
11   Exhibit 13 because I think -- that has attachments
12   anyway.
13        A  Can we put Exhibit 12 away?  Do we have --
14        Q  It doesn't matter.  You can do whatever
15   you want with it.
16        Now, who is LMattu@essemhightech.com?
17        A  LMattu is Lalit Mattu, also known as
18   Jolly.
19        Q  And Jolly, I take it, is with Essem High
20   Tech?
21        A  Yes.
22        Q  Does he run the company?

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 234

1    A I don't know that. Jolly is our contact
2  and our partner in India. He is the face of Essem to
3  the Indian government.
4    Q He's the other side -- he's the Indian
5  side of the India project, fair?
6    A He is the partner of GPP. He is GPP's
7  local contact.
8    Q Right.
9      What is his relationship, if any, with the
10  Republic of India?
11    A He doesn't have a relationship. He has
12  relationships because he is from a predominant family
13  in India in the sense that he has contacts. He is
14  not with the Indian government. He doesn't have an
15  official position in the Indian government. His
16  position in the India project is that he's our local
17  guy.
18    Q And I take it that you thought he was the
19  right person for the job to help get the India
20  project across the finish line, right?
21    A I will confess to you, he isn't the right
22  person for the job. He is the only person that we

Page 235

1  knew --
2    Q Okay.
3    A -- you know, so I assume he's the right
4  person. There is no second choice. There is Jolly,
5  and there is no India project.
6    Q Okay.
7    A So Jolly is Rohini's, I believe, nephew.
8  Rohini is my partner in REPI. Rohini is also
9  apparently a partner in Essem. And so he is our
10  local guy. We got to Jolly through Rohini.
11    Q Tell me about -- well, so Jolly is a
12  partner with GPP --
13    A Yes.
14    Q -- in the hopes of selling and eventually
15  effectuating the India project?
16    A Yes.
17    Q And do you consider him an important part
18  of the team?
19    A I think he's a critical part of the team.
20  If he doesn't know what's going on, he can't sell us.
21  If he feels like he's gotten undermined or
22  blind-sided, we're dead.

Page 236

1    Q Okay. Fair enough.
2      Now, tell me about Rohini Mattu. Who is
3  that?
4    A Rohini is my partner and Jolly's uncle, I
5  believe. It is a Faulkner-like (phonetic) set of
6  relationships -- I believe that's it.
7    Q Okay. Now, you sent this e-mail September
8  8th or September 9th. Probably September 8th, 2009.
9    A I sent in on that day, and then it arrived
10  the following day.
11    Q I'm with you.
12    A Had you ever --
13    MR. SIMS: You sent it on the 8th.
14    A I sent it the 8th. It arrived on the 9th.
15    BY MR. NEAL:
16    Q You had not met -- let's call him Jolly --
17  before?
18      You had not met Jolly before, right?
19    A I have had conference calls with Jolly --
20  I've met Jolly electronically. I've never met Jolly
21  in person. We've been on conference calls together,
22  and we've spoken, but we have not met in person.

Page 237

1    Q Regarding the India project?
2    A Yes.
3    Q Regarding anything else, or is that really
4  it?
5    A No. I think we had prior dealings with
6  him. In fact, we did have prior dealings with him.
7  I dealt with him on MODUS as well. He was going to
8  try to be the Indian contact on MODUS and maybe on
9  some Renewable Energy -- well, not maybe. Certainly
10  on some Renewable Energy projects, although I didn't
11  have the contact with him on the Renewable Energy
12  project. Brent, Rohini, Jon, et cetera, had that
13  contact with him.
14    Q What was the purpose of sending this
15  letter to Jolly and copying Rohini?
16    A So that they knew -- so Rohini didn't
17  think I was blind-siding them; so that Jolly did not
18  get blind-sided. A simple Google of GPP and
19  Katherine Friess pulls up, first and foremost, a copy
20  of the article and the lawsuit that are filed. And
21  if you Google GPP and Katherine Friess and security,
22  you will also get the lawsuit because it is a term in

DEPOSITION OF BRENT W. YESSIN – 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 238

1  there.
2       So anybody in India shopping a $10 million
3  deal is going to read these, in my judgment, with
4  some consternation, which was my original point to
5  you, which is this makes GPP's very existence -- I
6  mean, she's told you in this e-mail, We're hanging by
7  a thread, we're on life support, and we have no
8  money.  We're hoping to close this India deal.  And
9  my conversations with you and her were -- raising
10  these issues publically makes this transaction, and
11  therefore survival of the business, less likely and
12  not more likely.
13       Least likely is that it survives a body
14  blow if somebody else brings this article to the
15  table and drops it on the table in a room because
16  they happen to be showing for the competition, and
17  this would have blown us out of the water.  I think
18  it's bad business.
19       Q  So you wouldn't -- the purpose -- you're
20  telling me the purpose of this was not to scuttle
21  this deal, this project?
22       A  I guarantee you that if I wanted to

Page 239

1  scuttle the project, I wouldn't have sent this to our
2  partner in India; I would have sent it to the Indian
3  officials whose names and e-mail addresses I have.
4       (Yessin Exhibit 14 was marked for
5  identification and attached to the deposition
6  transcript.)
7       BY MR. NEAL:
8       Q  We're going to come back to Exhibit 12 in
9  a second.
10       Take a look at this e-mail of July 11th,
11  2009 from you to me copying others.  Let me know when
12  you've had a chance to look through it.
13       A  Okay.
14       Q  Do you remember writing this letter, this
15  e-mail to me on July 11th, sir?
16       A  Yes.
17       Q  We don't need to go through all of it, but
18  after you call me a pest -- you say, I don't have
19  time for you.  The India transaction will simply
20  disappear.
21       Do you see that?  You say, If those two
22  cannot safeguard the confidential material sent back

Page 240

1  and forth between their partners in India, the
2  government and the partners here, then the India
3  people have a right to know that.  I feel obligated
4  to tell them.
5       Do you see that?
6       A  Yep.
7       Q  What you're referring to there is the fact
8  that their own e-mail system had been compromised,
9  right?
10       A  No.
11       Q  What are you referring to?
12       A  I'm referring to their assertion that they
13  can't safeguard their own e-mails.
14       Q  Right.
15       Well, and the reason they can't safeguard
16  their e-mails is because you and Ms. Glover accessed
17  them, right?
18       MR. SIMS:  I'm going to object on
19  foundation.
20       A  No.  What they've said is that they can't
21  safeguard their own e-mails if they have one password
22  that everybody knows and people are in their e-mail

Page 241

1  system and they haven't put any security provisions
2  in place and they purport to be doing classified
3  national security issues, it makes them look as if
4  they cannot provide even the most rudimentary
5  security of their own facilities.
6       BY MR. NEAL:
7       Q  And as far as you know, other than you and
8  Ms. Glover, has anyone been accused of accessing the
9  GPP e-mail system without authorization?
10       A  I don't know of any, but it would
11  certainly appear to be pretty easy.
12       Q  Seemingly.
13       So go back to Exhibit 12.
14       A  Okay.
15       Q  So in July -- in Exhibit 13 in July you
16  say, I feel the need to tell the Indian government or
17  tell the Indian partners; in Exhibit 12 that's
18  exactly what you did, isn't it?
19       MR. SIMS:  I object, mischaracterizes
20  the --
21       A  That's not what it says.
22       BY MR. NEAL:

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 242

1    Q  You're sending it to your partner on the
2  India project with the sole purpose of scuttling this
3  deal, right?
4        MR. SIMS: I object. It's been asked and
5  answered.
6    A  No. The Indian --
7        BY MR. NEAL:
8    Q  So you -- do you think --
9    A  Can I finish?
10   Q  Please.
11   A  Jolly is not in the Indian government.
12  Jolly is our partner.
13   Q  Right.
14   A  Telling our partner, Watch out, these
15  things have become public is essential to
16  preservation of the deal. If I wanted to scuttle the
17  deal, I would have sent the same communication to the
18  Indian authorities who would have then dropped in on
19  Jolly and his uncle, Rohini, who is my partner in a
20  Renewable Energy deal that we, at that time, would
21  have hoped to close, would have said to me, How could
22  you let this happen to my nephew, you told me you'd

Page 243

1  take care of this.
2        Rohini and I had continued to have
3  conversations about, Brent, please try to give them
4  good advice. Please try to steer them in the right
5  direction. Don't let them just chase rainbows. Get
6  them in and do any deal that can be done to get in
7  and establish your credibility with the Indian
8  authorities.
9        So I have made that representation of
10  Jolly, that I would try to exercise adult supervision
11  in this, and letting his nephew get blind-sided after
12  they released this information at the Washington Post
13  and Bloomberg would have been irresponsible. As the
14  owner of GPP, I would not have gotten paid. I would
15  have no chance of getting any recovery out of this.
16  And assuming that I was only one of the managers, I'd
17  still have an obligation to protect the assets of the
18  company.
19   Q  Why did you attach to this exhibit -- to
20  this letter, rather, or e-mail the lawsuits that you
21  filed in the State of Florida?
22   A  Well, there are two lawsuits.

Page 244

1    Q  Right.
2    A  They're both a matter of public record.
3    Q  Okay. So why did you attach them to this
4  e-mail to Jolly and Rohini?
5    A  For the same reason. If those things
6  become public, it looks like that GPP can't pay its
7  bills, number one, and there is a battle for control
8  of GPP between its owner and the two people who were
9  trying to run away with the company. I don't think
10  that's good for business. I think that we can
11  explain it if we know about it in advance. It
12  doesn't look good, but I think not knowing about it
13  and simply having the jaw drop when it's dropped on
14  your desk would be the end of the project.
15   Q  Do you think that Mr. -- well, do it this
16. way.
17        Do you think that Jolly and Rohini would
18  be more likely to continue working with GPP after
19  receiving your September 8th e-mail?
20        MR. SIMS: I'm going to object, calls for
21  speculation.
22   A  They're still dealing with GPP. I have

Page 245

1  talked to Rohini about GPP as recently as the last,
2  you know, few weeks.
3        BY MR. NEAL:
4    Q  What did he have to say?
5    A  That it's plugging along and could happen
6  any day.
7    Q  Really?
8    A  Uh-huh.
9    Q  So it's still imminent? Is that the word
10  that he would use?
11   A  Well, he's cautioned me that there's
12  imminent and there is imminent in India, and that
13  imminent is not necessarily tomorrow, but it will
14  happen.
15   Q  Who is David Chandler?
16   A  David Chandler dates my ex-wife, Michelle.
17  And he probably is a cousin of mine.
18   Q  He's what?
19   A  He's a cousin.
20   Q  He's a cousin of yours who's dating
21  your -- one of -- well, your ex-wife?
22   A  I'm from Kentucky.

62  (Pages 242 to 245)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 246

1      Q I'm from North Carolina. We're not that
2  far apart.
3          So what does Mr. Chandler do for a living?
4      A He -- I don't know. He works for -- I
5  believe he's in research.
6      Q Do they work with GPP on Indian projects?
7      A Not to the best of my knowledge.
8      Q They're not part -- one of your partners
9  or independent contractors who could sign up with the
10 India project?
11     A They're not included in any project that
12 I'm aware of. They're not included on the
13 PowerPoint. They didn't travel. Katherine's
14 representation to me after our separation was,
15 Obviously, we're not going to do business with Dave's
16 company. I was only talking to him, you know, in
17 order to help Michelle out, who's my ex-wife.
18     Q Right.
19         Did you have a conversation with him in
20 the last couple months -- actually, when's the last
21 time you talked to Mr. Chandler?
22     A Last week perhaps. Thanksgiving, for

Page 247

1  sure. Over the holidays.
2      Q Are you friendly with him?
3      A Sure.
4      Q So you --
5      A He's a cousin. He's sleeping with my
6  ex-wife. Of course. Why wouldn't we be friendly.
7      Q Why wouldn't you be friends.
8      A No. He is the significant other in my
9  ex-wife's life, so he provides sort of in loco
10 parentis supervision for my daughter, et cetera, so
11 we all get along.
12     Q You've got to get along.
13     A Well, I like him. He's a good guy. We
14 get along.
15     Q That's good.
16         Did you ever have a conversation with
17 Mr. Chandler where you said, Look, you shouldn't do
18 business with GPP because they can't keep their
19 e-mail system secure?
20     A Of course not.
21     Q Nothing like that?
22     A No.

Page 248

1      Q Why did you call him last week?
2      A Why did I call who?
3      Q I'm sorry. Withdrawn.
4          You spoke to him last week, I take it?
5      A Uh-huh.
6      Q What was that conversation about?
7      A Kelly got all As and one B.
8      Q That was the conversation?
9      A That was the conversation.
10     Q You didn't want to get together with him
11 for coffee for some reason?
12     A I'd love to get together with him for
13 coffee, but the conversation was Kelly got all As and
14 one B, and we did a (indicating) celebratory fist
15 pump as you do, and he backed out of the driveway.
16         And I should note, he is a distant cousin.
17 My mother has --
18     Q I don't care. It's none of my business,
19 and I don't care.
20         Now, when you got married to Katherine,
21 she had a cell phone that she had been using for a
22 long period of time, correct?

Page 249

1      A I don't know. She had a cell phone.
2      Q But she had a cell phone, and she had had
3  the same cell phone number for a long period of time.
4          Are you aware of that?
5      A I'm aware she had a cell phone, and she
6  had a cell phone number. Beyond that, I don't know.
7      Q Was that cell phone -- at a point in time
8  after you became married or started dating or
9  whatever, did you basically roll that cell phone into
10 a joint plan?
11     A When Trey cut her cell phone off because
12 it was on his plan and we were stranded in Bermuda
13 with no cell phone, we arranged to have that cell
14 phone switched to my AT&T wireless account. So it
15 became part of the Yessin & Associates account.
16     Q Okay. And I take it Yessin & Associates
17 paid for that?
18     A Oh, yeah. And paid and paid and paid.
19     Q I got the point.
20         So --
21     A That bill was -- you know, that's a
22 thousand-dollar bill at times --

63 (Pages 246 to 249)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 250

1    Q I'm not really going to get to the billing
2  side of --
3    A I don't mean the bill as a while. I mean
4  the bill for that phone. So that's an expensive
5  wine.
6    Q Okay. Now, did there come a time -- well,
7  after you got separated or stopped seeing one another
8  or whatever it was, did Katherine ask that she have
9  that number transferred back to her so that she could
10 use it -- continue to use it?
11   A No. She -- no. She had some kind of --
12 she was trying to -- that may have been what she was
13 trying to effect, but that is not what she asked for.
14 She told me she needed the password to the AT&T
15 account because she was having problems with the
16 phone. I correctly deduced that is a load of horse's
17 petute. She is trying to switch that phone over to a
18 different account.
19       That phone number now belongs to me, and
20 I'm happy to transfer it. I told her I'm absolutely
21 content to transfer that. I think it should go with
22 you and with GPP when we settle up.

Page 251

1    Q Well, did there come a time when she no
2  longer had access to that phone number?
3    A Yes, after you sued me. I cut the phone
4  after you sued me.
5    Q The answer is "yes."
6    A Well, I'm just -- no hard feelings. I'm
7  just explaining it. I figured my goodwill was then
8  expired, as you understand.
9    Q I understand.
10       So when -- and after you cut the phone
11 off, she no longer had access to it, correct?
12   A I assume so.
13   Q Did you change the password on that phone?
14   A No.
15   Q On the account?
16   A No.
17   Q Did you set up a new voice mail account on
18 that phone?
19   A No.
20   Q Does it have a voicemail account on the
21 phone?
22   A I don't know.

Page 252

1    Q Have you ever checked the voicemail on
2  that phone number?
3    A No.
4    Q Never?
5    A Never. Don't have the code to it.
6       You know, let me go back. That was a
7  two-step process. I had an old iPhone, and I first
8  had the number transferred to the iPhone sort of a
9  holding -- to the second iPhone as kind of a holding
10 pattern. So I didn't kill it. I transferred it, and
11 I dropped it down to some negligible, you know,
12 $25-a-month plan, so I didn't lose the number because
13 I thought, look, we may settle this, and I want to be
14 able to throw the number in.
15       And then at some point fairly recently,
16 and that may have been two months ago, I just cut it
17 completely. It was just an unnecessary expense.
18   Q And as we sit here today, you still have
19 the number, or don't have the number?
20   A No, no. I cut -- I want to say it was
21 two -- it may have been three months ago. It was a
22 bifurcated process. I didn't mean to suggest it was

Page 253

1  one time. I moved it to the iPhone. I kept it on
2  the iPhone for a couple months. I actually lost the
3  iPhone almost immediately. I have no idea where that
4  is. I have maids come in when I'm gone. And they
5  don't play this looks like this very well. So I have
6  no idea where it is. I have looked -- scoured the
7  house. After a while, I said this is ridiculous.
8  I'm not paying for the stupid thing. I don't know
9  where the damn thing is, and I just cut the number.
10   Q So you don't have the number anymore, you
11 don't have the account anymore, it's gone?
12   A I don't have the number. I don't have the
13 phone. I don't have anything.
14       MR. NEAL: We're at five until four. I
15 know you have your call in 30 minutes -- what do you
16 think it will take? We're off the record.
17       (Off the record.)
18       BY MR. NEAL:
19   Q We're going to move into the corporate
20 government part of this, and I'll be candid with you.
21 A lot of my questions are really just trying to
22 figure out all these different agreements. Mr. Sims

64  (Pages 250 to 253)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 254

1    did this with Katherine and went through a number of
2    these agreements, but not all of them. Part of this
3    is just me trying to figure out which came first and
4    which parties believe are bound.
5         Before we get there, are you, in your -- I
6    know you do labor consulting and you do labor law and
7    a lot of other things, but do you also -- have you
8    had some experience in corporate law?
9         A Yes.
10        Q And you already testified today that you
11   draft agreements and the like?
12        A Yes.
13        Q Are you familiar with the law the governs
14   LLCs in the State of Florida?
15        A I'm not as familiar as Phil Clarke, but
16   I'm familiar with it.
17        Q You rely on outside counsel, but you've
18   looked at the statutes, correct?
19        A Yes, yes.
20        Q And through -- you've set up a number of
21   Florida LLCs, correct?
22        A Yes.

Page 255

1         Q So you're not a novice to the process?
2         A Right.
3         (Yessin Exhibit 15 was marked for
4    identification and attached to the deposition
5    transcript.)
6         BY MR. NEAL:
7         Q Mr. Yessin, the court reporter has put
8    Exhibit 15 before you. I take it you've seen this
9    document before?
10        A Yes, I have.
11        Q Who drafted this document?
12        A I don't know who drafted it. It is a form
13   document and Dawn Russell, who is my paralegal,
14   filled in the blanks and filed it.
15        Q Was this prepared at your direction?
16        A Yes. Not the detail of it, but the filing
17   of it to get the company name locked up was at my
18   direction. I didn't review it, but I instructed that
19   we file quickly.
20        Q All right. So on page 2 it identifies the
21   managers of this LLC.
22        Do you see that?

Page 256

1         A Yes.
2         Q And it's Brent Yessin, Katherine Friess,
3    and Jeffrey Weiss.
4         Do you see that?
5         A Yes.
6         Q Did you provide that information to Dawn
7    since she's inserted it into this document?
8         A I did not. I would imagine -- it's on the
9    16th. Katherine and I may well have done it. It's
10   got Jeffrey listed at 110 City Center, obviously,
11   instead of his address in D.C., so it was clearly
12   hastily done. I don't want to blame Katherine or me.
13        I'll say Dawn was -- Dawn was acting at
14   what she thought was our -- at our behest to get it
15   filed and get the name quickly. So mission
16   accomplished. It's not perfect on form.
17        Q But you do understand there are three
18   managers identified in the articles of organization,
19   correct?
20        A Yes.
21        Q And it has a formation date of July 16th,
22   2007?

Page 257

1         A Yes.
2         Q Are you suggesting that there shouldn't
3    have been three managers identified here?
4         A Well, it's an issue that we had a lot more
5    discussion on after the filing of this in the
6    preparation of the operating agreements.
7         Q Okay.
8         A That number was a moving target. It's as
9    good a place to start as any for the purposes of just
10   filing the articles of organization.
11        Q But you understand under Florida law
12   the -- until they're amended, the articles of
13   organization govern, correct?
14        A Until there is an operating agreement,
15   yes.
16        Q Well, and --
17        A And the operating agreement effects -- the
18   operating agreement has the effect of modifying
19   the --
20        Q It can have the effect of modifying --
21        A It can adopt it, absolutely. I agree.
22        Q But as of July 16th, 2007, there are three

65 (Pages 254 to 257)

Page 258

1 managers to this LLC, correct?
2 A That's correct.
3 Q All right.
4 (Yessin Exhibit 16 was marked for
5 identification and attached to the deposition
6 transcript.)
7 A I've seen this document.
8 BY MR. NEAL:
9 Q I'll bet you have.
10 Exhibit 16, Mr. Yessin. This is a 2008
11 limited liability company annual report filed on
12 April 30th, 2008, correct?
13 A Yes.
14 Q For Global Policy Partners, LLC, right?
15 A Yes.
16 Q It is signed -- well, in the middle of
17 page, the electronic signature of the registered
18 agent is Phil Clarke.
19 Do you see that?
20 A Yes.
21 Q Again, dated 4/30/2008, and you sign at
22 the bottom under -- affirming that it's true and

Page 259

1 accurate, correct?
2 A No. It's my electronic signature. Phil
3 had my authority -- this was about to expire, and he
4 called me or e-mailed me while I was out on the road
5 somewhere, who knows where, and said, We're about to
6 lose these, we've got notices, and we need to renew.
7 Do you want me to renew for you? I said absolutely.
8 So he had my authority. I never -- the first that I
9 saw of this document was when it became an issue in
10 this case.
11 Q Okay. So --
12 A So there's no -- you're not going to find
13 a document that has my actual signature on it because
14 I never -- I never really saw it, but Phil had my
15 authority. So legally, you know, have I -- have I
16 provided authorization for this, I suppose I have. I
17 didn't see it and didn't realize that my name was
18 actually on it until I saw it.
19 Q All right.
20 A Didn't know it had to be on it.
21 Q All right. Let me just -- it says what it
22 says.

Page 260

1 A Right.
2 Q It says, I hereby certify that the
3 information indicated on this report is true and
4 accurate, and that my electronic signature shall have
5 the same legal effect as if made under oath.
6 Do you see that?
7 A Yep.
8 Q Okay. So I guess your testimony today is
9 that even though your name appears here and you had
10 authority to do it, you never saw this before it was
11 executed?
12 A That's correct. I'm not -- I'm not
13 disclaiming the act. I just didn't know it was -- I
14 didn't know my name was on it, and I didn't instruct
15 that it be done other than, yes, get it filed.
16 Q Fair enough.
17 So let's talk about what happens in this
18 document.
19 A Okay.
20 Q If you look at where it says managing
21 members/managers, there's you and there's Ms. Friess,
22 and then there's Mr. Weiss, and by Ms. Friess' name

Page 261

1 and by Mr. Weiss' name there's a box that says
2 "delete," and then there's an X in both those boxes.
3 Do you see that?
4 A Yes.
5 Q So what this annual report purports to do
6 is to delete Katherine and Jeffrey as managers,
7 correct?
8 A No.
9 Q That's not your understanding of this?
10 A No. That's not what it does.
11 Q Tell me what you think it does.
12 A What this does is it changes the person
13 that is identified to the public as the manager to
14 one manager, but it doesn't have any effect on the
15 operation of the company. It's simply a public
16 disclosure document. It doesn't have any operating
17 effect.
18 Q Why -- why was it done at all?
19 A Because it was about to expire so it had
20 to be -- it had to be reregistered.
21 Q I understand that, but that doesn't mean
22 you had to delete two of the managers, right, or

66 (Pages 258 to 261)

DEPOSITION OF BRENT W. YESSIN - 12/8/2009
CONFIDENTIAL PORTIONS REDACTED

Page 282

1    A  So what we don't want to do is offend
2  Jeffrey making him think, you know, he's an outsider,
3  which is why it's a simpler explanation to say we go
4  to a single-manager entity and every -- in every one
5  of the businesses, and it's not offensive to anybody.
6  Cusack and everybody understands it in MODUS; Jeffrey
7  and Katherine understood it in GPP.  So it's not a
8  sinister plot.  It's just --
9      Q  So up until June 30 -- you dealt with
10  Jeffrey.
11      As of June 30, the date of the operating
12  agreement that you signed, did Katherine have a
13  membership interest at all?
14      A  Only through me.
15      Q  So there was only one member, and that's
16  you?
17      A  Yes.
18      Q  That's your contention?
19      A  Yeah, but 50 percent of that is hers,
20  right?  So that's not a problem for her because we're
21  married.
22      Q  As of the date of the operating agreement,

Page 283

1  your contention is that you were the only manager?
2      A  Yes, single manager.
3      Q  So why would Jeffrey and Katherine work
4  for GPP --
5      MR. SIMS:  You're not going to ask him
6  that question.
7      BY MR. NEAL:
8      Q  -- while they're not either managers or
9  members?  Why would they do it?
10      MR. SIMS:  I have to object.  You're
11  asking him to speculate.  He can't answer that
12  question.
13      BY MR. NEAL:
14      Q  Now, look, don't you tell me you can't
15  answer that question.
16      MR. NEAL:  That's called a speaking
17  objection.
18      MR. SIMS:  It calls for speculation.
19      MS. HARRIS:  He can answer if he told him
20  why they were working for GPP.
21      MR. SIMS:  But that doesn't answer the
22  question.  I can --

Page 284

1      BY MR. NEAL:
2      Q  Just answer my question as best you can.
3      A  With his objection on the record --
4      Q  He's got his objection.
5      A  -- Jeffrey wasn't long on options, and he
6  was -- we were paying him, and no one else was is the
7  answer to the first part of that question.  Katherine
8  and I were married, so there was no risk is the
9  second part of the question.  It just wasn't viewed
10  as a risky move.  It's only a problem if --
11      Q  All right, Mr. Yessin.
12      MR. SIMS:  Hold on, hold on.
13      (Simultaneous conversation.)
14      A  Genuinely, that's an answer.  It's only a
15  problem if we got divorced, and that was not within
16  our contemplation.
17      (Yessin Exhibit 17 was marked for
18  identification and attached to the deposition
19  transcript.)
20      BY MR. NEAL:
21      Q  Exhibit 17, Mr. Yessin.
22      Have you ever seen that before?

Page 285

1      A  Yes.
2      Q  Now, did you direct that this annual
3  report be filed?
4      A  In the same manner that I directed the
5  last annual report be filed, which is to tell Phil,
6  yes, go ahead and file the annual report.
7      Q  Well, Mr. Clarke didn't even sign this
8  one, did he?
9      A  This is an electronic form.
10      Q  I understand.
11      A  So, you know, his -- look, we all know
12  what happens, which is your assistant does the
13  filing.
14      Q  Okay.  So in other words, you signed this
15  subject to -- well, your signature appears here.
16      You're saying you never looked at this
17  before it was filed?
18      A  They had my authority to execute this.
19      Q  And this -- this document only identifies
20  one manager, and that's you, correct?
21      A  Yes, that's correct.
22      Q  And you believe that to be accurate, that